# CHARLESTON .

GRIFFIN *v.* COAL CO.

Submitted January 18, 1905.   Decided November 14, 1905.

1.  COAL LANDS—*Deeds—Construction Of.*
    Deeds conveying coal with rights of removal should be con-
    strued in the same way as other written instruments, and the
    intention of the parties as manifest by the language used in the
    deed itself should govern.   (p. 488.)

2.  COAL LANDS—*Removal of Coal.*
    The vendor of land may sell and convey his coal and grant to the
    vendee the right to enter upon and under said land and to mine, ex-
    cavate and remove all of the coal purchased and paid for by him,
    and if the removal of the coal necessarily causes the surface to
    subside or break the grantor cannot be heard to complain thereof.
    (p. 484.)

3.  SAME—*Reservation in Deed.*
    Where a deed conveys the coal under a tract of land, together
    with the right to enter upon and under said land and to mine, exca-
    vate and remove all of it, there is no implied reservation in such an
    instrument that the grantee must leave enough coal to support the
    surface in its original position.   (p. 484.)

4.  CONTRACTS—*Construction.*
    It is the duty of the court to construe contracts as they are made
    by the parties thereto, and to give full force and effect to the lan-
    guage used, when it is clear, plain, simple and unambiguous.   (p.
    494.)

5.  SAME.
    It is only where the language of a contract is ambiguous and un-
    certain and susceptible of more than one construction that a court
    may under the well established rules of construction interfere to
    reach a proper construction and make certain that which in itself
    is uncertain.   (p. 494.)

Error to Circuit Court, Harrison County.

Action by Leander Griffin against the Fairmont Coal Com-
pany.   Judgment for defendant, and plaintiff brings error.
*Affirmed.*

H. W. HARMER, H. W. WILLIAMS, W. P. HUBBARD, and
THOS. P. JACOBS, for plaintiff in error.

JOHN BASSELL, Z. T. VINSON, and EDWARD A. BRANNON,
for defendant in error.

McWHORTER, JUDGE : ·

This is a writ of error to a judgment of the circuit court. of Harrison county rendered in the case of Leander Griffin against Fairmont Coal Company, by the Honorable John W. Mason, then judge of that court. The learned judge in rendering the judgment, filed in the case an opinion in writing, which opinion is copied into one of the briefs filed in the case, and so ably discusses most of the questions arising in the case that I have quoted and adopted as part of the opinion in this case a large part thereof, which accords in the main with the views of the majority of this Court.

"The declaration alleges that the plaintiff on —— day of ——; 1902, was the owner in fee of a certain tract of land, situated in Harrison county, and fully described by metes and bounds, containing about sixty-eight acres, and that underlying the surface of said land there is a vein of coal, which coal (except about three acres) the plaintiff and his grantors on the 1st day of November, 1889, sold and conveyed to Johnson N. Camden, with the following mining rights and privileges:

"The party of the second part and his assigns is to have the right of way through said reservation for a road, air course and drain way, necessary or convenient for the mining and removal of said coal and the coal under coterminous and neighboring lands, together with the right to enter upon and under said land, and to mine, excavate and remove all of said coal and remove upon and under said land the coal from under adjacent, coterminous and neighboring lands, and also the right to enter upon and under the tract of land hereinbefore described, and make all necessary structures, roads, ways, excavations, air shafts, drains, drain ways and openings necessary and convenient for the mining and removal of said. coal and the coal from coterminous and neighboring lands to market.

"The declaration further alleges that said coal and mining rights were, by various deeds, conveyed to the Fairmont Coal Company, and that it was, on the —— day of ——, 1902, the owner of said coal and mining rights and privileges; that the said farm or tract of land was owned in fee and used and occupied by the plaintiff on the day and year last aforesaid,

and for a long time prior thereto as a home and farm; that the defendant on the day and year last aforesaid, and prior thereto, mined and removed the coal under the said tract of land, as it had a right to do, leaving, however, large blocks or pillars of coal as a means of support to the overlying surface of said tract of land; that on the —— day of ——, 1902, the defendant, well knowing the premises, by its agents and servants wholly ignoring the right of the plaintiff in that behalf, did wilfully and negligently and without any compensation therefor, or from the damages arising therefrom, mined and removed all of the said blocks or pillars of coal left as aforesaid, and that by reason of the mining or removal of said blocks or pillars of coal, and by reason of the failure of the defendant to provide in any way proper or sufficient support for the overlying surface of said land, the said land, or a large portion thereof, was caused to fall; that the strata of rock overlying said coal and forming a part of the said land were cracked, broken and rent, and that large bodies of it, with the overlying surface fell leaving the said surface with holes and sunken places of such great size and depth as to render it unsafe and of little value for grazing stock or cattle or other farming purposes; that fissures of great depth, and running at great length were made at different places on said land, some of which were near to the dwelling house of plaintiff, passing through that part of said land most valuable for cultivation, and all the water percolating said land above the said coal removed as aforesaid, and all the springs and other courses supplying said farm were diverted, sunken and wholly destroyed.

"There is also a second count in the declaration alleging that defendant through its agents, servants and employes entered said mine under the said premises and wrongfully and wilfully, and without any compensation therefor, did quarry large quantities of valuable building stone and remove the same off of the said premises, which stone were of the value of $200.00.

"The damages claimed in the conclusion of the declaration are $5,000.00.

"The defendant has entered a general demurrer to the declaration and each count.

"The questions arising upon this demurrer are the only ones now before the court.

"No defects in the second count have been suggested by counsel and none are observed by the court, unless it be that it should be averred that the stone removed belonged to the plaintiff. It is possible that by a liberal construction this may be inferred from the general averment of ownership of the land (with exceptions named) contained in the first part of the declaration. It was probably unnecessary to repeat this, in this Court. The demurrer to the second count may therefore be overruled.

"The serious, and in fact, only important question in this case arises upon consideration of the first count. No objections have been pointed out to the form of this count. The objection insisted upon by defendant goes to the right of action. If the defendant's contention be correct the facts stated in the first count do not constitute a cause of action, even if formally pleaded.

"I may add, in passing upon this count, that the declaration should, in addition to the formal commencement and conclusion, contain four parts, to-wit:

"First, A statement of the interests and relative rights of the parties.

"Second, The duties which the defendant owed the plaintiff.

"Third, A breach of duty on the part of the defendant, and,

"Fourth, The damages which resulted to the plaintiff by reason of this breach of duty.

"This declaration does contain a very full statement of the rights of the parties. It avers that the plaintiff owned the land, except the coal and mining rights and privileges named; that this coal and mining rights belonged to the defendant; that plaintiff was in possession using and occupying the land as a home and a farm; that the defendant mined and removed coal under said land as it had the right to do.

"The declaration does not, however, in specific terms, declare what are the duties as claimed by the plaintiff imposed upon the defendant in the premises. The pleader simply avers that the defendant mined and removed coal under the

land, leaving, however, large blocks or pillars of coal as a means of support to the overlying surface, and then alleges that the defendant, by its agents and servants, wholly ignoring the rights of the plaintiff in the behalf did wilfully and negligently, and without any compensation therefor, or for the damages arising therefrom, mine and remove all of the said blocks or pillars of coal, left as aforesaid, and that by reason of the mining and removal of said blocks or pillars of coal, and the failure of defendant to provide in any way proper or sufficient support for the overlying surface the land was caused to fall, etc. Now it will not be contended, I apprehend, that these blocks and pillars of coal did not belong to the defendant, nor that it did not have the right to remove them. All that can be claimed is that if all the coal be removed some sufficient support would have to be provided in its stead. At most, all that could be required of the defendant in this respect would be to furnish a sufficient support for the overlying surface. The declaration is somewhat confusing and uncertain on this point. But if I am correct in the views hereinafter stated, this is immaterial.

"The demurrer is to the whole count, and the court must consider whether or not the count contains any matter which will sustain the action.

"In investigating this subject the character of the transaction should be kept in mind. The plaintiff of his own will sold and conveyed this coal with the express privilege of removing *all of it.* The plaintiff knew when he sold the coal that its removal was contemplated, and consented thereto in language which admits of no doubtful meaning. He also knew that when all the coal should be removed that the overlying surface would sink unless supported. He, by clear and unequivocal language granted a privilege which would necessarily injure him. Why did he grant this privilege? Was the contemplated injury to the surface a part of the consideration of the grant? Or was there an implied contract that compensation would be made for the injury? The deed itself is silent on this subject. Which is the more reasonable theory? Why shall not the defendant have without additional compensation, what the plaintiff has sold and conveyed and agreed it shall have? There being no ambiguity

in this contract why should the court look beyond it for a meaning? Why shall it not be permitted to speak for itself?

"A person who owns the entire estate may sell and convey any part of it. It may be divided horizontally, perpendicularly, or in any manner according to the will of the owner. It is a mere matter of contract. The plaintiff owning the entire estate had the unquestioned right to sell and convey this coal with necessary and convenient mining rights. He did this. Why is not the transaction closed? It certainly is unless there is an additional implied contract or the courts shall extend and add burdens not included in the deed. It is insisted by the plaintiff that the owner of the coal must bear this additional burden because it proposed to remove the coal and that its removal will injure the overlying surface unless supported. Was not this as well understood before the deed was made as afterwards? The plaintiff parted with his title to the coal and granted the right to have it removed upon terms satisfactory to himself. He could easily have required the grantee to furnish support for the surface when the coal should be removed. He owned the natural support of the surface, and sold it and granted the right to remove it, and now asks that before this natural support is removed some other must be provided by the purchasher. It is conceded that the defendant takes under its deed all the coal, and has the right to remove it, that is, it is the owner of all, but it is said it cannot use it (for it is of no possible use to defendant without being removed) without providing some means by which the overlying surface will not be disturbed. On the other hand it is insisted by the defendant that when the plaintiff sold this coal, including the right of removal, that he must have known that its removal would injure the surface unless supported, and that as a man of ordinary prudence and business capacity he protected himself and received ample remuneration for this injury in the purchase price,—that the consideration paid included the value of the coal, and the injury which would be done to the residue of the estate by its removal. Of course the mere fact that a person is the vendee of another does not get him a license to wantonly inure his vendor. It is simply a question whether the injury complained of was anticipated before the conveyance, and taken into consideration and compensated for in the consideration

paid by the purchaser. When the contract is silent upon this point is there any reason why a contract for the sale of minerals should be construed by rules entirely different from the rules of construction applicable to other contracts? It is a rule without any exception (unless the class of contracts under consideration constitutes exceptions) that when a person sells a thing with the right to remove it, or the right to occupy and use it, that he is conclusively presumed, in the absence of a contract to the contrary, to have included in the consideration not only the value of the thing sold, but compensation for the inconvenience and injuries which will necessarily result by its removal or occupation. Many illustrations might be given, such as the sale of growing crops, fruit on the trees; wool on the back of the sheep; trees standing in the forest. Many logs of timber are sold from the standing trees, with the right to cut and remove, and no one would think of asking compensation for the residue of the trees before removing the logs, although the removal of the logs would destroy the trees. In such case, evidently the person selling the logs would take this into consideration when fixing the price of the logs. A farmer may sell that part of his farm most useful to him in furnishing an outlet to the public road, making access to the highway inconvenient. He may sell the portion containing water and seriously lessen the value of the residue, but these things are all presumed to be taken into consideration when the sales are made. The building of a railroad through a piece of land may damage the part not taken. This is always considered when fixing the price of the right of way, whether by private sale or condemnation. Why should a different rule prevail when a contract is for the sale of mineral below the surface?

"The English rule as tersely stated by Baron Parke in the case of *Harris* v. *Ryding*, 5 M. & W. 59, in the following language: 'I do not mean to say that all the coal does not belong to the defendants, but they cannot get it without leaving sufficient support.'

"This rule thus suggested, when carried to its ultimate and logical conclusion means that a sufficient support must be left even if it take all the coal. The Supreme Court of Pennsylvania has frankly stated the rule to be:

" 'Where there has been a horizontal division of land the

owner of the subjacent estate, coal or mineral, owes to the superincumbent owner a right of support. This is an absolute right arising out of the ownership of the surface. Good or bad mining in no way affects the responsibility; what the surface owner has a right to demand is sufficient support, even if to that end it be necessary to leave every pound of coal untouched under his land.' *Noonan* v. *Pardee*, 200 Pa. State Rep. 474.

"The reason given by the English courts for the rule under consideration, is that there are two separate estates, one belonging to the owner of the mineral and the other to the owner of the surface; that each has the right to use his own—the owner of the surface to occupy the surface and the owner of the minerals to mine them, but each must so use his property as not to interfere with the other, in accordance with the well recognized maxim of the law. 'Enjoy your own property in such a manner as not to injure that of another person.' Truly this is a just and equitable maxim. It is the Golden Rule of the law. But no one should be permitted to use it as a cloak to cover wrong. Certainly the person who owns the entire estate may sell a part of it, and also a privilege to be exercised in connection with the part sold, which will injure the part retained by him. It would be manifestly unjust for the person who has made a contract of this kind, and received the compensation for the injury, to be permitted to invoke this righteous maxim to aid him in committing a fraud. I understand this maxim can only be properly applied to 'Restrict the enjoyment of property, and to regulate in some measure the conduct of individuals by enforcing compensation for injuries *wrongfully occasioned* by a violation of the principles which it involves, a principle which is obviously based in justice, and essential to the peace, order and well being of the community.' Broome on Legal Maxims, 289. I do not understand that it applies to injuries done to property by authority of the owner for a compensation. The compensation for the injury is a proper matter of contract between the parties, and there is no reason why the injured party may not receive satisfaction by contract as well as by the verdict of a jury. In order to avoid the force of this reasoning it has been held that in such conveyances all the estate is not granted with the minerals—that

*prima facia* enough is reserved by implication for support of the overlying surface. Baron Parke admits that the title to minerals passes by the deed, but says that grantee cannot take them without providing support for the surface, but Chief Justice Campbell lays down the rule in *Humphreys* v. *Brogden*, 12 Q. B. 730, that the presumption is, in the absence of express words waiving or qualifying the right that the surface must be protected with the natural support which it possessed before the demise. Which means, I take it, that enough of the minerals are reserved for that purpose. I cannot assent to this proposition. This rule, taken in connection with the other one propounded by the same court, that sufficient of the minerals must be left, no matter how much, to support the surface, involves the absurd proposition that a person who owns the entire estate may convey without limitation or qualification all the coal, with the right to remove it, and yet the deed contain the presumption that a portion of the coal is reserved, and further, that the coal reserved may amount to the whole of the estate granted that the purchaser in fact takes nothing. It seems to me that this is a *reductio ad absurdum*. Why not assume, at least *prima facia*, that the deed is correct; that it means just what it says when there is no ambiguity? When a deed on its face by plain and apt words conveys all the coal, why should the courts say there is an implied reservation of part or perhaps of all of it, and that less than the whole, or in some cases nothing, is conveyed? The owner of property about to part with the title is at liberty to prescribe the terms and conditions on which he will do it. The intention of the parties is presumed to be expressed by the language of the deed itself. If no reservations or exceptions are found in the deed none should be presumed. The deed as the witness to the contract between the parties should speak the truth, the whole truth and nothing but the truth.

"The rule for the construction of deeds prescribed by our statute is:

" 'Every such deed conveying lands, shall, unless an exception be made therein, be construed to include all the estate, right, title and interest, whatever, both at law and in equity of the grantor in such lands.' Code, chapter 72, section 2.

"Again, some of the courts uphold the rule on the principles applied in the cases prohibiting one owner of land from making an excavation so near the adjoining lands of another that the soil of the latter breaks away. This illustration is not an apt one. Ordinarily, in the cases where lateral support is required there are no contractual relations between the parties. Even when they sustain the relation of vendor and vendee toward each other the excavations are not contemplated by the nature of the transaction. But in the sale of coal the removal is not only contemplated but expressly authorized. Lord Campbell in delivering the opinion in the case of *Humphreys* v. *Brogdon*, 12 Q. B. 739, cites as authority supporting his opinion, the case when a person purchases one story of a building containing two or more stories. He says:

" 'Where a house is divided into different floors or stories, each floor belonging to a different owner, which frequently happens in the city of Edinburg, the proprietor of the ground floor is bound merely by the nature and condition of his property without any servitude, not only to bear the weight of the upper story, but to repair his own property that it may be capable of bearing that weight. The proprietor of the ground story is obliged to uphold for the support of the upper, and the owner of the upper must uphold that as a roof or cover to the lower.' 32 Am. Rep. 112. The conclusion reached by the learned chief justice is erroneous because his premises are wrong. He assumes that the cases are similar. A moment's reflection will convince any one that they are dissimilar in a very material point. The story of the building, whether the lower or top one, is sold and bought to be used in place. This is apparent from the very nature of the transaction; but in the case of the sale of coal the opposite is true. It cannot be used in place. In the case at bar nothing is left to presumptions. The deed expressly grants the right to remove it.

"It is conceded that the grantor might waive the right to support of the surface, and where that is done there can be no recovery for injuries caused by the subsidence of the soil. It is insisted by the defendant that the language used in the deed in controversy is equivalent to a waiver. It is true that in this deed there is not only a grant of the coal, but also an

express grant of the right to remove '*all of it.*' It may be that this grant of the right of removal adds nothing to the legal effect of the deed except to make the general grant more emphatic. Taking the entire granting clause of the deed together there can be no doubt as to the intention of the parties. I rest the case on the fact that plaintiff by his deed conveyed the coal with the right to remove all of it. There is no limitation to or qualification of the estate granted, nor is there anything in the deed to indicate an intention to limit or restrict the right to remove the coal. Then, the plaintiff was the owner of the entire estate, and when parting with the title to the whole or any part of it could do so on terms and conditions to be agreed to by him. He was fully aware of the injury that might naturally and reasonably be expected to result from the removal of the coal, and yet he expressly authorized its removal. Under these circumstances it is proper to assume that the price paid for the coal and the mining rights granted, was fixed with reference to the nature, extent and effects of the rights conveyed. There is no ambiguity in the terms of the grant, and there is no reason to believe that the grantor did not fully understand them, or what was the effect of the deed, deliberately made by him.

"It may be that it was an improvident contract; but courts cannot make contracts for people; they can only construe the contract made by the parties. I cannot construe this contract to mean that the parties intended that the plaintiff should sell his coal, receive the pay for it, and keep both the coal and the money. This would certainly be a perversion of the homely old proverb that you 'Cannot eat your cake and keep it.' Nor can I reach the conclusion by any fair construction of the language employed by parties in the deed that any additional burden was to be placed on the grantee before enjoying his property than those named in the deed. This would be inserting in the deed new conditions. I am clearly of opinion that the courts hereinbefore referred to have wholly disregarded the well established rules of construction applied in construing all other contracts. It is a rule as I understand the law of universal application, that where there is no ambiguity in the language of a deed it should be construed according to its legal effect to be gathered from its face. 5 Grat. 141.

"But if these cases are to be followed a different rule is to prevail in construing deeds conveying minerals. We must according to these decisions, presume that a part of the thing conveyed was intended to be reserved, notwithstanding the conveyance is without qualification or limitation, or any expressions in any part of the deed indicating that the parties intended anything but an absolute grant.

"I wish to be clearly understood, and hence at the risk of becoming tiresome by unnecessary repetitions will add that I do not mean to intimate that the person who owns the entire estate and sells the subjacent strata of any kind should give away the surface or waive damages thereto without compensation. What I mean is that all such questions should be settled at the time these strata are sold, and that courts should presume they were so settled unless a contrary intention appears on the face of the deed. The removal of substrata is a matter of too much importance, and effects too largely the residue of the estate, not to enter into the contract or to be left to doubtful and uncertain implications of law. Of course the rule of law which applies to coal must apply to fire-clay, potter's clay, iron ore and all subjacent minerals. The thing sold and to be removed may be of very small value as compared with the overlying surface, and as a consequence the owner would want to sell only so much as could be removed or taken away without disturbing the surface, on the other hand, the thing sold may be of so much more value than the surface that the owner would be willing to sell and authorize the removal of all without reference to the soil. He might not wish to retain coal which he could sell at $100.00 per acre to support surface worth $5.00 per acre.

"Many examples may be found; coal removed from the same opening, and when the coal is of the same value, yet there may be immense difference in the value of the overlying surface. Then, again, in many places are found several veins of coal overlying each other; when the owner of all of them sells the lower vein and retains the others he is interested not only in protecting the soil but the intervening strata as well. Many other illustrations might be given but these are sufficient to illustrate my idea and to show that in all sales of minerals the question of injury to the lands not con-

veyed is of so much importance that courts should not assume
that it was not considered and made part of the consideration
of the deed.   In mining coal perhaps from 35 to 50 per cent.
of the entire vein would have to be left in the land by way
of ribs and pillars, unused, to form surface support.   This
would depend to some extent upon the depth of the coal be-
low the surface and the nature and condition of the interven-
ing rocks if any.   These pillars and ribs would be of no pos-
sible use to any one except to the owner of the overlying
surface.   Now whether all this coal is to be bought and re-
moved, or only a part of it, and the residue to be kept by the
owner for the benefit of his other estate, are proper subjects
of contract, and the contract must be expressed in the deed.
When the deed shows clearly on its face that all the coal was
sold, and especially where there is a clause giving the right
to remove all of it, I cannot think the courts have any right
to say that the deed does not *prima facia* mean what it says.
This would be to construe out of the deed, after it was made
and delivered from 35 to 50 per cent. of what clearly passes
by its express terms.   For it is a matter of common informa-
tion, known to all who have paid any attention to mining
that in coal mines the coal will have to remain in place as a
support, or the surface be permitted to subside.   Permanent
artificial support would cost more than the coal is worth in
most cases.   So it is a question of leaving something like
one-half the coal in the mine or removing all and permitting
the overlying surface to adjust itself to a new bed.   And
this, I again repeat, should be left for the parties to deter-
mine by their contract.   If the owner of the coal wishes to
keep half of it as a support for the surface he has a perfect
right to do so, and if he wishes to sell all and permit all to be
removed he may also do that.   When he has made his con-
tract in accordance with his own will and reduced it to writing
the courts may declare the legal effect of the writing but can-
not change it."

In 9 Cyc. 577, it is said:   "The law furnishes certain rules
for the construction of written contracts for the purpose of
ascertaining from the language the manner and extent to
which the parties intended to be bound and that rule ought
to be applied with consistency and uniformity; and it is not
proper for a court to vary, change or withhold their applica-

tion;" citing *Johnson County* v. *Wood*, 84 Mo. 489; *Heady* v. *Building Association*, 26 S. W. 468 (Tex.) It is further said on the same page, 9 Cyc.: "The first and main rule of construction is that the intent of the parties as expressed in the words they have used must govern. Greater regard should be had to the clear intent of the parties than to any particular words which they may have used in the expression of their intent. If the words clearly show the intention there is no need for applying any technical rules of construction, for where there is no doubt there is no room for construction." And cases there cited. And same volume 587, "It is not the province of a court to change the terms of a contract which has been entered into, even though it may be a harsh and unreasonable one. Nor will the dictates of equity be followed if by doing so the terms of a contract are ignored; for the folly or wisdom of a contract is not for the court to pass upon. Its terms, however onerous they may be, must be enforced if such is the clear meaning of the language used and intention of the parties using that language." Citing *Larguier* v. *White*, 29 La. Ann. 156, where it is held: "The stipulations made by the parties in their contract are the law to them, and to their assigns under the contracts, except when such stipulations are in contravention of the public law or good morals." The deed set out in plaintiff's declaration gives to the grantee and his assigns, in as clear and distinct terms as the English language could well express, the "Right to enter upon and under said land and to mine, excavate and remove all said coal." In *Carrington* v. *Goddin*, 13 Grat. 587, it is held: "If it is doubtful on the face of the deed whether one or both of the parcels were intended to be conveyed, the deed will be construed most strictly against the grantor and so as to give it effect, rather than that it should be void for uncertainty." And in *Allemong* v. *Gray*, 92 Va. 216, it is held that where: "If the words and provisions are doubtful they are to be taken most strictly against the grantor." And in *Lagorio* v. *Dozier*, 91 Va. 492, it is held: "A deed should be so construed as to give effect to the true intent of the parties, as expressed in the deed, considered in all its parts, and construing the language used according to its common and usual acceptation." And in *Gibboney* v. *Fitzsimmons*, 45 W. Va. 334, (syl. pt. 1), "The legitimate

purpose of all construction of instruments in writing is to ascertain the intention of the party or parties making the same and when this is determined effect will be given thereto unless to do so will violate some established rule of property." And in *Hurst* v. *Hurst*, 7 W. Va. 341, it is held that parol evidence as to the actions or declarations of the parties at the time of the execution of the deed or afterwards are inadmissible and incompetent to enlarge, restrain, explain or alter the intention of the grantor or grantee, "As expressed in the deed or to vary the legal effect thereof as clearly manifested by the deed itself." *McDougal* v. *Musgrave*, 46 W. Va. 509; and in *Long* v. *Perine*, 41 W. Va. 314, (syl. pt. 2), it is held: "Where there is no ambiguity in a written contract, oral evidence is not admissible to explain it, as it speaks for itself." And in 9 Cyc. 590, treating of the construction of a deed by the parties thereto being adopted by the court in giving effect to its provisions, says: "The rule above stated does not apply, however, where the meaning of the terms used is clear. In such a case the fact that the parties have themselves, by their subsequent conduct or otherwise, placed an erroneous construction upon them will not prevent the court from giving the true construction." And cases there cited.

We agree with the conclusion reached by the learned judge in what we have above quoted from his opinion, and with much of the reasoning upon which it is based. We do not, however, fully agree with all that is said in his opinion. We do not agree that the additional grant contained in the deed of the right to enter upon and under said land and to mine, excavate and remove all of said coal adds nothing to the legal effect of the deed, or that it is merely emphasis to the general grant, as intimated by him. It seems to us that this additional grant has a distinct and material office to perform and that force and effect must be given thereto in the construction of this deed. In the construction of a deed, effect must be given to every part and every word therein contained if possible to do so.

We in no sense question the doctrine or right of subjacent support in a case where the surface and subjacent estate are owned by different persons and the right of support has in no way been parted with or waived by the surface owner.

In case at bar there is no ambiguity in the language of the deed, and taking the words used in their common acceptation they have but one meaning, and therefore there is no room for construction. The reservation of the three acres in the deed is in such language as to emphasize the intention of the parties that *all* and not *a part* only of the coal should be removed from the land not so reserved, as it plainly provides for the protection of the three acres, only granting "The right of way through said reservation for a road, air course and drainway, necessary or convenient for the mining and removal of said coal, and the coal under coterminous and neighboring lands."

It is contended by counsel for plaintiff in error that it is a question of public policy and says that "West Virginia is not altogether silent on this question." Citing section 7, chapter 79, Code, which provides: "No owner or tenant of any land containing coal shall open, or sink, or dig, excavate or work in any coal mine or shaft, on such land, within five feet of the line dividing said land from that of another person or persons, without the consent, in writing, of every person interested in, or having title to, such adjoining lands, in possession, reversion or remainder, or of the guardians of any such persons as may be infants;" with a penalty attached for any violation thereof, to be recovered by the party injured. This is a provision for the protection of lateral support of coterminous owners between whom there are no contractual relations and the statute cited recognizes on its face that it is a matter of contract between the parties interested; but, the law makers did not presume to legislate concerning subjacent support, recognizing the well established fact that the owner of the whole estate in fee, has unlimited control thereof, from the center of the earth to the surface, and if he could himself by mining or other means cause the subsidence of the whole or any part of the surface not within five feet of his exterior line he could by contract grant that right to another, and this is a fact conceded, as well in the English and American States cases cited, as by counsel for plaintiff in error.

It appears from the record that the plaintiff waived his second count and declined to amend the first count, the demurrer to which was sustained by the court because "It seeks to recover damages from the defendant for having done

what the deed upon which the action is based, clearly and unequivocally authorized the defendant to do."

The reasons for our decision in this case are more elaborately set out in an opinion filed by JUDGE Cox, which appears below, and in which all the members of the Court concur, except JUDGE POFFENBARGER, who dissents from the decision.

There is no error in the judgment and the same is affirmed.

*Affirmed.*

Cox, JUDGE, (*concurring*:)

I concur in the conclusion reached by this Court in this case. I have no quarrel with the doctrine or right of subjacent support, when it has not been parted with, applicable where the surface and subjacent estate in the same land are owned by different persons. I do not condemn or question what I deem the best considered cases and text-books expounding this doctrine. Owing to these facts, and to the very great importance of this case, I have concluded to prepare this opinion.

This case is on a writ of error to the judgment of the circuit court, sustaining a demurrer to the declaration and dismissing the action. It appears from the averments of the declaration, which for the purposes of demurrer must be taken as true, that plaintiff, Griffin, being the owner in fee of 68.89 acres of land in Harrison county underlaid with coal, sold and conveyed the coal (except 3 acres thereof) to Camden, with the following mining rights and privileges: "The party of the second part and his assigns is to have the right of way through said reservation for a road, air-course and drain way necessary or convenient for the mining and removal of said coal and the coal under coterminous and neighboring lands, together with the right to enter upon and under said land and to mine, excavate and remove, all of said coal and remove upon and under said land the coal from under adjacent, co-terminous and neighboring lands, and also the right to enter upon and under the tract of land hereinbefore described, and make all necessary structures, roads, ways, excavations, air-shafts, drains, drain-ways and openings necessary or convenient for the mining and removal of

said coal, and the coal from co-terminous and neighboring lands, to market."

The defendant company became the owner of said coal and mining rights and privileges conveyed to Camden. The defendant, having removed a part of said coal, leaving blocks or pillars thereof, afterwards removed the blocks or pillars, completing the removal of all the coal without leaving support for the surface, thus causing subsidence of the surface, as plaintiff avers, to his injury and damage.

Plaintiff brings his action of trespass on the case for damages, not relying upon any express covenant or provision of the deed of conveyance, which constitutes the contract between the parties, but relying upon what is termed the doctrine or right of subjacent support. The only act complained of is the act of removing all the coal conveyed without leaving support. The manner of the removal is not complained of; and no negligence in the manner of removal is averred. The act of removal itself, and not the manner of doing the act, is averred to be negligent. This being the case, there is for determination the single question: Was the removal of all the coal conveyed without leaving support in violation of plaintiff's right?

This leads us to a consideration of the doctrine or right of subjacent support. We are cited to no previous decisions in point in this State, or in the state of Virginia before the formation of this State. We are cited to many decisions and text-books, both English and American, which are not said to be binding authority upon this Court, but which may be termed persuasive reasoning. They appeal to us and should govern us so far, and only so far, as they appear to us to be founded upon correct principles. We are seeking the right—the truth—and should accept it wherever found.

In this investigation, we turn naturally to England, which I think may be termed the parent of the doctrine of subjacent support. The first cases were decided there.

No case or text-book, either English or American, will be found which rests this doctrine or right of subjacent support upon more than two grounds, or, rather, which holds that

the doctrine or right is composed of more than two ingredient propositions. They are: First, a presumptive or implied reservation to the surface owner of sufficient of the subjacent strata or estate to support the surface *modo et forma*. Second, the principle of law expressed in the Latin maxim: *Sic utere tuo ut alienum non laedas*—liberally construed, "So use your own property as not to injure the property of another." Many authorities rest the whole doctrine upon the last proposition only. The principle contained in the first proposition, when applied to a case where the fee owner has granted the surface and reserved the underlying strata or estate, would necessitate an implied additional grant of so much of the subjacent strata or estate as was necessary to support the surface; but we are not dealing with that case here.

The first proposition was announced by Lord Campbell in *Humphreys* v. *Brogden*, 12 Q. B. 739, decided in 1850, in which he used this language: "If the surface and the minerals are vested in different owners without any deeds appearing to regulate their respective rights, we see no difficulty in presuming that the severance took place in a manner which would confer upon the owner of the surface a right to the support of the minerals. If the owner of the entirety is supposed to have alienated the surface, reserving the minerals, he cannot be presumed to have reserved to himself, in derogation of his grant, the power of removing all of the minerals without leaving a support for the surface; and if he is supposed to have alienated the minerals, reserving the surface, he cannot be presumed to have parted with the right to that support for the surface by the minerals which it had ever before enjoyed."

This was not the first case in England upon the subject of subjacent support, as thought by some. Lord Campbell in that case also recognized the second proposition above mentioned, but reached his conclusion by analogy to the severance of the ownership of the different stories of a house, quoting Erskine's Inst. as follows: "Where a house is divided into different floors or stories, each floor belonging to a different owner, which frequently happens in the city of Edinburgh, the proprietor of the ground floor is bound, by the nature and condition of his property, without any servitude,

not only to bear the weight of the upper story, but to repair his own property, that it may be capable of bearing the weight. The proprietor of the ground story is obliged to uphold it for the support of the upper, and the owner of the upper must uphold that as a roof or cover to the lower."

Lord Campbell in that case was very guarded in his holding that the law there laid down only applied where the surface belonged to one man and the minerals to another, and no evidence of title appeared to regulate or qualify their rights of enjoyment. The last clause of the opinion contains the following language: "I need hardly say that we do not mean to lay down any rule applicable to a case where the *prima facie* rights and liabilities of the owner of the surface of the land and of the subjacent strata are varied by the production of title deeds, or by other evidence."

The earlier English case of *Harris* v. *Ryding*, 5 M. & W. Rep. 59, decided in 1839, held that the mining rights in the deed in question applied to acts to be done upon the surface of the land, and did not enlarge the rights of the owner of the minerals, under the ground, beyond what they were without the mining rights. Baron Park there reached his conclusion in this language: "I do not mean to say that all the coal does not belong to the defendants, but that they cannot get it without leaving sufficient support."

Some English and American cases have followed the two English cases cited, resting their decisions, at least in part, upon the theory of a presumptive or implied reservation of so much of the subjacent strata or estate as is necessary to support the surface. The case of *Noonan* v. *Pardee*, 200 Pa. 474, carried that theory to its logical conclusion by holding: "What the surface owner has a right to demand is sufficient support, even if to that end it be necessary to leave every pound of coal untouched under his land."

In Blanchard and Weeks' Note to the case of *Jones* v. *Wagner*, in Leading Cases on Mines, etc., page 617, it is said: "There is a *prima facie* inference at common law, upon every demise of minerals or other subjacent strata, where the surface is retained by the lessor, that the lessor is

demising them in such a manner as is consistent with the retention by himself of his own right to support. In the absence of express words showing clearly that he has waived or qualified his right, the presumption is that what he retains is to be enjoyed by him *modo et forma*, and with the natural support which it possessed before the demise."

The theory of implied reservation or implied grant has been couched in different language in different cases. Some cases have said that the subjacent estate owes a servitude to the super-incumbent surface. Others have said that the surface owner is entitled to an easement. Others have called the right of subjacent support *ex jure naturae;* and still others have said that the right is a part of the surface, and as such may not pass except by express words. In whatever language the decisions referred to may be couched, in the last analysis they rest upon the authority of *Humphreys* v. *Brogden*, holding that there is a presumptive or implied reservation or an implied grant.

The theory of an implied reservation is earnestly relied on by the learned attorneys for the plaintiff, in their original brief. I quote therefrom as follows: "In a grant like the one at bar, a reserve of the right of surface support is implied." This proposition of the early English cases, of an implied reservation in the face of an express grant, has been much questioned and criticised in England, and, it seems to me, with great reason. I do not think that, in a case where the owner of the fee granted or conveyed the underlying strata or estate, the theory of an implied reservation, amounting if necessary to the whole of the thing granted, could ever have been maintained upon sound reason. It seems to me that the first part of the statement above quoted from Lord Campbell in *Humphreys* v. *Brogden*, viz., that the grantor in case of the reservation of the minerals cannot be presumed to have reserved to himself, in derogation of his grant, the power of removing all the minerals without leaving a support for the surface, furnishes a conclusive reason for overthrowing the second part of his statement quoted, viz., that in case the owner of the entirety is supposed to have alienated the minerals, reserving the surface, he cannot be presumed to have parted with the right to

that support for the surface by the minerals which it had ever before enjoyed.   The latter part of the statement necessarily implies a reservation in derogation of the grant —the very thing condemned in the first part of the statement.

I cannot see how, against every rule of construction, where a deed has been made by the owner of the fee, granting in express terms all the subjacent strata or estate, that the right of subjacent support may be based upon the ground that there is a presumptive or implied reservation by such a deed, in which there is no express limitation, reservation or exception, and in derogation of the express terms of the grant, of so much of the subjacent strata or estate, to the extent of all if necessary, to support the overlying surface. Such a proposition seems to me to be contrary to all principles of law.   I am not, however, saying that the doctrine or right of subjacent support does not exist where it has not been parted with; but I do say that I cannot assent to the proposition that it emanates from a presumptive or implied reservation of so much of the estate granted as is necessary to support the surface.

An inconsistency running through most of the cases holding to the theory of an implied reservation is they concede that after the grant the grantee is the owner of the thing granted.

In the later English case of *Eadon* v. *Jeffcock*, L. R. 7 Ex. 379, decided in 1872, the provisions of a lease of a bed of coal were involved; and the Court held that the intention of the parties was that all the coal should be removed, other than certain pillars specified by the terms of the lease, and that the lessees were not otherwise liable for failure to leave support for the surface.   There is no difference in principle between a lease and a deed of conveyance. *Davis* v. *Treharne*, 6 App. Cas. 460.   I do not find that this case of *Eadon* v. *Jeffcock* has been overruled.   On the contrary, it is cited as late as 1902, as one of the leading English cases.   It is true that in the case of *Davis* v. *Treharne, supra*, Lord Blackburn alone, of the three Lords, delivering opinions, including the Lord Chancellor, said:   "I cannot agree with what seems to have been said by Baron Cleasby in the case of *Eadon* v. *Jeffcock*."   The other Lords delivering opinions

did not question that case; and it was not there overruled. In the case of *Eadon* v. *Jeffcock*, Baron Cleasby said in part: "It appears to us that, outside of this contract, there is no reservation of any right to support, whatever the exact nature of that right may be, but that we must look at the contract itself, and by a proper construction of it, having regard of course, as in all cases, to the subject matter, arrive at the extent to which the owner authorizes the minerals to be removed." He also quotes from Lord Wensleydale in *Rowbotham* v. *Wilson*, 8 H. L. C. 359, as follows: "Whether the right to support given by the land below to the land of the owner of the surface, when the strata belong to different persons, properly is to be called an easement, as it is by Mr. Gale in his excellent Treatise on Easements, 'a natural easement,' or, whether the owner of the surface has merely a right to enjoy his own land in its natural state and condition with a right of action against the owner of the land adjoining or subjacent when the act of his neighbor does him an injury, are questions immaterial to the decision of this case, though the last proposition appears to be fully established by the judgment of the Court of Exchequer Chamber in *Bonomi* v. *Backhouse*," 9 H. L. C. 503.

Baron Bramwell, delivering an opinion in the case of *Eadon* v. *Jeffcock*, said, in part: "In this case the defendants have a lease of a seam of coal. It may not appear of much consequence by what name their interest is called, but the word lease may in such cases have helped to a particular conclusion. For by that word we commonly understand a temporary estate granted in something which, at the end of the term, is to be restored to the lessor in the condition in which it was delivered to the lessee, fair wear and tear excepted, as in a lease of land, house or a moveable chattel. But that is not the intention of a lease of a seam of coal. That is more a sale of the coal, or grant of a right to take and remove it within a certain time, and it is not to be restored at the end of that time to the grantor. Treat it as a sale of the coal, provided the vendee get it all within a certain time; and why should the grantor be at liberty to say: 'Though in terms I sold the whole of it, yet by implication I reserved as much as was necessary to support the surface in its natural condition:' Why should not the argument be

good, 'If you meant that exception you should have said so in words.' Suppose a sale of brick, earth or gravel by metes and bounds, and suppose the vendee took it all, and suppose then the soil of the vendor outside the boundary crumbled in for want of lateral support would the vendee be liable to a claim in respect thereof by his vendor, and, if he would, why? With great respect, such a dealing with a seam of coal is more like selling the materials of an intermediate floor than letting or selling the floor. Suppose a man with a three story house sold the materials of the second floor, would he have a right to say, 'But you must leave enough to support my third story or you must prop it up?' It is true a lessee of a mine may take all the coal and artificially prop the surface; but, practically, this is impossible, owing to the expense; and the same argument applies, viz., why did not the grantor stipulate for it? It may be said that if this argument is true of a lease or grant of coal, to be taken in a certain time, it would be equally so of a grant to be taken whenever the grantee thought fit; if so, of all cases where the ownership of mines and surface was severed; and that the authorities are overwhelming the other way. But, in the first place, the argument is not so strongly applicable where the grant allows the grantee to take at any time, because the grantor may well allow his land to be let down provided it is to be down within a certain time, where he would object if he could not tell for all futurity when it might happen. In the next place, where the terms of the severance are not known, but only that there is a severance, then it may as well be presumed one way as the other. That is a case of ownership, not contract; as this is. Here the terms of the contract that gives the right to take the coal are known, and the question is, why does not the general principle apply viz., look at what is said in the deed, and add nothing except from a necessity for doing so." Yet Baron Bramwell felt bound by the previous decisions of his own country, and doubted as to his decision.

It is obvious that the English Courts are no longer in sympathy with the theory of presumptive or implied reservation of so much of the thing granted as is necessary for support, as a basis for the right of support. *Rowbotham* v. *Wilson, supra; Bonomi* v. *Backhouse, supra.* Our statute,

section 2, chapter 72, Code, provides:   "Every such deed, conveying lands, shall, unless an exception be made therein, be construed to include all the estate, right, title and interest whatever, both at law and in equity, of the grantor, in or to such lands."

Shall we still say that there is an implied reservation, in derogation of the express grant?   The answer is apparent.

What we have said does not dispose of the whole doctrine of subjacent support.   What is the doctrine or right in this State, and upon what does it rest?   It rests upon, and consists solely of, the second proposition above stated—the principle of law, *Sic utere tuo ut alienum non laedas.*   This rule of law expresses all that there is of the doctrine.   This position seems to be fully recognized by plaintiff's petition for a rehearing.

It may be asked, what is the difference upon what ground the doctrine or right of subjacent support rests, so that it exists.   The reply is that the difference is not so much in the existence as in the manner in which it may be parted with by the surface owner.   If the right of support is a reservation of the subjacent estate, or a servitude upon it, or an easement in favor of the surface owner, or a part of the surface estate, there is more show of reason in saying that the right of support may not be parted with by implication or without express words, than there is when the right is considered to consist only of a rule of law commanding that you shall not use your own so as to injure that of another.

This rule of law relates to the use and enjoyment of property, and not to the ownership of property.   As a rule of law it is negative in its application, forbidding the use so as to injure that of another.   It is not a servitude when applied between the owner of the surface and the owner of the subjacent strata of land, in the strict sense of that term, any more than it is a servitude upon all property.   Likewise, it is not, strictly speaking, an easement in favor of one owner of property against another.   It is no more a part of the surface than of the subjacent estate in land, although applicable to both.   It has no more force when applied between the different owners of the surface and subjacent estates in land,

than when applied between the different owners of property everywhere and of all kinds. As a rule of law, it must be always the same—constant, invariable, and immutable.

By the side of this principle of law, and to be applied in harmony with it, there is another which must be considered. It is the proprietary right of the owner of property—the principle of absolute dominion where there is absolute ownership.

Under the principle of law, *Sic utere*, etc., I think it is incontrovertible that where the surface and subjacent strata or estate in the same land are owned by different persons, and the right of support has not been parted with by the surface owner, the surface owner is entitled to subjacent support; or, as many of the authorities put it, the surface owner is entitled *prima facie* to support. All the authorities agree upon that proposition. Also, all of the authorities recognize the principle, *Sic utere*, etc., as one ground of the doctrine of support. Why? Because when the ownership is severed, two separate estates are formed, and neither may be used by the owner to the injury of the other. The owner of the subjacent estate may not so use his own by removing all of it, as to injure the surface estate; but so long as the removal does not injure the surface estate, he may remove.

Considering this rule of law as the doctrine of subjacent support in this State, how may the surface owner waive or exclude the right of support? which is simply another form of asking how he may waive or exclude the benefit of the rule of law mentioned. I would answer that he may waive or exclude the benefit of this rule of law in precisely the same way that he may waive or exclude it in relation to any other property owned by him, or any other rule of law the violation of which has caused or will cause him injury. It is now fully settled by the authorities, no matter upon what ground they base the right of support, that the surface owner may waive or exclude it by contract. "The right to remove all the minerals in a certain strata, though the support of the superincumbent strata is destroyed thereby, may be created by apt words." 6 Am. & Eng. Dec. Eq., 643, and English and American cases there cited.

Great difficulty has been experienced by the courts, upon consideration of the several instruments before them, as to what words, or whether the particular words involved, evinced an intent to part with the right of support.

It seems now to be fully settled that the right of subjacent support may be waived or excluded by plain implication.

The principal controversy in this case resolves itself to this: Has the plaintiff waived or excluded the right of support, by the deed of conveyance mentioned in the declaration? Let us look at the cases claimed to construe instruments similar in language to that used in this contract. Let me say that none of them interpret language exactly like the contract here presented.

The case chiefly relied upon by plaintiff is the English case of *Harris* v. *Ryding, supra.* As we have said, in that case it was expressly held that the mining rights related to acts to be exercised upon the surface of the land, and that they did not give additional rights to the owner of the minerals reserved, under the ground. Certain American cases are cited, such as *Carlin & Co.* v. *Chappel,* 101 Pa. St. 348; *Burgner* v. *Humphreys,* 41 Ohio St. 340; *Livingstone* v. *Coal Co.,* 49 Ia. 369; *Williamson* v. *Hay,* 120 Pa. St. 485, and others. An examination of these cases will show that they adhere, in some form of expression, to the theory of implied reservation or implied grant as a ground of support, following in the footsteps of *Humphreys* v. *Brogden.* So following, they in effect refuse to admit that the owner may waive the right of subjacent support by implication. I cannot pass this subject, however, without saying that I can in no sense agree with the two cases cited of *Livingstone* v. *Coal Co.* and *Williamson* v. *Hay,* upon the question of construction. The language of the instruments construed in those cases will be found in the reports thereof. It seems to me that the language used in those instruments was sufficient to waive and exclude the right of support, without considering whether that right rests upon one or both of the propositions first above mentioned. It was Judge Story who said: "Where the language of an instrument is neither uncertain nor ambiguous, it is to be expounded according to its apparent import, and is not to be warped from the or-

dinary meaning of its terms in order to harmonize it with uncertain suppositions, in regard either to the probable intention of the parties contracting or to the probable changes which they would have made in their contract had they forseen certain contingencies." Those cases seem to me to do violence to the principles of law stated.

In the Ohio case referred to, the agreement or lease was of the coal, with the right to remove the same. We are not construing that language here. It will be observed that the extent to which the coal might be removed, or the manner of its removal, are not expressed in that instrument. The mining right may not have amounted to more than the grantee or lessee would otherwise have been entitled to as a right of way of necessity, without words. As to that, I do not decide.

In the work on Mines by Robert Forster MacSwinney, of London, issued in 1884, all previous English cases are reviewed, and the rules governing the interpretation of instruments and contracts in relation to support obtaining in England are laid down. I quote from that work, page 304, as follows: "If apt words are used, whether in the instrument of severance itself; or in a contemporaneous, or a subsequent instrument; and whether in affirmative or negative terms and whether in express terms, or by plain implication; and whether the underlying mines are granted or excepted; and whether the instrument is voluntary or statutory; the right of support for land in its natural state may be effectually excluded"—citing *Rowbotham* v. *Wilson*, 6 E. & B. 593; *Shafto* v. *Johnson*, 8 B. & S. 252; *Taylor* v. *Shafto*, *Id.* 228; *Murchie* v. *Black*, 19 C. B. N. S. 207; *Williams* v. *Bagnall*, 15 W. R. 272; *Buccleuch* v. *Wakefield*, L. R. 4 H. L. 377; *Smith* v. *Darby*, L. R. 7 Q. B. 716; *Eadon* v. *Jeffcock*, L. R. 7 Exch. 379; *Buchanan* v. *Andrew*, L. R. 2 Sc. & D. 288; *Aspden* v. *Seddon*, 10 Ch. 396; *Gill* v. *Dickinson*, 5 Q. B. D. 159; *Davis* v. *Treharne*, 6 App. Cas. 466; *Dalton* v. *Angus*, *Id.* 809. *Chapman* v. *Day*, 47 L. T. 709; *Mundy* v. *Rutland*, 23 Ch. D. 81; *Bell* v. *Love*, 10 Q. B. D. 558. A number of cases are there cited in which the right of support was held to have been waived or excluded, either by the express terms of the contract or by plain implication.

In *Smith* v. *Darby*, *supra*, decided in 1872, Lord Blackburn said: "But does not this deed say, 'You may take them absolutely, only making compensation afterwards?' I cannot agree that there is any argument to be derived from the use of affirmative words only, without any negative words. The question is: What was the intention of the parties to the deed, when there is an affirmative promise to pay money to the tenants, and what was the bargain as to the sale of the property? If the owner of a horse said, 'You may take the horse,' and the person to whom this was said had promised to give £20 for it, there is no question that he could not be sued in an action of trespass for taking the horse, because the intention of the parties was that the one was to buy and the other sell the horse. So here the question is whether it appears upon the clauses in the deed that the intention of the parties was that the minerals should· go absolutely, without any restriction as to the right of support."

In *Aspden* v. *Sedden*, *supra*, decided in 1875, Sir G. Mellish, L. J., in the opinion said: "If it appears from any express words in the deed, or by necessary intendment from anything contained in the deed, that it was not the intention of the parties that there should be any right to support, the court is bound to hold that the plaintiffs have failed to make out their case." Also, "If liberty is reserved to do the act complained of, that reservation, as between the parties and those claiming under them, makes the act rightful."

In *Buchanan* v. *Andrew*, *supra*, decided in 1873, the Lord Chancellor said: "My Lords, generally speaking, when a man grants the surface of land, retaining the minerals, he is guilty of a wrongful act if he so uses his own right to obtain the minerals as to injure the surface, or the things upon it; and, as prevention is better than cure, the Court would be justified in granting an interdict to prevent him from doing so. But on the other hand, I apprehend it is the clear law of England, and also of Scotland, that when two persons meet and deliberately settle· a contract they are at liberty to enter into such terms (not being contrary to the public law) as they may think fit; and if a *feuar* of surface lands is willing to take the risk of any injury which may be done by the working of the subjacent minerals, it is perfectly lawful for him to do so; the person who was previously the owner of

the entirety being under no antecedent obligation to part with any portion previously his own, except upon such terms as are mutually agreed upon. In such a case, therefore, the whole matter resolves itself into a mere question of construction. No views of a conjectural kind as to what is or what is not reasonable can be admitted, if the contract itself is plain and free from ambiguity."

In *Davis* v. *Treharne, supra,* Lord Blackburn said, in relation to the exclusion of the right of support: "If Mr. Treharne, when he let the land, had by express words or by necessary implication, said, '*You may take away all the minerals*;' or, 'You must take away all the minerals, letting down the surface,' he had a perfect right, at least before he had made the two building leases, to do so."

Other English cases might be cited on the question of the interpretation of instruments as to waiver or exclusion of the right of support. From them it is simply a question of intention, in the usual way, from the words used in the instrument.

In McSwinney on Mines, this subject is treated under certain divisions. Under the division "(d)," the first case reviewed is *Harris* v. *Ryding, supra.* I quote from that work, on page 339, as follows: "With respect generally to the various cases referred to in divisions (b), (g), (d) and (e) of the present subject, the following observations may be made. In the earlier cases the courts, in construing the instruments before them, apparently adopted the curious mode, both in the case of land in its natural state, and of land in its non-natural state, of assuming, in the first instance, the existence of an intention, that the right of support should not be disturbed; and of then proceeding to consider, whether the provisions used could not be reconciled with that intention. In the later cases, on the other hand, the courts seem to have assumed nothing; but to have proceeded at once to construe the instruments before them according to their literal and natural meaning. It is, in many respects, difficult to reconcile the earlier with the later cases; and, on these grounds, the difficulty seems capable of explanation. It need hardly be added that the later cases must, at the present day, be considered authoritative.

"Having regard to these circumstances, the following

propositions may, as the result of the cases, in which the instrument of severance is producible, and in which some contract has been made, or is said to have been made, with respect to support, be considered as established:—

"1.  Instruments of severance are, at the present day, construed according to their literal and natural meaning, rather than according to preconceived assumptions of the existence of an intention in the parties, or in the legislature, that the right of support should not be disturbed.

"2.  Where it appears from the express words of such instruments, or by clear intendment therefrom, that it was the intention to exclude the right, effect will be given to such intention.

"3.  Where the mine owner is relieved from liability for damage, the surface owner may often be presumed to have been compensated by anticipation.  But in other cases, the presence of a clause for compensating the surface owner; at all events if it refers to underground working; are material elements in ascertaining an intention to exclude the right."

\*   \*   \*   \*

"7.  The common covenants to work in the usual and most approved mode, or the common clause in an Inclosure Act under which mines are reserved to the lord, of holding and enjoying them in as full, ample and beneficial a manner as if the act had not been made; or the common clauses giving full liberty of working and winning; are not, of themselves, sufficient to exclude the right."

Other propositions are deduced by the author, which I deem it unnecessary to repeat.

From this it appears that the early English cases, such as *Harris* v. *Ryding*, are discredited in their own land upon the question of the construction of instruments relating to the waiver or exclusion of support, and are no longer considered as authority at home on that question.  They are, however, relied on here as conclusive on that question.  It seems to me that these early English cases would come with more force, as persuasive argument, if they had not been discredited in the land from which they come.

It is hardly necessary to say that American cases which adhere to, and follow implicitly in the footsteps of, those early English cases, on the question of the construction of

instruments of severance, adopting the same "curious mode" of construction, would be discredited in England, and it seems to me in reason should not be followed by us.

In argument, much stress is laid upon the ability and learning of the English judges. I concede it all. I would detract nothing from their world-wide reputation for ability and learning in the law: but I do say that the trend of the English courts, with all their greatness, is toward, if indeed they have not already come to, the position, to which every other court it seems to me must finally come, of construing an instrument conveying coal or minerals under the ground in identically the same manner in which other written instruments are construed, and in the same manner as instruments conveying any other species of property, free from presumptions or implied reservations not applicable to other instruments of conveyance.

This being the true rule, we seek the intention of the parties to the instrument involved in this case, as the paramount end to be attained. Certain rules of law applicable to contracts are referred to, all of which will simply aid us in ascertaining the intention of the parties. All the provisions of the contract must be considered together. Then resort must first be had to the language used by the parties therein. As has been said, the contract of the parties is the law to them. The words are to be given their plain, ordinary and popular meaning, unless they have acquired a peculiar sense in respect to the particular subject matter, as by the known usage of trade or the like, or unless the context shows that the parties used them in some other and peculiar sense. 17 Am. & Eng. Enc. L. 11; *Railroad* v. *Chutte*, 103 U. S. 118. When the contract is thus considered, and it appears to be free from uncertainty and ambiguity, and the intention of the parties is apparent, the task is at an end. *Uhl* v. *Ohio R. Co.*, 51 W. Va. 106; Story on Contracts, section 780; 9 Cyc. 587: *Gibboney* v. *Fitzsimmons*, 45 W. Va. 334; Devlin on Deeds, section 837; *Salt Co.* v. *Campbell*, 89 Va. 396.

Before the deed in question was made, the plaintiff was the owner of the fee and everything in the land in question. He might have removed the subjacent estate, and permitted the surface to subside. He might have destroyed both, or used them at his pleasure, so long as he did not injure another.

What he might have done himself, he might grant to another the right to do.

For a valuable consideration, the plaintiff granted the coal under the land in question, which means all the coal, and he granted certain mining rights and privileges, among which was the following: "*together with the right to enter upon and under said land and to mine, excavate and remove all of said coal.*" It will be observed that these words are not "the common covenants of working in the usual and most approved mode," or "the common clauses giving full liberties of working and winning." It cannot be said that the minds of the parties did not meet upon the removal of all the coal, when they so expressed it in the deed.

If the right to support may be waived or excluded by contract, what kind of a contract is necessary for that purpose? The plaintiff granted all the coal, and the ownership of the surface and of the underlying coal was severed, creating a separate estate in each. If the deed said nothing more, the owner of each would be bound by the rule, *Sic utere,* etc. If the deed said nothing more, I would without hesitation hold that the owner of the surface would be entitled to support, and that the owner of the coal could not so use it by removing all of it as to injure the surface. The deed does not stop with the grant of all the coal. It contains the express additional grant, on the part of the plaintiff, to the grantee, of the right to enter upon and under said land and to mine, excavate and remove all of said coal. It is contended that the conclusion reached in this case overlooks the fact that the law is a part of the contract so far as the parties have not otherwise contracted. I think it does not. I go further, and say that the parties to this contract are presumed to have known the law at the time they entered into it, and to have known that if the deed rested with the simple grant of all the coal and nothing more the grantor would then be entitled to support for his surface. Knowing the law, the parties undertook to further contract. The grantor being willing to give further privileges, and the grantee desiring further privileges, they placed in the deed a further provision granting the right to enter upon and under the land and to remove all of the coal conveyed. This intent gives effect to the additional grant; otherwise, it would seem to be mean-

ingless, and not to grant more than a way of necessity, which the law would give without it. In fact, that is the position taken by the learned attorneys for the plaintiff. It is true that other mining rights are also granted, and the provisions granting them are not without meaning. But the particular grant of the right to enter upon and under the land, and mine and remove all of the coal, is virtually without meaning if it does not give to the grantee the right to remove all of the coal.

I think there is a vast difference between a grant of all the coal simply, and a grant of all the coal together with the right to enter upon and under the land and remove all of it. Without a right to remove all, the owner of the coal may not do so, if to do so would injure the surface.

As to the waiver or exclusion of the benefit of the rule, *Sic utere*, etc., upon which alone the right to support rests, I ask in what more effective way may it be waived or excluded by the surface owner, than by positively agreeing or consenting, for a valuable consideration, to the specific use complained of? The plaintiff complains of the use by the removal of all. He has by express, positive words, not by implication, agreed to the specific use of which he complains. No claim is made that the words used have any technical meaning, as applied to the subject matter of the deed. The words are intelligible to all. They mean the same to the linguist and the unlettered. If the English language were searched for words of consent or agreement to the removal of all the coal conveyed, I apprehend that none more appropriate could be found. Then, has the defendant so used its property as to damage the plaintiff? According to the averments of the declaration, it has; but we cannot stop there. Has not the plaintiff consented and agreed to that specific use by his solemn deed, and thus been barred of his right to complain? If the plaintiff is injured by the performance of the contract, is it not *damnum absque injuria?* I must answer in the affirmative. So long as the constitutional guaranty of the right to contract exists, a man may so contract, and the contract must be respected by the court. If a party chooses by binding contract to agree to an act resulting in damage to his property, he has the right to do so. It is a proper subject of contract. Can the plaintiff say, I have

agreed in unequivocal terms to the specific use of the defendant's property of which I now complain, but *sic utere tuo ut alienum non laedas.* I have agreed to the act, anticipated the injury, and received the compensation therefor. May I not sue and recover the compensation again? I answer, most certainly not. To answer in the affirmative would be to say that the principle, *Sic utere,* etc., may be invoked to impair the obligation of a binding contract. No such application of this principle is authorized by law. It may not be used to perpetrate a fraud; neither may it be used against the express terms of a contract, or to impair or destroy its obligation.

"It is a general rule of law that no one can maintain an action for a wrong, where he has consented to the act which occasions his loss." 8 Am. & Eng. Enc. L. 698; 1 Broom's Legal Maxims, 268, quoting Tindale, C. J.

In other like cases, where a party has so contracted or consented, it would hardly be contended that he might, notwithstanding the contract, recover damages.

If the owner of a building sell and convey the materials in a story of the building, together with the right to remove all of them, may he afterwards complain of the removal of what he sold? If one sitting on a chair in his own home, sells that chair together with the right to remove all of it, and it is removed under the contract, may he afterwards complain because he has not the support of the chair as he had before the sale and removal? If one agrees that another may do a particular act which otherwise would constitute a trespass to the former's property, and that act is done pursuant to the agreement, may he complain? It is hardly necessary to say that, in such cases, damages may not be recovered produced alone by the specific act agreed to, if there be no negligence or malice in the manner of doing the act. Illustrations might be multiplied indefinitely. The intention of the parties to the deed is apparent, certain and unambiguous, from the language used. The language of the deed gives the grantee the right to remove all the coal.

It may be claimed that, although the grantee is given the right to remove all the coal, if he does so he should provide artificial support. As said by Baron Bramwell, this is impossible, owing to the expense. I doubt if it is possible to

support a whole tract of land *modo et forma* by artificial
means.   It seems to me that there must be some subsidence,
some settling, of the surface, if artificial support alone be re-
sorted to.   What has been said in relation to agreeing and
consenting to the specific use, disposes of the question of ar-
tificial support as effectually as the question of natural sup-
port.   Taking the deed as it is averred to be, we find no ex-
press covenant for artificial support.   I do not think that
artificial support was within the contemplation or intention
of either of the parties when the deed was made.   No lan-
guage was used from which such intent may be implied.
The court cannot make a contract for the parties, and can-
not extend or enlarge one already made.

Many of the English cases lay stress upon the fact that,
under the particular instruments before them, the mining
rights applied to acts to be done upon the surface of the land
only.   If anything were needed to show the contrary intent
here, the word "under," when read with the rest of the deed,
certainly performs that function.   It cannot be said, if the
word "under" is to have effect, that it does not clearly mean
that the rights granted may be exercised under the land, and
that the right of removal relates to the coal conveyed under
the land.   It may be claimed that the word "under" should
be excluded as repugnant.   Why should it be excluded?
The claim is that it is in conflict with the dominant and
primary intent of the deed.   Is this true?   What is the pri-
mary or dominant intent of the deed?   The primary or dom-
inant intent is to convey the coal *under the ground*, and the
right to remove all of it *under the ground* is not in conflict
but consistent with this dominant intent.   It is argued that
the dominant intent of the deed is to reserve the surface.   I
cannot agree with that.   The plaintiff does not own the sur-
face by virtue of this deed.   He was the owner of it before
this deed was made.   He derived title to it, as well as to the
coal conveyed, from some other source.   He simply did not
part with the surface by this deed, farther than therein
specified.   No reservation of surface is expressed in the deed.
It was not necessary to do so.   I must give meaning and
effect to the word "under," because I believe it is rational and
consistent with the residue of the deed to do so.   "Rules of
construction are adopted with a view of ascertaining the in-

tention of the parties, and are founded in experience and reason, and are not arbitrarily adopted. They are not intended to make terms for the contracting parties. but simply to ascertain what the language means which they have employed in their contracts." 2 Devlin on Deeds, section 837.

If, however, there were a doubt (which I do not concede), then the rule that the deed must be construed most strongly against the grantor is applicable. "Where the grant shows the intention, even though ambiguously stated, following the rule that it is construed most strongly against the grantor; the right to surface support will be held not to exist." Snyder on Mines, section 1032, and cases there cited. It is said that this rule, that a deed must be construed most strongly against the grantor, is the last rule to be resorted to, after everything else has failed, and for that reason it is inveighed against in argument. If it be the last, and there remains ambiguity after the others have been applied, it must certainly be applied before reaching a decision in favor of the grantor. It hardly seems fair to treat this rule so harshly, when we remember that we have a statute (section 2, chapter 72, Code,) designed at least to emphasize and carry it into effect. Mr. Minor in his Inst., Vol. II, p. 918, speaking of the like statute in Virginia, says that it "seems to be designed to carry this principle of the common law yet further, although there has been as yet with us no judicial determination as to its construction. The enactment is that every deed conveying lands shall, unless an exception be made therein, be construed to include all the estate, right, title and interest whatever, both at law and in equity, of the grantor, in or to such lands."

I think the language used in the deed under consideration, no matter what may be the ground upon which the right to subjacent support is thought to be based, is sufficient to exclude the right to support. I would apply here the same rules of construction applicable to other instruments of like character conveying other property; no stronger, no weaker, but with the same effect upon all. This is the trend of many of the late cases and authorities and I feel that it is the true rule.

Section 7, chapter 79, Code, is cited as bearing upon this case. In my judgment, it has no application.

It is contended that the court should look at the hardship of a decision in favor of the defendant. If the contract is binding, the court cannot relieve against it because of hardship alone. It is claimed by each side that great hardship will result, in case of an adverse decision. This may be true: but if true, it is a hardship of their own making.

According to the declaration, the plaintiff's surface has subsided, and damage resulted. If the plaintiff was required to leave, of the coal conveyed to it, enough to support the surface, which is estimated at from one-fourth to one-half of the whole, then the part so left would be of no value in place to the defendant. Under our law, the defendant, being the owner thereof, must pay taxes on the portion left, through all the years to come. It is persistently urged that the modern and best methods of mining require the removal of all the coal for the benefit of the surface: that to do so permits the surface to re-form and the remaining strata to re-unite, thus preventing the continuous draining of the water from the surface. This may or may not be true; I do not know. If true, the damage to plaintiff's surface may not be so great as it otherwise would be.

My only apology for the length of this opinion is the importance of the questions involved. For the reasons stated, I concur in the decision.

POFFENBARGER, JUDGE, (*dissenting*):

I am unable to concur in the view of my associates in this case, because I do not think it has been, or can be, reached without violating sound and well settled principles, and especially rules governing the interpretation and construction of deeds and contracts. The opinion avowedly disapproves and repudiates vital principles of the law of subjacent and lateral support, declared by every American court that has ever applied that law to a deed or contract by which the surface of land has been separated in title from the underlying coal, as well as the decisions of the English courts. It expressly condemns, by name, the decisions of Alabama, Illinois, Indiana, Iowa, New York and Pennsylvania, and those of Ohio and perhaps other states without express reference to them. It demolishes at one fell blow the entire system of

English and American law on the subject. This the opinion fully and expressly concedes.

An effort is made, however, to free the case from the operation of the principles declared by the numerous decisions, thus repudiated and disapproved by this Court, but uniformly recognized and rigidly enforced by all others in the English speaking world, because of an alleged variance in the language of this deed from that of the ordinary deed conveying coal without the surface. After conveying all the coal in the tract of land except about three acres, the deed further stipulates, among other things, that "The party of the second part (grantee of the coal) and his assigns is to have the right of way through said reservation for a road, air-course and tram-way necessary or convenient for the mining and removal of said coal and the coal under coterminus and neighboring lands, *together with the right to enter upon and under said land and to mine, excavate and remove all of said coal.*" Immediately connected with this there is further language to be noticed later. Conceding, for the purposes of illustration and argument, that a mere grant of all the coal would not confer, by implication, the right to deprive the surface of subjacent support by removing all the coal, the opinion asserts that the clause above quoted confers, by express grant, the right to remove every particle of the coal, and that the grant of such right of removal is an express grant of the right to take away the support of the surface, because the destruction of the support is the necessary and inevitable result of such removal from under the surface, provided no artificial support be substituted. This is the theory advanced by counsel for the defendant in error and adopted by the Court as a means of escape from the effect of the general principles declared by all other courts, in cases involving the interpretation of deeds, severing minerals from the surface by grant or reservation thereof. If it is untenable and unwarranted by the language of the deed, this decision is squarely contrary to said principles, and, in legal effect, as well as declaration of opinion, denies that they obtain in the law of this State, although universally approved as sound in all other jurisdictions. In determining whether this deed may be so distinguished, for the reasons aforesaid, it is certainly not improper to ascertain what reply other courts have made to

the same contention, based upon similar, if not identical, clauses in deeds of this class. If they have held such clause, taken in connection with a previous clause, granting the coal, insufficient to authorize the destruction of support of the surface and to distinguish the deed from one granting title to the coal without saying more, then this decision ignores and repudiates the application of rules of construction and interpretation, made by courts of the highest credit and repute, and without showing wherein they have erred in doing so.

One of the earliest cases on the subject, *Harris* v. *Ryding*, 5 M. & W. 60, decided in 1839, by the English Court of Exchequer, presided over by some of the most distinguished jurists whose names are recorded in the annals of our jurisprudence, including the great Sir James Parke, construed a deed, which, in all material respects, was like the one now under consideration here. By it, A., being seized in fee of certain lands, granted it to P., his heirs and assigns, reserving to himself, his heirs and assigns, "all and all manner of coals, seams and veins of coal, iron ore, and all other mines, minerals and metals which then were, or at any time, and from time to time thereafter, should be discovered in or upon the said premises." By this language, he retained the title to all the coal. Then follows an additional reservation, which, it was claimed, conferred right to remove all the coal and destroy the support of the surface. It was in these words grammatically annexed to the words of grant: "with free liberty of ingress, egress, and regress, to come into and upon the premises, to dig, delve, search for, and get, the said mines and *every part thereof, and to sell, dispose of, take and convey away the same, at their free will and pleasure.*" In that case, as in this, it was urged that this last clause must have effect; that the words thereof must be deemed to have been used in their usual and ordinary sense and meaning, and, given such effect, that they authorized a removal of all the coal and so necessarily carried the right to injure the surface by destroying its support. Counsel in the argument of that case, said: "The defendant was entitled to work out all the mines, but he could not do so if he was obliged to leave props, which would be of coal to support the surface." But the court, after mature consideration, replied thus: "Under this reserva-

tion, A. was not entitled to take all the mines, but only so much as he could get, leaving a reasonable support to the surface." The clause of the deed, giving the right to enter upon the land to seek for, get, *and to sell, dispose of, take and convey away all the said mines and every part thereof* was not overlooked by the court in reaching its conclusion. In respect to it, Lord Abinger said: "The defendants' counsel, therefore, seeks to carry the right of the defendants a step further by the operation of the words in the 'exception, giving a right of ingress upon the land. Now the meaning of that exception was to meet the difficulty the defendants laboured under, of not being able to enter upon the land to sink shafts, and make use of those shafts for the purpose of getting their mines. I think there is no new right reserved thereby more than the right to use the surface, for the purpose of getting the mines; but it does not enable them to get them to a greater extent, or in a manner unusual and improper, so as to prejudice the surface of the land. I cannot therefore see how the exception relied upon by the defendants at all assists their argument. That exception was rendered necessary by parting with the surface of the land; it applies to the liberty the grantor has of going upon the surface, and does not apply to the right he has below." Maule, Baron, said: "I think the covenant or stipulation, giving them the power to go upon the plaintiff's land, and providing that they are to make compensation for it, applies merely to acts done upon the surface of the land, that is, disturbing the surface by digging, sinking shafts, and so on; all those things they are authorized to do, but not absolutely, only conditionally upon making compensation; and that liberty has nothing to do with the right of getting the mines, which may be taken to be done on this occasion without breaking the plaintiff's soil; but their right to get the mines is the right of the mineowners, as against the owner of the land which is above it." Parke, Baron, after setting out the terms of the reservation and the power to enter the land and take away the coal, said: "It is clearly the meaning and intention of the grantor, that the surface shall be fully and beneficially held and enjoyed by the grantee, he reserving to himself all the mines and veins of coal and iron ore below.   *   *   *   This is the true construction of this deed, in order to make it operate ac-

cording to the intention of the parties. * * * If that is the true construction of the reservation and power, the defendant ought to have stated in his plea that he took the coal he did take, leaving a reasonable support for the surface in the state it was at the time of the grant."

Another parallel case is *Carlin & Co.* v. *Chappel*, 101 Pa. 348. One Brown conveyed to Lewis certain lands by deed containing the following clause: "Excepting and reserving to John Brown all the coal underlying said lots of ground, the right and full and free privilege of ingress, egress and regress for digging, mining and excavating said coal (for the purpose of mining, digging, excavating and conveying away said coal)." By sundry conveyances, the title to part of the land came to Chappel and the last deed contained this clause: "All the coal underlying the same, together with the full and free privilege and right of ingress, egress and regress, so far as may be required for digging, mining, excavating and conveying away said coal, being vested in John Brown." Counsel for the defendant in error said in the argument that as the grantor had expressly excepted and reserved all the coal underneath the lots conveyed, with the right to mine and take it away, he and his assigns of the coal were not liable for damages to the grantees of the surface, or their assigns, for any result following the removal of all the coal. But the court unanimously resolved as follows: "Where the owner of land conveyed it in fee simple, excepting and reserving all the underlying coal, with the right of mining, excavating and conveying away the same; and subsequently conveyed to another party the coal and privileges so excepted and reserved: *Held*, that the grantor's assigns of the coal were liable for damages occasioned to the owner of the surface by subsidence caused by mining the underlying coal." In *Williams* v. *Hay*, 120 Pa. 485, the deed conveying away the land, expressly reserved to the grantor the right to take all the coal and afterwards the necessary rights of way for the full exercise of the privileges were reserved. It is much stronger than the language used in the deed now under consideration. It reads as follows: "Reserving, however, to the use of the said W. J. Baer, his heirs and assigns forever, the full and perfect right and privilege of searching for, mining, procuring and taking away by such ways and means as to the said W. J. Baer, his

heirs and assigns, may seem fit and practicable, *all the coal*, iron ore, metals, limestone, fire clay, and all other mineral substances, whatsoever, whether solid or liquid, lying and being upon, under, and contained within the surface of the land hereinbefore mentioned and described, (exclusive of the three (3) acres around the buildings,) and the necessary right of way for the full exercise of privileges as aforesaid, Provided, however, that the said W. J. Baer, his heirs and assigns, in mining and removing the coals, iron ore and minerals aforesaid shall do as little damage to the surface as possible." In view of the decision in *Carlin & Co.* v. *Chappel*, cited, it does not seem to have been urged in this last case that the right to remove all the coal carried with it the right to destroy the support to the surface, but it was insisted that this grant together with the clause recognizing the right to damage the surface, disclosed upon the face of the deed intent to permit the support to be destroyed and the surface thereby damaged. But the court said: "Where one person owns the surface and another the underlying coal or other minerals, the absolute right of the former to surface support is not to be taken away by a mere implication from language not necessarily importing such result. Such right is not affected by a clause in the deed conveying the surface but reserving the coal, which provides that the grantor, his heirs or assigns, in mining and removing the coal 'shall do as little damage to the surface as possible.' "

In *Burgner* v. *Humphreys*, 41 O. St. 340, the court held as follows: "If the owner of land grants a lease whereby he conveys all the underlying mineral coal, *with the right to mine and remove the same*, the lessee will not be entitled to remove the whole of the coal without leaving support sufficient to maintain the surface in its natural state, unless the language of the instrument clearly imports that it was the intention of the lessor to part with the right of subjacent support." In that case the grantor owning a tract of land, bargained, sold, transferred, aliened and conveyed to another "all the mineral, coal, iron ore, limestone and all the other minerals" under or upon said tract of land, and further gave, granted and conveyed to said other parties "the right, privilege and license to enter upon the above described land at any and all times hereafter and search and explore thereon.

for said mineral, coal, iron ore, limestone, clay and other minerals, oil and salines, or for any of them, and *when found to exist on said land, to dig, mine and remove the same therefrom.*" The deed then went on and granted all the rights, privileges, licenses and easements necessary or incident to the proper prosecution of the business of mining and removing any or all minerals or substances aforesaid. It is to be observed here that this deed gave expressly the right to remove all that had been granted. It granted all the coal and granted the right to search for it and remove the same. "Same" in that connection could mean nothing other than all the coal, but the court said the deed conferred no right upon the grantee to disturb the surface by withdrawing its support. No doubt, the clause giving the right to remove the coal was strongly urged as a relinquishment of the right of support, for counsel for plaintiff in error conceded that the lease of coal carried with it the right to open the mines and explore, and if coal was found to dig and remove it, but they insisted that the mine owner had no right to remove all of it, including props and pillars, in the absence of an express relinquishment of the right of support by the owner of the surface, and the court, as above shown, sustained that view. In *Livingston* v. *Coal Co.,* 49 Iowa 369, the clause conferring the title to the coal was in this language: "And reserving also to said first party, his heirs, successors and assigns, all coal, coal mines, mineral products and oil beneath the surface of, and belonging to, said premises, with full and sole right to mine, and obtain and remove the same, by such means as they deem proper, without thereby incurring, in any event whatever, any liability for injury caused or damage done to the surface of the land in working coal, coal mines, minerals, mineral products and oil, and removing the same, provided the said first party shall not enter on the surface of said lands." Upon this deed the court held that support for the surface could not be destroyed. Here, it is to be observed that all the coal, together with the right to remove the same, was reserved, which meant the right to remove all the coal, if the language is to have the effect the terms used import.

In all the above mentioned cases, the deeds contained clauses giving the right to remove all that was granted. How the deed from Griffin to Camden can be distinguished from them

is not perceived.   It granted all the coal under the tract of
land and gave the right to enter upon the land and remove all
the coal.   Can it be doubted that the deeds in the Ohio case,
and in the Iowa case, and *Williams* v. *Hay*, 120 Pa. 485, used
language purporting to confer the express right to remove
all the coal?   There is no claim that the language of the deed
under consideration here does more.   The deed in *Williams*
v. *Hay* did that and added a clause which purported to rec-
ognize the right of the mine owner to damage the surface,
and yet the court said there was no language in the deed by
which the intent to waive support of the surface was suffi-
ciently evidenced.   In the Iowa case, there was an express
grant of the right to remove all the coal, and, in addition
thereto, language which purported to relieve the mineowner
of any liability for injury caused or damage done to the sur-
face of the land in working coal, coal mines, minerals, min-
eral products and oil and removing the same, provided said
owner should not enter upon the surface of the land, and the
court said that was not sufficient.   It is said in the argument
that this last decision denies to the owner of the surface, on
grounds of public policy, the power to release his support by
contract.   No such reason is anywhere given in the opinion
for the conclusion arrived at in that case.   Certain English
cases, recognizing such right and power are referred to and
the principles announced in them not denied or criticised.   It
was said of them that they did not go so far as to confer the
right, under such a contract as the court was considering, to
remove all the coal without liability for negligence in not
placing pillars for support of the surface.   This may have
been an erroneous view of those cases, and the Iowa decis-
ion may be wrong, but it is no declaration of public policy
forbidding the owner of the surface to part with his right
of support by express contract.

As to the interpretation of this clause there may be differ-
ences in some of the decisions above referred to.   In *Harris*
v. *Ryding*, 5 M. & W. 59, Lord Abinger said the clause giv-
ing right to enter and remove every part of the coal, was in-
serted for the purpose of authorizing an entry upon the land,
for the purpose of exploring and searching for, and carrying
away, the minerals, which he seems to have thought was nec-
essary to give such right of entry.   In this view, Maule,

Baron, concurred, and thus they denied to it evidence of intent to authorize the removal of all the coal. Parke, Baron, without giving any reason for its insertion, said, "I do not mean to say that all the coal does not belong to the defendants, but that they cannot get it without leaving sufficient support." The American cases seem to concede that a clause granting the right to remove all the coal will authorize the removal of all of it, but will not carry, by implication or otherwise, the right to destroy the support of the surface. They say it does not amount to an express relinquishment of the right of support and that no such right can be relinquished otherwise than by express language, disclosing plain intent to do so.

But it is said that, if the clause giving right to remove all the coal does not authorize the destruction of the support of the surface, it has no effect, for there is no other function it could perform, and the parties are not presumed to have used any language in their contract without purpose, and that the rules of construction require that every word shall have some effect, if possible, and as much effect as it may have consistently with other parts of the instrument. No fault is to be found with these propositions of law. They are sound and incontrovertible, but how about their application to the clause used in this deed? By reference to JUDGE McWHORTER's opinion, it will be seen that the first part of the clause relied upon confers a right of way through a reservation of coal in the plaintiff's land, which the grantee did not take by his deed and through which he could have no right to go without an express grant of the right of way. There was necessity for this part of it. It performs an important function. Then follows this language: "Together with the right to enter upon and under said land and to mine, excavate and remove all of said coal." But it does not stop there. It goes on and confers the right to remove upon and under this particular tract of land, coal to be mined upon other tracts of land, coal which had been, or might be, purchased from persons other than Griffin. There was reason, therefore, for not stopping with the mere grant of title to the coal and a way through the three acre reservation. Without this clause they could not have removed, through Griffin's land, coal taken out of lands of other people. There was absolute necessity

for these two additional clauses. There may not have been any absolute necessity for so much of the stipulation as conferred the right to enter upon and under said land to mine, excavate and remove all of said coal. The grantee of the coal would have the right, under the law of necessity, to do this. When a man grants a thing he grants with it, by necessary implication, the means of getting to it. But this principle does not prevent the parties to a deed or contract from expressly stipulating for rights which the law would give without such stipulation. Illustrations of this are to be found in almost every oil lease and coal lease and purchase of timber, operative within the limits of the State. Although, when timber is purchased on a tract of land, or oil and gas under it, or a lot or tract of land out of the interior of another, and left surrounded by the residue, the law gives the right to go upon the land and cut the timber or bore for oil and gas, and a right of way to the owner of the lot or tract of land so purchased and situated, the deed or contract almost always contains an express stipulation for such right of entry or way. This denies that express contracts for rights which the law gives are deemed useless and without purpose. Are express contracts never made where the parties may rest their rights upon the law? Money advanced without an express contract of repayment may be recovered. Goods, wares, and merchandise delivered to a party and by him consumed, without an express promise to pay for them, gives a right of action for the recovery of their value. But does this principle prevent men from taking notes in such cases? And, if in such case, a man takes a note for the money or the value of the goods, is he regarded as having done a vain, useless and foolish thing? If Mr. Camden preferred to have an express stipulation in his deed for entry upon the land, mining, excavating and removing the coal, rather than rely upon the law of necessity, giving him these rights by implication, is he to be regarded as having had it inserted for no purpose whatever, because, forsooth, the court denies to him the right to establish some other or different purpose or reason for its insertion? Will his assignee be permitted to advance, as a pretext upon which to found the construction it wants, the lack of another and different and baldly apparent purpose? If the court will not permit it to operate as a relinquishment of the

right of support, could he not rely upon it in the court as a covenant for the right of entry upon the land? If we say no other purpose than to authorize the destruction of the support of the surface is discoverable, then we must say that, in no case in which a man could assert his rights without written evidence of the contract, does the taking of such evidence admit that there was any reason for it or purpose in it. But this is not all. The law gives no more than is necessary. It does not consult or provide for the mere convenience of the party who must appeal to it alone for his rights, but gives only what he can get along with. Parties often want more than this, and, therefore, stipulate for it. So did Mr. Camden in this case. After providing for entry upon the land for the purpose of mining, excavating and removing his own coal and the coal from adjacent coterminus and neighboring lands, he, in the same clause and immediate connection, stipulated for the right to make all structures, road ways, excavations, air-shafts, drains, tramways and openings necessary *or convenient* for the mining or removal of said coal and the coal from coterminus or neighboring lands. Not satisfied to depend upon the law of necessity for the privileges of structures, roadways, excavations, air-shafts and so on, he stipulated *for all such things as might be convenient.* Can it be said that this does not evince a purpose limited to the working of the mine conveniently and successfully which stops short of the right to take away the support of the surface, and that, if he cannot take such support under this clause, the clause is useless and valuless to him and there was no reason for putting it into the contract? An affirmative answer to this question would do violence to the rules of construction and be at variance with the known practice of all classes of business men everywhere, at all times, and in all relations. Even if this express contract did not broaden the rights of the grantee in extent, as to the rights of way and structures, it is a contract of a higher nature than a mere implied right, for such right is merged in it. An action for its vindication would have to proceed upon the express contract. But it is said no reason is yet assigned for the use of the word "all" in the clause conferring the right to remove the coal. Why did not the stipulation stop with a grant of the right to mine, excavate and remove "the coal"

or "said coal?" Does not the word "all" prefixed signify every particle of the coal? Can it mean anything else? Plainly it does not necessarily mean that. In seeking its meaning we must consider it in connection with its immediate context, the language of the clause in which it appears. The purpose of that clause is to give the right to necessary and convenient roads, ways, structures, shafts, etc., and it was desired that such necessary and convenient things should extend to all the coal, that is, to the coal under all portions of the coal area purchased, the coal in the northern, southern, eastern, western, central and all other portions of that area, and the most apt words and expressive terms for securing such right were "all the coal." That is the sense in which it is generally used in conveyances. A deed generally grants all of the tract of land, which it purports to convey. In a sale of timber or growing crops, the contract almost invariably uses the word "all," unless something is to be excepted. Its use here by no means necessarily signifies intent that every particle of the coal may be removed.

It being thus demonstrated that this deed differs in no essential or material respect from those construed, by courts everywhere, as not authorizing destruction of the support of the surface, and as leaving the parties, as to the matter of surface support, in the situation in which they would be if the deed merely conveyed the coal, reserving the surface, or conveyed the surface, reserving title to the coal, it becomes necessary now to inquire whether this construction is right, as tested by the rules of construction and to point out the fallacy, if any, in the numerous decisions which have so construed such contracts, and, incidentally, to ascertain whether the reasoning found in JUDGE McWHORTER's opinion has clearly demonstrated misapplication of the rules of construction in the long line of decisions which the Court repudiates and overthrows.

In deeds, as well as in other contracts and in statutes, the intention controls, and the object and purpose of all interpretation and construction is to ascertain the intention. For this purpose, rules have been devised and prescribed by the courts. Dominant over all other rules of that kind is the one which declares that the whole instrument shall be considered and the intention expressed in every clause and in every word

thereof shall be reconciled and harmonized, if possible. 13 Cyc. 605. Chitty on Contract, Volume 1, page 106, states this rule in different language and as the language strongly illustrates the meaning of the rule it is quoted. "An agreement or contract shall have a reasonable construction, according to the intent of the parties: as if a man agree with B. for twenty barrels of ale, he shall not have the barrels when the ale is spent." "In the construction of contracts, all the provisions thereof shall be taken into consideration and reconciled if possible, so that the true intent of the parties to the contract may be ascertained." *Barber* v. *Ins. Co.*, 16 W. Va. 658; *Heatherly* v. *Bank*, 31 W. Va. 70. Closely akin to this great dominant rule, requiring the construction of the contract as a whole, comes the next most important one, namely, some meaning must be given to every clause, word and expression, if it can reasonably be done, consistently with the general intent of the whole instrument, so that the deed may operate, if by law it may, according to the intention of the parties. Another rule of great importance, but clearly subject to exceptions and modifications, where the application of the rules above referred to require it, is that which says words must receive that interpretation which is given by the common usage of mankind. That is, as a general rule, the words must be given their popular ordinary meaning. This rule is subject to many exceptions, but the other two are subject to none. They are invariable and unalterable. Whether a word is to be given its literal meaning must be determined in view of the circumstances under which it is used and the context. Where a word has a popular meaning and a technical meaning, the rule requires that the technical meaning shall prevail. Non-technical words are not to have their plain, natural, grammatical established, definite, usual, obvious and ordinary meaning, if the paper is ambiguous on its face. 13 Cyc. 606. Nor are they to have such meaning if, to give it to them would prevent a rational exposition of the whole contract. *Id.* "A literal interpretation will be abandoned where it leads to a capricious and irrational result, if such rational exposition can be followed." *Id.* It is upon this rule, relating to the sense in which words shall be taken and given effect, that the whole theory of the defense to this action is based. It is upon this rule that the

whole contention of counsel for defendant in error, as to the construction of the deed, is founded.   It is obviously subsidiary and subordinate to the two rules above referred to, and if in applying it to this deed, as counsel for defendant in error contend, it conflicts with the result of the application of the other two rules to the contract, then it must yield.

What is the general intent manifested by this deed?   The grantor owned the tract of land from the sky to the center of the earth.   He granted away the coal only.   Therefore, he retained the surface.   He did not reserve the surface, he excepted it by putting no language in the deed which could take any part of it away from him.   The dominant intent of the whole contract is that the grantor shall retain the surface and the grantee shall have the coal.   All other parts of this deed must receive such construction as will not make them conflict with this general intention, if it be possible to do so, and yet give them some reasonable operation and effect. Other parts must not have such effect as to deprive the grantor of the surface or any part of it, unless they so clearly express that intention as to make it necessary to give them that effect.   The court cannot presume that by retaining the surface there was any intention, on the part of the grantor, to retain it otherwise than in that state in which nature placed and left it.   If, in his hands, it is to become punctured with craters and holes and riven with fissures, so as to deprive him of the use and benefit of it for those purposes for which, by nature, it is fitted and designed, he does not retain the surface in the true and full sense of the word.   If, having bargained for the surface, he is to be put off with a broken, ruined and useless piece of land, he does not get what he bargained for.   Hence, it will not be presumed, in the absence of words expressly showing it, that he intended to let the support go from under his surface, for the very reason that loss of the support is loss of the surface itself, and the whole general intent of the contract, viewed as a whole, is defeated so far as the grantor is concerned, and thereby the first great rule of construction violated.   On the other hand, the intent plainly disclosed is that the grantee shall have the coal and all of it.   And if he is entitled to all of it, he may remove all of it, but he cannot take with it any part of the surface, because the intent that the grantor shall have that is just as full and

plain as the intent that the grantee shall have the coal. There-
fore, although entitled to remove all the coal, if this contract
gives such right, he still has no right to withdraw the sup-
port, because he may substitute artificial, for the natural
support.    Impracticability of artificial support, because of
the great expense is the only answer to this.    But that de-
pends upon the circumstances. As a matter of fact, such sup-
port is sometimes employed.    The books contain reports of
cases referring to instances of the substitution of artificial,
for natural, support.    But, be this as it may, the deed can-
not be so construed as to take away any part of the surface,
if the other portions of the deed can have some reasonable
effect without doing so.    Repugnance is to be avoided if pos-
sible.    That which is plainly guaranteed to the grantor by an
exception, the surface, cannot be cut down or impaired by
another clause of the deed, if that other clause can have rea-
sonable effect in some other way,—can subserve some other
purpose useful to the grantee.    That it can, and does, has
been clearly demonstrated.    It gives the important rights of
entry upon the land, of excavation, of removal, and of nec-
essary and convenient ways, shafts, structures, etc., as to all
the coal, and, if it be limited to these things, plainly co-ex-
tensive with the utmost signification and import of its terms,
the clause is consistent with the general and dominant intent
of the whole instrument.    Thus every portion, provision,
clause and word is given effect as required by law.    The oth-
er construction would defeat the general intention and sub-
ject the whole instrument and the general intention to the
domination and control of the single word "all" and without
necessity, as has been clearly shown.    This would stand aside
the great rule, requiring effect to be given to the general in-
tent, which is absolute, for the subsidiary rule, requiring ef-
fect to be given to every word, which is not absolute except
to the extent that some function must be found for each word.
It is not absolute as to what office it shall perform or the ex-
tent to which it shall be effective, and under it, the import
and meaning of mere words are required to be curtailed and
limited so as not to conflict with the general intent express-
ed.

"And as the meaning to be put on a contract is that which
is the plain, clear, and obvious result of the terms used there-

in; so these terms are to be understood in their plain, ordinary, and popular sense, unless they have, generally, in respect to the subject-matter,—as by the known usage of trade or the like,—acquired a particular sense, distinct from the popular sense of the same words; or unless the context evidently points out that they must, in the particular instance, and in order to effectuate the immediate intention of the parties to that contract, be understood in some other special sense. And the same rule has been thus stated: "words are to be construed according to their strict and primary acceptation, unless, from the context of the instrument, and the intention of the parties to be collected from it, they appear to be used in a different sense, or unless in their strict sense they are incapable of being carried into effect." Chitty on Contracts p. 113. "As a rule, the terms of a contract are to be understood in their ordinary and popular sense, rather. than in their strict grammatical or etymological meaning. Subject to this rule, words are ordinarily to be understood in their plain and literal meaning. * * * However, the literal meaning will not be adopted by the court against the intention of the parties as evidenced by the entire contract." Hammon on Contracts, pp. 812–13, section 412. "As in the case of all contracts, the intent of the parties to the deed, when it can be obtained from the instrument, will prevail, unless counteracted by some rule of law. * * * The rule is that the intention of the parties is to be ascertained by considering all the provisions of the deed, as well as the situation of the parties, and then to give effect to such intention, if practicable, when not contrary to law." Devlin on Deeds, section 836. "Manifestly, no general rule can be laid down as to the construction of particular words. The primary object courts have in view is to carry out the intention of the parties." *Id.* section 864. In order to do this, words are often ignored entirely or discarded as meaningless and useless, and, in some instances, a meaning and effect are given to them entirely different from what they import, in order to effectuate the general intention shown by the deed. Numerous illustrations of this might be given but one or two will be sufficient. If it appears, from the terms of a deed, and the circumstances connected with the execution that the grantor meant children, although he used the word "heirs," effect

will be given to it accordingly, and the deed will not be defeated, by the general rule that a conveyance to the heirs of a living person is void. *Heath* v. *Hewitt*, 127 N. Y. 166; *Vickars* v. *Lee*, 104 N. C. 248; *Griswold* v. *Hicks*, 132 Ill. 132; *Broliar* v. *Marquis*, 132 Ill. 194; *Broliar* v. *Marquis*, 80 Ia. 49. The term "heirs at law" may be construed as children, or grand children, where such a construction will effectuate the grantor's intention, and is consistent with legal principles. *Waddell* v. *Waddell*, 99 Mo. 238. "Generally whatever is inconsistent with the real intention of the parties as ascertained from the language of the whole instrument may be rejected as superfluous, or false or mistaken, or repugnant, provided no rule of law be violated thereby, so as to give effect to the deed according to the intent. But although words may be rejected which are repugnant to other parts of the deed and to the general intention of the parties, nevertheless no word is to be rejected, unless there cannot be given a rational construction to the instrument with the words as they are found." 13 Cyc. p. 619, article on deeds.

Under the application of these rules there can be no doubt that the general intention of the parties to the effect that the grantor shall have the surface in the full sense of the term and the grantee the coal, must govern and control the subsidiary clause giving right to enter upon the land and mine, excavate and remove all the coal, for these words may have reasonable and important force and effect without working such disturbance, and, under these rules, the court must so limit their effect. This clause adds nothing to the grant of the coal. The grant alone gives the right of removal of all of the coal, if it can be done without depriving the surface of its support. No additional words are required to confer that right. It exists without any additional clause. The mere addition of the right to remove all the coal, without language in connection with it, disclosing intent to allow the surface to be thereby injured, leaves the parties in the same situation as if the deed stopped with a mere grant of the title to the coal. The value and character of the surface in its natural state cannot be cut down or impaired without the employment of language expressly and necessarily showing such intent.

Under the operation of these rules of construction the

courts have said, uniformly, that, in order to take away the right of support, the language used must not only authorize the taking of all the coal, but must go further and authorize in terms or by such language as clearly shows the intent, the letting down of the surface. There must be some words which can refer to nothing but the surface. No such language appears in this deed; no right to compensation for damages to the surface is stipulated for. No word is used which says the surface may be let down or necessarily means that. In *Davis* v. *Treharne*, 6 App. Cas. 460, Lord Blackburn said, in construing a coal lease, under which royalty was to be paid, not a deed conveying coal, that, if the lessor had said by express words or by necessary implication, you may take away all the minerals, or, you shall take away all the minerals, letting down the surface, he would thereby have relinquished his right of support, and that the fact, that it was to the interest of the lessor to have all the coal removed because he derived a royalty therefrom, might be considered as material on the question of intent. But the words of that lease omitted to say the surface might be let down and it was held that the support could not be withdrawn from under it, although it was a lease and although it contained a clause stipulating for compensation to the lessor for any damage or injury done to the surface of the said farms or lands. This stipulation was referred to, and held to be governed by, the clause giving the right to erect buildings and machinery and to do and execute all such other acts, works and things, upon, in, or under, or above the said premises, as should be necessary and convenient for working and carrying away the minerals, and that the use of the word "under" in that clause did not make it applicable to operations carried on under the surface so as to permit injury to the surface by a withdrawal of the pillars. The general intent disclosed by the whole contract rendered this word irreconcilably repugnant thereto and it was thrown away and not allowed to control the general intent, because its connection was such, its location such, that the court could see that it was never intended to have such effect, and was intended to play a subsidiary and comparatively unimportant part in the contract. It was restrained by its immediate context and had to yield under the force of

the general context, and the contrary intent appearing from the whole instrument.

Now what are held to be deeds and contracts giving the right to take away the support of the surface? What language is sufficient to disclose intent, on the part of the grantor, to relinquish it? In *Smith* v. *Darby*, 7 L.R.Q.B. 716, a deed was held sufficient for that purpose, because it conferred upon the lessees the right to enter and work and take the minerals by this clause: "they, the lessees, their executors, administrators, and assigns, making reasonable satisfaction to the lessors, their heirs and assigns, and their tenant and tenants, for the damage done to them respectively by the surface of their lands being covered with rubbish or otherwise injured, or as he or they should or might sustain, as well by the injury done to the lands of the said lessors in sinking and getting the said mines and mineral and converting coal into charcoal, *as for such damage or injury as may be done or caused in the dwelling house or other buildings of the said lessors by getting mines of coal, ironstone, or other stone or other minerals under or near* to any of the dwelling-houses or other buildings of the said lessors, according to the covenant hereinafter contained." Following this was a covenant that the lessors, in case of damage or injury to any dwelling-house, cottages or other buildings already erected, or to be thereafter erected on the land in lieu of those then on it, and not of greater value than those then on it, "by reason of any minerals being got *under them*, or so near to them *as to occasion such damage or injury*, the lessees and assigns shall at their own cost, on six days' notice by the lessor, rebuild or repair any such buildings so damaged and injured, and put them in as good condition and repair as they were before the damage was done." There was a further stipulation for the payment of damages done to the crops on the surface. These provisions of the contract clearly showed an intention to allow the surface to be injured. They had direct reference to injury to the surface by withdrawal of its support, and, seeing that in the language of the contract, the court said it must have effect according to the intent of the parties. It was impossible to say that buildings could be injured *by getting coal under them* otherwise than from subsidence of the surface and that could result only from lack of support.

Hence, the language clearly showed that the support might be withdrawn. *Eadon* v. *Jeffcock*, 7 L. R. Ex. 379, proceeds on the theory of a difference between a lease and a deed, and seems to go a step further, but in *Davis* v. *Treharne*, above referred to, Lord Blackburn disapproved that case and said the intent to relinquish the right to support must affirmatively appear in a lease as well as in a deed; and the principles announced in *Smith* v. *Darby* are also inconsistent with the theory of *Eadon* v. *Jeffcock*. In *Scranton* v. *Phillips*, 94 Pa. 1, an executory contract of sale determined the rights of the parties in respect to the coal.    It excepted and reserved to the vendor the coal under the tract of land and provided that on full payment of the purchase money the grantor was to execute and deliver a good and sufficient deed in fee simple, "reserving the coal and privileges above stated, and with a full and unconditional release and discharge forever, on the part of the said party of the second part, her heirs and assigns, to the party of the first part, his heirs and assigns, *from any liability for any injury that may result to the surface of the said premises from the mining and removal of the said coal;* and with a quit-claim on the part of the party of the second part to the party of the first part, his heirs and assigns, of all right, title and interest in and to said coal, and the privileges of mining and removing the same as aforesaid." In the opinion of the court, this contract sufficiently disclosed intent to permit the surface to be injured by the withdrawal of support.    It is stipulated that there should be no liability on the part of the mine owner for any injury that might result to the surface of the said premises from the mining and removal of the said coal.    There was no room to say the injury to the surface contemplated might result from entry upon the surface and doing acts thereon. The language was susceptible of but one signification. It said injury to the surface *from the mining and removal of the coal*, from taking the coal from under the land, so as to inflict injury by subsidence of the surface.    What a vast difference between that contract and the deed here under consideration! Where, in this deed, is there a waiver of damage for injury to the surface, or reference to such injury?    Search for it will be made in vain.    In all these cases, the contract showed an affirmative intent to permit injury to the surface by withdraw-

al of the support, and the language used expressing that intent was such that it could be referred to no other subject than injury to the surface by removal of the support.   Another case in which support was allowed to be taken away, without liability, is that of *Duke of Buccleuch* v. *Wakefield*, 4 L.R.H.L. 377.   It arose under an Act of Parliament, providing for the inclosure of a commons, the minerals under which were owned, at the time of the passage of the act, by the Duchess of Buccleuch, and the surface held by her tenants.   The forty-third section of the clause of the Act provided that the owner of the mines should work them "in as full and ample a manner to all intents and purposes as would or might have been done if the said lands had remained open and uninclosed, or this Act had not been passed, without any interruption whatsoever, yet nevertheless making reasonable compensation for damages done by such works as aforesaid to the person or persons sustaining such damage."   The court found that prior to the passage of that Act, it had been the usage, custom and practice, of the owner of those mines to take away the support of the surface and pay the tenants the damages occasioned thereby, and as the act provided that the working of the mines should go on in all respects as if it had never been passed, it was held that the mine owner had the right to remove the support but was liable for the injury resulting.   By accepting their deeds under the Act of Parliament, the parties were deemed to have assented to the provision of the Act, which authorized the working of the mines to continue in the future as they had been carried on previously.   *Rowbotham* v. *Wilson*, 8 H. L. 348, arose under another inclosure act.   Under it, commissioners were appointed to allot the land, according to the rights of the various persons interested in them, including the mines.   The award of the commissioners, assented to by the persons among whom the partition was made by them, provided that the land so allotted should be lawfully held and enjoyed by the allottees without molestation and without any mine owner being subject to damages on account of working and getting the mines, or by reason that the lands might be rendered uneven and less commodious to the occupiers thereof, or by sinking in hollows, or being otherwise defaced or injured.   The court held that, whatever is the general right in the surface to sup-

port, this clause in the award operated as a grant of a right to disturb the surface of the land. But there was nothing left to implication in the terms of that award. They expressly referred to the surface and exonerated the mine owner from liability for injury to it by causing it to become uneven or to sink in hollows or to become otherwise defaced and injured. The language used could perform no other office than that of a relinquishment of a right of support, as in the Pennsylvania case and in all the other cases in which such effect has been given to the deed.

The requirement of expression of intent to impair the surface in connection with the grant of right to remove the coal, stands upon sound reason, arising from the nature of the right of support. There must be enough to enable the court to see that there is a covenant on the part of the surface owner not to sue the mine owner for damages for injury to the surface resulting from subsidence, or in any way molest him in the working of his mine. If the right of support is an easement, or a right *ex jure naturae*, it is a right which cannot exist except as incident to, and a part of, the surface. It cannot be annexed to the coal for, by its nature, it is incapable of such annexation and cannot pass with a grant of the coal. It cannot pass by grant in connection with the coal, nor in any way, because when it is disconnected or eliminated from the surface it ceases to exist. There must be a subject of grant in order to effectuate a grant. The thing which language purports to grant must be capable of being given to another. This easement is not. *Bonomi* v. *Backhouse*, E. B. & E. (92 E. C. L.) 622. Nor can it be the subject of release in the legal sense of the term, because a release passes an estate, or right. In other words, it passes title; and as this right is incapable of existence except as part of the surface, it cannot be passed to another, unless he has the surface which is necessary to its existence. This view is explained in *Rowbotham* v. *Wilson*, by Lord Chelmsford, as follows: "But although the thing itself, namely, the right to support cannot pass by grant, nor be extinguished by release, yet the covenant amounts to a grant of license to do acts which may be completely destructive of that right; and being by deed, and therefore presumed to be founded upon good and sufficient consideration, it is irrevocable and bind-

ing upon all who claim the surface land from Pears. The effect of Pears' deed is, not to transfer to Howlette any right or interest in the coal which might serve as a support to the surface-land, but it operates as the grant of right to Howlette, his heirs and assigns, to work the mines without molestation, denial, or interruption, even to the taking away this support, and defacing and injuring the surface of the land, which, without such a grant, could not lawfully have been done." As tested by the decisions hereinbefore adverted to and by the rules of construction, which are laws to which the court must bow and submit, the mere grant of a right to remove all the coal, unconnected with any words giving right to damage the surface by withdrawal of the support therefrom, does not amount to a grant which can operate, or be effective, as a covenant not to disturb, molest or sue the grantee for such injury to the surface; for the reason that the words "all the coal" are susceptible of more than one meaning. It is an uncertain equivocal grant, not necessarily meaning that the support shall be withdrawn, and grants or covenants which fall short of that intent cannot protect the grantee in the destruction of the right of support.

Another rule of construction which is favorable to the defendant in error, if it were applicable, but which does not seem to be relied upon in the argument, remains to be considered. It is that in deeds and contracts, the language of the grantor, covenantor or promisor is sometimes to be taken most strongly against him. This applies when there is doubt as to the meaning of the contract. It cannot avail here. Hammon on Contracts, at section 413, names six exceptions to which this rule is subject. 1. There must exist in the terms of the contract an ambiguity justifying more than one construction of it. 2. It will not be allowed to defeat the plain intent of the parties as gathered from the entire instrument. 3. It is inapplicable where the terms of the contract were concurrently settled by both parties. 4. It is not allowed where the contract contains anything in its nature odious and unequally burdensome. 5. It does not apply to grants from the sovereign. 6. It is not resorted to in any case until all other rules of construction have been tried and have proved ineffectual. See Chitty on Contracts, p. 137. Any one of he first, second and sixth exceptions will defeat the applica-

tion of this rule to this case. The contract is not suscepti-
ble of two constructions. To apply the rule would defeat the
plain intent to be gathered from the whole instrument. Oth-
er rules of construction make the intention of the parties
clear. "This rule is subservient to the ascertained intention
of the parties, and is to be modified by the rule requiring ef-
fect to be given every word so far as possible; nor is it to
be applied or invoked until all other rules of construction
fail." 13 Cyc. title Deeds, clause Construction against
grantor, 609. Of this rule, Chancellor Kent says: "It is a
rule of strictness and rigor, and not to be resorted to but
where other rules of exposition fail. The modern and more
reasonable practice is to give to the language its just sense,
and to search for the precise meaning, and one requisite to
give due and fair effect to the contract, without adopting
either the rule of a rigid or of an indulgent construction. 2
Kent. Comm. 556. The ambiguity which calls into effect this
rule, must be, according to all the authorities, one which will
not yield to any other treatment, one which, like Banquo's
ghost, will not down at the bidding of any other rule. It
must be an obstruction which defies crow-bar, pick and shov-
el, sledge and stone wedges, drill, black powder and dyna-
mite, and requires, for its demolition, the volcanic action of
nitro-glycerine.

All that has been said thus far in this opinion, however,
has been put aside by the declaration that this deed is free
from ambiguity, in consequence of which no rules of con-
struction can be invoked or applied. The majority opinion,
as well as the brief for counsel for defendant in error, asserts
and reiterates that the contract is clear and free from ambi-
guity. I assert that a contract or deed must be read in the
light of the rules of interpretation to ascertain whether it is
ambiguous. The mental process of analysis must be per-
formed in the reading of the contract in obedience to the
rules of construction. The legal effect of the instrument can-
not be determined from one clause. All must be read and
collectively viewed. No words or clauses will be limited or
transposed or otherwise altered from the arrangement in
which they are found or the ordinary sense in which they are
used, unless some conflict is found to exist, but whether there
is such conflict must be determined from an analysis of all

the parts. "It would seem to follow, from the statement just made as to the object of interpretation, that if the language of the instrument is plain and unambiguous in itself, there is no room for interpretation or construction, and it is quite frequently so stated. But in determining whether there is such an ambiguity as calls for interpretation the whole instrument is to be considered, and not an isolated part thereof, this being merely an application of the *rule considered below, that the instrument is to be considered as a whole.*" 17 Am. & Eng. Ency. Law, 4. The first great dominant rule of construction is used first to determine whether there is ambiguity, and that rule controls all other rules of construction. The assertion made, as to lack of ambiguity, a mere assumption based upon three words of this deed, was made in a case lately pending in the Supreme Court of the United States, with reference to a contract which that court had under consideration. But that court, the highest in the land, and at least the equal of any other in the world, speaking through Mr. Justice White, replied as follows: "The fallacy which underlies the assertion as to want of all ambiguity in the bond arises, therefore, from presupposing that in order to establish want of ambiguity in a contract a few words can be segregated from the entire context, and that because the words thus set apart are not intrinsically ambiguous, there is no room for construing the contract itself. In other words, the confusion of thought consists in failing to distinguish between the contract as a whole and some of the words found therein. If the erroneous theory were the rule, then, in every case, it would be impossible to arrive at the meaning of a contract, in the event of difference between the contracting parties, since each would select particular words upon which they relied, and thus frustrate a consideration of the whole agreement. The elementary canon of interpretation is, not that particular words may be isolatedly considered, but that the whole contract must be brought into view and interpreted with reference to the nature of the obligations between the parties, and the intention which they have manifested in forming them." *O'Brien* v. *Miller*, 168 U. S. 287, 297. "The meaning of the parties to written instruments must be ascertained by the tenor of the writing, and not by looking at a part of it." *Boardman* v. *Reed*, 6 Peters 328. "When

the substantial thing which they have in view can be gathered from the whole instrument, it will control mere formal provisions, which are intended only as a means of attaining the substance." *Canal Co.* v. *Hill*, 15 Wall. 94.

The keynote of the majority opinion is "when a person sells a thing with the right to remove it, or the right to occupy and use it, that he is conclusively presumed, in the absence of a contract to the contrary, to have included in the consideration not only the value of the thing sold, but compensation, for the inconvenience and injuries which will necessarily result by removal or occupation." The fallacy of this proposition is that it assumes everything at issue. It is merely saying in another form and in different words that the contract is not ambiguous. It assumes that the question of the right to remove the coal without leaving support has been determined. Illustrations of the alleged rule are given by saying the sale of logs in the tree, wool on the sheep's back and a growing crop, etc., with the stipulation of the privilege of severing and taking the same away, confers complete title and full dominion over the thing sold. But suppose the purchaser of the wool on the sheep's back should set up a claim, in view of his peculiar practice or mode of enjoying and using such property, to the right to destroy the hide of the sheep, upon the theory that he is entitled, under his contract, to take all the wool and should have that part of it which extends into the skin. Or suppose one who sells a growing crop of clover, stipulating further that the vendee shall have the right to enter upon the land, sever and remove all of said clover, and the grantee should set up, under that contract, a claim to the right, not only to take so much of it as stands above the ground, but to turn his hogs in upon it to dig up and consume the roots. All this would be strictly within the literal meaning of the terms, but no one would pretend to say that any such claims could be sustained. The man who has the title to property and the right to remove the same or otherwise use it must do so in such manner as not to injure the property of another. *Sic utere tuo ut alienum non laedas*, (so use your own as not to injure another's property,) and *prohibetur quis faciat in suo quod nocere possit alieno*, (it is prohibited to do on one's own property that which

may injure another's,) are maxims enforced by all the courts, known to our jurisprudence. They are a part of the common law, and as old as the law itself. No man can free himself from their operation except by a contract which expressly exonerates him from the burden of them. They are rigidly and vigorously enforced by this Court. *McGregor* v. *Camden.* 47 W. Va. 193; *Powell* v. *Bentley & Gerwig Co.*, 34 W. Va. 804. This old and universal law says when a man buys a thing with the right to remove it or occupy and use it, he cannot use it in such manner as to injure the property of another. Title alone gives right to remove and use. Every owner of property has that right, but the law limits that right to the extent of the maxims just quoted, no matter how or from whom he acquired the property, or what its character may be. Here the surface belongs as clearly and as fully to the plaintiff in error as does the coal to the defendant in error, and not one word of the contract necessarily, or fairly, confers upon the owner of either, the right to use his property so as to injure that of the other, except the express stipulation for rights of entry for certain specified purposes. A contract, by which a thing is sold and a right to remove it is conferred, must be governed to some extent by the nature of the thing so sold. Coal differs in its situation and in its nature from all the things enumerated in the opinion. There is no ground upon which a fair and just analogy between coal and any of them can be predicated. An element to be considered in ascertaining the meaning of all contracts is the nature of its subject matter, and this rule is utterly ignored in the comparison made. "In construing a contract the Court considers its subject matter, and reads it in the sense most agreeable to the nature of the contract." Ham. Cont. section 400, p. 796.

It is also said that difference in conditions prevailing in England where the principles of law found in the decisions relating to contracts of this kind originated, from the conditions prevailing here, furnishes some ground or reason for departure from those principles. Coal is coal the world over, has like uses and value everywhere and is mined and handled in the same way wherever use is made of it. The surface has the same general uses and value in

all parts of the civilized world. If any difference should be made, probably it would favor, rather than militate against, the adoption of the principles of the ·English decisions. In England, much of the coal seems to lie in comparatively level regions and near the surface, so that the inconvenience of supporting the surface is greater than it is here where the coal, for the most part, is found in the mountains and overlaid with hundreds of feet of solid rock, in consequence of which less coal need be left here for the purpose of support. Another criticism made in the brief of counsel for defendant in error, but not mentioned in the opinion is grounded upon an alleged, unjust and unsavory origin of the English decisions on this subject. It is said that the nobility owned the surface and prided themselves upon the number and breadth of the acres held, while the villains, in the feudal ages, operated the mines, and the courts, under the control or influence of the nobility, steadily ruled in the interest of·the latter. So far as my limited investigation has revealed the history of the mining of coal in England, it does not sustain this charge, even if, in view of the reasonable and just principles upon which these decisions rest, as viewed in the light of present conditions, it merited any remark or attention. In most of the cases reported, the title, disclosing rank and fortune, is prefixed to the name of the defendant and not to the name of the plaintiff who brings the action for injury to his surface.

### POFFENBARGER, JUDGE, (*dissenting*), *Additional Opinion.*

Since the decision of this case and the filing of a petition for rehearing, my associate, JUDGE COX, has prepared another opinion, setting forth the principles which, in the opinion of the majority of the Court, govern the construction of deeds of the class to which the one under consideration belongs, and stating their conclusion. My former opinion dealt with the case as disposed of by the opinion prepared by JUDGE McWHORTER, embodying the opinion of Judge Mason of the circuit court. As the new opinion of the majority of the Court states a foundation for their conclusion, somewhat at variance with the views of Judge Mason, and presents propositions not raised or discussed at the time of the preparation and filing of my dissenting opinion, I feel it my

duty to express the reasons and grounds of my dissent from the views stated in the new opinion.

I took the position in my former opinion that the rule of construction which, in case of ambiguity in a deed, requires that the doubt be resolved against the grantor, is only applicable when, after the application of all other rules of construction, a doubt as to the intention of the parties still remains. This seems to be rather acquiesced in, and yet, for some reason, it is said that this rule has been strengthened, extended, or accentuated by section 2 of chapter 72 of the Code of 1899. It is true that Professor Minor, in the second volume of his work, at page 918, says this statute seems to be designed to carry this rule further than did the common law, But he frankly admits that there is no judicial determination to that effect. It is merely an idea of his own, not emanating from any court. With all due respect to the great learning and ability of Professor Minor, I am bound to express my unwillingness to accept his opinion. I do not feel at liberty to engraft upon the law so important a change upon a mere conclusion of this kind without any authority to support it, and, worse yet, without any statement of the process of reasoning by which it is reached. Furthermore, the language of Professor Minor has not, in this instance, the accuracy and preciseness which usually characterize his statements. He quotes the statute as if it said ''every deed conveying lands shall,'' &c. This is not the language of the statute. Its language is ''every such deed, conveying lands,'' shall etc. It follows section one of chapter 72 which prescribes a simple form of deed to take the place of the cumbersome and verbose instruments by which lands were anciently conveyed. Section 2 then says ''Every such deed, conveying lands, shall unless an exception be made, be construed to include all the estate, right, title and interest whatever, both at common law and in equity, of the grantor, in and to such lands.'' The purpose of the two sections was to dispense with the common law requirements of a deed essential to the passing of the whole estate, or highest estate that a man could have, or may have, in a tract of land, or any other estate, title, or interest, without describing it. If he had less than a fee simple title, such a deed would pass it. If he had only an easement in it, such

a deed would pass that interest.   The statute simply ena-
bles the grantor to pass any interest or estate he may have
in a tract of land by executing a deed purporting to convey the
whole of the estate.   That is its purpose and its only purpose.
How could this statute have any application to a deed which
does not purport to pass the whole of a tract of land with-
out exception?

By its very terms, it is only applicable when the deed con-
veys all of a tract without exception or reservation.   When
it does not purport to convey the whole tract, but reserves a
portion of an estate or interest in a tract, or grants only a
certain estate or interest in, or portion of, a tract, how could
this statute have any application?   It is generally in such
deeds and contracts only that rules of construction have to
be used and this statute has no application to such deeds.   If
it is claimed that a deed, uncertain in its terms, does pass the
grantor's title, or title to the land claimed under it, said
section 2 has no application.   It applies to nothing except a
deed in form or effect like the deed prescribed in the
preceding section.   Hence, it is beyond my power
to see how it can be deemed to have, in any way, strength-
ened, extended, or affected the rule of construction in
question.

Upon further investigation, I have reached the conclusion
that this rule of construction is wholly inapplicable, under
any circumstances, in determining whether a deed or con-
tract granting or reserving coal and mining rights, shall
have the effect of authorizing the mine owner to injure the
surface, belonging to another person, by destroying its sup-
port.   In the opinion prepared by JUDGE COX, Macswinney
on Mines, page 340, is quoted as stating the following to be
the principle governing such deeds, deduced from the lan-
guage of the decisions:   ''Where it appears, from the ex-
press words of such instrument, or by clear intendment
therefrom, that it was the intention to exclude the right,
effect will be given to such intention.''   This is the most
liberal rule that can be extracted from the authorities, the
most liberal rule stated by Macswinney.   It says in effect,
in order to deprive the surface owner of the right of sup-
port, the deed must do it by express words or by clear in-
tendment.   If the language must be such as to make the in-

tent clear, what room is there for the application of the rule prescribed for the government of cases of doubt? Mr. Macswinney's tenth rule given on page 341 says: "Where the right has not been expressly excluded, or where the intention to exclude it is doubtful, the principle formerly mentioned—that the owner of land in its natural state is entitled, *prima facie*, to support, lateral as well as vertical; and that in whichever way the severance is effected, whether by a grant of the land, excepting the mines, or by a grant of the land (whether in fee simple, or for a term of years,) excepting the surface;—is applicable in favor of the contention, that the right has been granted or reserved by implication." It has been suggested that the doubt referred to in Macswinney's rule 10 is a doubt remaining after the deed has been tested by all the rules of construction, including the rule that an ambiguous deed is to be taken most strongly against the grantor. To this view, I cannot accede, for the reason that this rule is applicable only in cases of doubt. It does not make a doubtful deed plain. After its application, the deed is not plain as construed by the rules of law. It is still a doubtful deed on its face, and the law says, not that it is plain, or shall be deemed to be plain and unambiguous, but that, *although doubtful on the question of intent*, the thing in question shall pass by it. This law was prescribed for, and is applicable to, instruments, disclosing doubt as to the intent of the parties, not instruments showing plain intent, nor for the purpose of making doubtful instruments plain, but only to make a doubtful instrument pass a right of title, *non constat* the doubt. Mr. Macswinney does not state this principle in any such sense as is claimed. When does he say "the principle formerly mentioned" shall control? The answer, in his own language, is "Where the right has not been expressly excluded, or where the intention to exclude it is doubtful." How are we to take this language? Shall we engraft upon it something that the author has not put into it? If so, why? Upon what ground can this be done? It will appear in a subsequent part of this opinion that no decision of the English courts, with a single possible exception, to be noticed, has ever given the benefit of the doubt on the question of intent to the mine owner or lessee. It will be further shown that no decision of the English courts, with

one possible exception, has ever allowed a deed to take away
the right of support from the surface by any implication, ex-
cept a necessary one.   The language in every instance was
such that it could not be given force and effect without allow-
ing it to deprive the surface of its support.   In at least one
case, as shown in my · former opinion, words of minor
importance, irreconcilable with any other view, were abso-
lutely discarded as being repugnant, and deprived of any
effect, because their immediate context was such as to
make it plain, upon a view of the whole instrument,
that the parties did not intend them to have such effect,
or, at least, as to raise a doubt as to what they in-
tended.

I turn now to another proposition, deemed by my asso-
ciates to be important and controlling in the construction of
this deed.   I am unable to see how the nature of the tenure
to the right of support can have such effect.   *Harris* v.
*Ryding*, 5 M. & W. 59, and *Humphreys* v. *Brogden*, 12
Q. B. 739, decided, respectively, in 1839 and 1850, started
with the view that, where the coal is granted and the sur-
face retained, or where the surface is owned by one person
and the minerals by another, and nothing further appears,
respecting the rights of the parties, the owner of the sur-
face has, by implied reservation, a right of support which
the owner of the coal cannot destroy; and where the sur-
face has been granted and the coal retained, and nothing
further appears in the dead, the grantor is deemed to have
granted the right of support along with the surface, with-
out express words to that effect.   In the first instance, it
is a reservation in derogation of the grant.   In the other, it
is a grant in derogation of the reservation, if we treat the
right as an easement, resting on the coal.   When no title
papers appeared showing how the severance had taken place,
it was presumed that the estate had been severed into two
parts in such manner as to confer the right of support
either by grant or reservation as aforesaid.   Lord Campbell
said, in *Humphreys* v. *Brogden*, "If the owner of the en-
tirety is supposed to have alienated the surface, reserving
the minerals, he cannot be presumed to have reserved to him-
self, in derogation of his grant, the power of removing all
the minerals without leaving a support for the surface; and

if he is supposed to have alienated the minerals, reserving the surface, he cannot be presumed to have parted with the right to that support for the surface by the minerals which it had ever before enjoyed." The first proposition says, in effect, in granting the surface, the grantor is presumed to have granted the surface in its natural condition and state, for otherwise he would have made a resevation in derogation of his grant. The second says, in substance, that, when granting the minerals, he cannot be presumed to have parted with the support of the surface, which he reserved to himself, because the surface, without the support, would not be the surface in truth and in fact. It is not strange that Lord Campbell should have stated these propositions in a case in which no deeds were shown, and it did not appear how the severance occurred, for he had before him the earlier case of *Harris* v. *Ryding*, in which the deed of severance did appear and had been construed. It was a deed granting the coal and reserving the surface. Therefore, it presented the strong case of a reservation to the grantor of a right which stood in the way of his grantee and impaired the value of the thing granted. The court held in *Harris* v. *Ryding* that a deed should not be so construed as to take away the right of support, even when it granted the minerals, reserving the surface, in the absence of language conferring, upon the grantee of the minerals, the right to destroy the surface. Such being the true construction of a deed of that kind, the court very consistently said in the later case, showing nothing except ownership of the surface by one person, and of the coal by another, that there could be no presumption that the deed or other instrument by which the severance had been made contained terms which took away the right of subjacent support. Still later, in *Rowbotham* v. *Wilson*, 6 E. & B. 593, decided in 1856, Lord Campbell, delivering the opinion, the doctrine laid down in *Humphreys* v. *Brogden* was adhered to, but it was found that the deed in that case was such as to take away the right of support. This decision was in the court of Queen's Bench. The case was appealed and heard in the Exchequer Chamber in 1857, when Lord Campbell's decision was affirmed. It was here that a different view from that held by Lord Campbell, as to the nature of the tenure of

the right of support, was suggested. Watson, Baron, said that the provision of that deed by which the surface owner had given away his right of support should be treated and regarded as a covenant not to sue for damage to the surface. He said: "No doubt these words might operate as a grant, if the subject-matter was capable of a grant. But I am of opinion it could not be the subject-matter of a grant. * * * To be the subject-matter of a grant, it must be an easement to be imposed on the corporeal property of the grantor. * * * The present claim is not anlogous to that of lights; for this, as nothing is to be done on or over the plaintiff's land, but only in the event of surface injury from works, is a covenant not to sue." Bramwell, Baron, said: "Now I think it inaccurate to say that the plaintiff is claiming any kind of easement, qualified or otherwise; an easement seeming to me to be something additional to the ordinary rights of property. I think the plaintiff is merely claiming the common right not to be injured in his property by the way in which another uses his." Martin, Baron, after expressing similar views in different form, said: "I think these are the true legal grounds upon which this case rests, and not upon the principle applicable to easements and servitudes; as, in my opinion, the general right which a man *prima facie* has at common law to the support of his land, either subjacent or adjacent, is a natural right analogous to the right of flowing water; and not an easement." Williams, J., said: "It is, I apprehend, in its nature, one of the ordinary rights of property, and not an easement, which is a right accessorial to those ordinary rights." Cresswell, J., said: "Howlette had a right to the mines, and to use them as he pleased, provided he did not, by so using them, injure the property of Pears. And that right of Pears to sue for an injury done to his land was a right given to him by the common law, as owner of that land, and not as being entitled to any easement in or over the mines below it. An easement must be an interest in or over the soil; but the owner of the mines might have removed every atom of the minerals without being liable to an action if the soil above had not fallen." In 1858, *Bonomi* v. *Backhouse*, E. B. & E. 622, was decided in the Court of Queen's Bench, Lord Campbell,

C. J.. participating. The question in that case was, when the statute of limitations begins to run for an injury done to the surface. In it, Lord Campbell said: "I agree in the opinion that the right of support which the plaintiff claims is a natural right of property, to be presumed till (as in *Rowbotham* v. *Wilson*, 8 E. & B. 123, E. C. L. R. vol. 92), evidence is given to rebut the presumption; and that such a right is not to be considered an easement or servitude arising from grant." Wightman, Coleridge and Earle, Judges, were all of the same opinion. *Rowbotham* v. *Wilson* went to the House of Lords on appeal and was there decided in 1860, Lords Wensleydale and Chelmsford delivering opinions, both of whom expressed themselves as satisfied with the views expressed in *Bonomi* v. *Backhouse*, concerning the nature of the right. 'In 1861, *Bonomi* v. *Backhouse* was finally disposed of in the House of Lords, where the following was announced as law: "The right of a person to the support of the land immediately around his house is not in the nature of an easement, but is the ordinary right of enjoyment of property." The injury to the property in that case was the result of the breaking down of the surface over a mine on an adjacent tract of land; but it was agreed that the same principles governed as in the case of a letting down of the surface by mining operations immediately under it. That case did not determine the principle upon which the right of subjacent support is parted with, whether by grant or othrewise. It was not necessary to do so. There was no pretention that it had been lost. The only defense was the statute of limitations.

When writing my former opinion, I did not regard this new view concerning the nature and origin of the right of support as having any important bearing upon the concrete question presented by this record. Upon reflection, however, I have come to the conclusion that, if it has any such effect, it is an element of strength in the conclusion to which I have come rather than of weakness. It says the right of support is part and parcel of the surface, a property right, naturally incident to the surface, recognized by law as belonging to the surface, and never to be regarded, in law, as having been parted with, unless it clearly appears to have been granted away. It no longer stands upon the questiona-

ble presumption of a reservation in a deed in derogation of the grant made by that deed, or as an implied addition to the thing granted. This change elevates it to the impregnable position of a property right belonging to the surface, and going with the surface whenever the surface is granted or reserved. The first theory treated it as an easement, not naturally belonging to the surface, but as rather belonging to the coal, a right of property incident, and belonging, to the coal, and carved out of it and annexed to the surface by the grant or reservation. The new view makes it doubly and unqestionably a part of the surface.

My associates say, in their new opinion, that this ascertainment of the exact nature of the right of support affords more solid ground for the position that it may be parted with otherwise than by an express grant or the equivalent thereof. In other words, that it may be lost or released by mere implication not necessary. As it is not an easement annexed to the surface and operating as a servitude upon the coal, but is a part of the surface, an invasion or disturbance of that right merely gives a right of action, just as any other wrongful act, wherefore, on the principle that a man cannot sue for damages consequent upon the performance of an act to which he has consented, a grant of the right to remove all the coal estops the grantor from recovering damages for the injury resulting to his land. They say that, if it were an easement, annexed to the surface by grant or reservation, there would be more reason for saying it could be parted with only by express words or necessary implication. This view impresses me as confusing the right in question with the remedy for redressing a wrong to that right. If it is an easement annexed to the surface, an obstruction thereof or injury thereto would be remediable by an action for damages. If it is a natural right of property incident to the surface, an injury thereto is remediable in like manner. Permission to inflict the injury by a disturbance of this right would bar an action as effectually in the one case as in the other. If a man consent orally to the mining and hauling away of his coal by another who has not a shadow of title to it, there would be no right of action against him as for a wrong. The taking of the coal would not be a trespass. So, if a man permit any other act to be done to the detriment of his real property,

no matter by what right he holds, he cannot complain of it as a wrongful act. If such act be done without permission, it is a mere trespass and does not in any way affect the estate, although the party is liable in damages for the wrong done. These are acts which do not, in any way, affect or destroy the title or estate of the owner. They merely injure and damage the property. They may be done to an easement or other appurtenance of the property as well as to the corpus. But they are only wrongful acts when not done by consent or permission of the owner. But when the act is done, not as a trespass, admitting title in the owner, nor by his consent and permission, but as a rightful act, and the defense to the action brought for the injury is based upon a claim of title and right of the defendant to do it, then the issue becomes one of title, of right, of estate. A mere permission is revocable at any time and any further injury done after the revocation gives a right of action for damages. The previous permission, which had been revoked, constitutes no bar to it. I imagine that the defendant in this case would be unwilling to say that its rights to remove the support now existing under the surface of the plaintiff's land depends merely upon the will and pleasure of the plaintiff, and that his revocation of the permission expressed in the deed to do the injury, if it be such, will put an end to its right to effect further damage to the surface. If it be only a valid personal covenant, a breach of it would only give a right of action for damages. Its contention is not that it has inflicted an injury upon the plaintiff's property by an act to which the plaintiff consented, in consequence of which he cannot bring an action for the resulting damages, but that the plaintiff has no right of support, because he has parted with it by his deed—that the surface is a servient estate to the coal—that the deed imposed a servitude upon the surface in favor of the coal. The contention is that this right, be it easement or natural right, has been bargained, sold and conveyed away by the plaintiff and is no longer his property, in consequence of which he cannot prevent further injury to his surface by revoking his consent.

In *Rowbotham* v. *Wilson*, 8 E. & B. 122, Watson, Baron, and Cresswell, Judge, in the court of Exchequer Chamber, took for their position the view thus adopted by the majority

in the new opinion.    They said the clause by which the owner of the surface parted with his right of support operated as a covenant not to sue, nothing more nor less.    The surface had passed out of the hands of the man who made that covenant and had come into the hands of the plaintiff; and, as such a covenant does not run with the land, so as to bind subsequent purchasers, they said the plaintiff might recover, notwithstanding the deed of severance had released the right of support.    But Barons Bramwell and Martin and Judges Williams and Crowder, constituting the balance of the court, were of a different opinion.    They refused to accept this view.    They said it operated either as a covenant running with the land and affecting the estate itself, or as a grant of a right in and to the land.    When the case went to the House of Lords and was there affirmed, that final decision again repudiated this doctrine of a mere personal covenant and it was held solemnly that it "operated as a grant of a right to disturb the surface of the land."

The idea of estoppel asserted by the opinion of the majority of the Court, as a principle to be applied in construing deeds, severing the minerals from the surface, in determining whether the right of support has been relinquished, is the proposition upon which *Eadon* v. *Jeffcock*, L. R. 7 Exch. 379, seems to partially stand.    Whether it is the real basis of the decision may well be doubted, since the court was composed of six judges, three of whom delivered opinions, and only two of these three placed their decisions upon that ground, namely, Barons Martin and Cleasby.    It is not the ground upon which Bramwell, Baron, concurred in the decision of the case.    He merely commented upon the position of the other two judges and looked upon their argument as plausible.    He refused and declined to accept it, because it was, in his opinion, contrary to every other decision which any English court had ever rendered.    He expressly denied that the authorities, relied upon for it by Barons Cleasby and Martin, could be so construed.    These cases were *Taylor* v. *Shafto*, 8 B. & S. 228, and *Shafto* v. *Johnson*, 8 B. & S. 252, and his interpretation of both was that, by the leases, the lessors of the mines had bound the lessees by covenant to do what was inconsistent with leaving support for the surface, and quoted from the opinion of the vice-chancellor to

prove his statement. Those leases did not merely permit, or authorize, the removal of all the coal, but absolutely bound the lessees, by covenants in the leases, to do so. These covenants raised not a mere implication by probability, not a mere doubtful implication, that the support of the surface might be destroyed, but, on the contrary, a necessary and inevitable one. It must result, else the covenant could not be performed. It must result, else the deed could not have effect according to either its spirit or its terms. His interpretation of these cases corresponds with that of Macswin.ney, who, analyzing *Shafto* v. *Johnson*, says: "It was considered, that the leading features of the lease were (1) the intention, in preference to everything else, to provide for the safety of the mine; and (2) the covenant (not by way of privilege to the lessees, but by way of positive obligation upon them, and for the benefit of the lessor) to get all the coal, which could be got with safety to the mine." Macswinney on Mines 323. Having thus put aside the views of his associates, as absolutely devoid of authority for their support, Baron Bramwell found another ground upon which to rest the decision of the court. That was this: The lease bore date 1840 and contained the provisions upon which Barons Martin and Cleasby came to their conclusions. They considered nothing else. From the terms of this lease it was possible to infer that there was an intent that the pillars might be removed. Later, in 1857, the land on which the operations were carried on under the lease was conveyed to persons from whom the plaintiffs took their title, with notice of the provisions of that deed. The deed reserved the bed of mines covered by the lease, together with power to the grantor, his heirs or assigns, to be exercised from and after the expiration of the term, for carrying on the works of the mine and carrying away the fireclay so reserved. It also reserved to the grantor the coal rent under the lease of 1840. It provided for rent for the land used and occupied by the grantor for the purposes of the mine and for compensation for buildings required or removed for that purpose and for surface damage to the land. It further provided specially that the grantor, his heirs or assigns, tenants or lessees, *should not be liable for any damage caused to buildings* which should thereafter be erected on the land conveyed, *by*

*the sinking of the land through mining operations in getting
the coal, clay, stone and other minerals hereby excepted and
removed.* It was upon this that Baron Bramwell based his
concurrence in the decision in favor of the defendants. His
position is best stated in his own language, which is as fol-
lows: "And it was contended by the defendants, that
by this conveyance the grantees took without a right to
support for houses built over the mines, and without a
right to recover damages for injury to houses arising from
the surface being let down by mining operations. This un-
doubtedly is so, if those mining operations were carried on
by Roberts, or by his lessees, under leases granted subse-
quently to the conveyance to the plaintiffs. But it was said
by the plaintiffs not to apply to the defendants, who were
lessees at the time of the conveyance to the plaintiffs. I
think it does. The lease of June, 1840, under which the de-
fendants have the right to work, is mentioned in the convey-
ance to the plaintiffs, and the words are general and unquali-
fied: 'Roberts, his heirs or assigns, tenants or lessees, shall
not be responsible for damages caused to dwellings which
shall hereafter be erected,' by mining operations. And it is
clear that as the mines and the reversion to the mines
were separated from the rest of the soil, Roberts covenants
with the plaintiffs for the performance of the same matters
for the benefit of the surface owners that the lessees had
covenanted with Sotheron to perform for their benefit. And
it is also clear that a power of distress which is given to the
plaintiffs, would enable them to distrain on the defend-
ants' goods. It is asked, why are the defendants to have the
benefit of an arrangement to which they are not party or
privy? The answer is, that the very foundation of the plain-
tiffs' case is a right to support as against the defendants, and
if the plaintiffs have taken their estate without that right
the defendants incidentally get a benefit perhaps not contem-
plated." The case seems never to have been appealed, and
what the position of the court of last resort would have been,
nobody can say. Nor can it be determined upon which
ground the decision rests, for only three of the judges out of
six have spoken. As two grounds, barring the right of re-
covery, were stated, one of which seemed to be clearly suffi-
cient, the plaintiff no doubt considered an appeal useless, and

so this anomalous and mysterious decision remains.   An ele-
ment which entered largely into that case was a supposed
radical distinction between a lease of coal and a conveyance
thereof.   As a lessor always receives royalty, the working of
the mine is partly for his benefit, while the working of a
mine which has been sold and conveyed absolutely is not for
the benefit of the owner of the surface.   It seems to have
been supposed by Barons Cleasby and Martin that the mere
fact that the instrument governing the rights of the parties
was a lease, was sufficient to show intent that the surface
might be let down by mining operations under it.   This er-
roneous view was utterly demolished in *Davis* v. *Treharne*,
6 App. Cas. 460, decided by the House of Lords.   Macswin-
ney on Mines, page 297, says:   "According to this decision,
it does not follow from the mere facts of a lease having been
granted and a royalty reserved thereunder, that there is not
a right of support.   Those facts may be elements to be taken
into consideration, in seeing whether or not the right is taken
away.   But they are not sufficient of themselves to decide
that question."   *Eadon* v. *Jeffcock* has never been expressly
overruled, it is true, but it is undoubtedly the only case of
its kind, as regards the proposition, that mere permission to
remove all the coal, sufficiently discloses intent to relinquish
the right of support of the surface.   Moreover, there enters
into it the circumstance, that the paper construed was a lease
under which the mines were worked on account of the owner
of the surface, and not a deed conveying title, in consequence of
which benefit from the work inured to the surface owner, the
real owner of the mine.   In this case, the rights of the parties
are fixed by a deed and not a lease.   When the works are
carried on under a lease, there is some plausible ground for
saying the construction should be more liberal to the lessee,
because, in one sense, the operations, resulting in injury to
the surface, are carried on in part by the owner of the sur-
face himself, for he causes it to be done for his own benefit.
He injures his own property for his own benefit.   Whatever
force there is in this view, and whatever effect it may have
had in the decision of *Eadon* v. *Jeffcock*, and it is conceded
that it had some, and more than it could have under the later
decisions, it can have none here.   Therefore, I cannot see

that *Eadon* v. *Jeffcock* is any authority for the position taken by the majority of this Court.

*Davis* v. *Treharne*, 6 App. Cas. 460, was another case involving the construction of a lease, and foundation for the position of the majority is sought in certain language quoted from the opinion of Lord Blackburn therein. We must consider all his language, and do it in the light of the lease he was discussing. I think his meaning was that the words "letting down the surface" should qualify both sentences "You may take all the minerals." And "you must take away all the minerals." The lease did expressly give the right to take away all the .minerals, but it gave no right to let down the surface. It did not say the lessee had the right to mine, excavate and remove all the coal, it is true, but it did demise the veins, mines and seams of coal, ironstone and blackband, with power to the lessee to enter into and upon certain portions of the land and to open, get and carry away the said veins, mines, &c. No words limited the extent to which the lessee could carry them away and the general language used clearly covers all. This is the sense of it, the meaning of it. Moreover, there was a clause in the lease which required the lessee at the end of the term to "compensate the said lessor for any *damage or injury done to the surface of the said farm and lands.*" Not only did it authorize the mining and taking away of all the minerals, but it contained, in addition thereto, an express reference to injury and damage to the surface and provided for compensation. But it did not·expressly say, or use any language which necessarily meant that the surface might be let down. It was the absence of this that decided the case in Lord Blackburn's mind, as is shown by the language quoted from him in the majority opinion. Proceeding, he said: "And when I come to look at the documents, though one is more ready, it being a lease, to believe that the parties meant to say, You shall take all the minerals letting down the surface, than one would have been if it was a sale or a reservation of minerals below to be taken out some future time, I cannot agree with what seems to have been said (I do not know whether that was what was meant) by Baron Cleasby in the case of *Eadon* v. *Jeffcock*. I cannot agree that it follows from that that there is not a right of support. I think

the right of support exists unless it is taken away. I think the fact that it is a lease may be one of the elements to be taken into consideration in seeing whether it is taken away or not, but that is not enough of itself to decide that question. My Lords, looking at these two documents, I cannot find anything that takes away that right of support. It is quite true that where parties have agreed in this way, you shall make compensation for whatever injury you do in respect of these rights, and amongst other things you shall make compensation for what you do in letting down the surface, the conclusion is very strong from that that the lessor says, You may let down the surface. I do not say that it is conclusive, but it is a very strong argument, if you find that clause, to say that he did mean that the lessee might let down the surface. But when you find it said, as it is here, that he shall do certain things underground and a great many things upon the surface, and afterwards make compensation (as it is said in the lease) 'for all damage occasioned by the exercise of the rights hereby reserved' or (as it is said in the lease) shall at the end of the lease 'compensate the lessor for any damage or injury done to the surface of the said farms and lands' (that means any damage done to the surface of the said farms and lands in the exercise of the rights previously given), and when we find that those rights do include a great many things which will necessarily damage the surface, the reasonable conclusion is that the meaning is that there is to be compensation for things done in the exercise of those rights. I cannot see that that affords any argument whatever for saying that the lessor intended that the lessee should be able to do something more, and let down the surface. Yet that is really the whole argument; it stands upon that; that because a clause saying, you shall make compensation for letting down the surface is a strong argument for saying you may let down the surface, therefore a clause saying you shall make compensation for damage done to the surface affords a strong argument for saying that the lessee might let down the surface. I cannot see that. It does not seem to me to be any argument at all." In the face of this language, how is it possible to conceive that he meant that a mere grant of permission to take away all the minerals would amount to a relinquishment of support? Why, he admits that the lease

said more than that. It said all that, and, in addition there-
to, that if damage should result, compensation for the injury
must be made. But he said even all that stopped short of
making the letting down of the surface rightful. Taking all
his language together, it is absolutely clear that he meant to
say that a permission to take away all the minerals, letting
down the surface, or an obligation to take all the minerals.
letting down the surface, would amount to a relinquish-
ment of the right of support. He makes it plain that
the intent to be looked for and to be ascertained is, not that
the coal may be removed or must be removed, but that the
surface may be let down. Hence the phrase, "letting down
the surface," must qualify both of the preceding sentences,
not merely the latter. This case was decided in 1881, and
the general impression is that it wholly repudiates the doc-
trine propounded by Barons Cleasby and Martin, and, to my
mind, it seems impossible that there could be a doubt about
this. If anything further were required to make this plain,
it would be found in the opinion of Lord Watson, in the
same case: "When a proprietor of the surface and the sub-
jacent strata grants a lease of the whole or part of his min-
erals to a tenant, I think it is an implied term of that con-
tract that support shall be given in the course of working to
the surface of the land. If it is not intended that that right
should be reserved, the parties must make it *very clear upon
the face of their contract;* in other words, they must express
their intention *so clearly as to enable a Court to say that such
intention is plain.* I think that rule was laid down by the
late Lord Justice Mellish in the case of *Hext* v. *Gill,* and I
quite agree with that ruling. It may be done in express
terms; but of course it is not necessary that express language
must be used; for it may appear by a plain implication from
other clauses of the deed, as in the case of *Taylor* v. *Shafto,*
where an obligation was laid upon the tenant to perform
certain acts which were plainly inconsistent with supporting
the surface."

If it be conceded that the lease in *Eadon* v. *Jeffcock* dis-
closed nothing more, bearing on the intent of the parties,
than that it gave permission to remove all the coal, there is
nothing in any of the opinions delivered in the case to show
or indicate that the liberality of that view stands upon the

altered opinion as to the nature of the right of support.    The distinction between an easement and a right of property is not mentioned or adverted to in any of the opinions.    That case, even if it be authority for anything else, affords no ground for saying the right of support may be relinquished by a covenant or a grant less certain in its terms and direct in its effect, than under the early doctrine, because the right of support is a natural right incident to the surface, and not an easement.    The English judges did not regard the nature of the right of support as important in construing the instrument of severance with a view of determining whether the right was cut off by it.    In *Rowbotham* v. *Wilson*, 8 E. & B. 145, Bramwell, Baron, said:    "Now I think it inaccurate to say that the plaintiff is claiming any kind of easement, qualified or otherwise; an easement seeming to me to be something additional to the ordinary right of property.    I think the plaintiff is merely claiming the common right not to be injured in his property by the way in which another uses his.    But I do not think it necessary to determine this; for I think that, whether the defendant is entitled to the mines as a separate tenement, whether the space they occupied belonged to him, or whether he has a grant of the minerals and a license to take them, or whether the right of the surface or general owner to support from the mines below is a natural territorial right or an easement absolute or qualified, or whether the right to sink pits and cause subsidence is a natural incident of a grant of the mines or license to take them, the defendant is entitled to judgment."    Lord Campbell did not think it made any difference.    In *Bonomi* v. *Backhouse*, E. B. & E. 622, 643, he said:    "I agree in the opinion that the right of support which the plaintiffs claim is a natural right of property.    *  *  *    But the consequence does not seem to me to follow that the Statute of Limitations cannot begin to run for an injury to such a right till there has been an actual subsidence of the surface.    *  *  *    *The present appears to me to be an action for injury to a right, and not merely for what is called consequential damage.*"

The later decisions of the English court, rendered in view of all that was said in *Bonomi* v. *Backhouse*, *Rowbotham* v. *Wilson*, *Eadon* v. *Jeffcock* and *Treharne* v. *Davis*, all say that language, sufficient to relinquish the right of support,

36

must amount to a grant of the right to disturb the surface or the equivalent thereof. It must rise to the dignity of a positive grant of a property right in the surface. It must touch in direct language the subject matter of the grant. It is not enough to grant the right to do something with the coal. It is not of the surface. Language touching it only does not reach the subject matter of the grant affecting the surface. The deed must grant part of the surface. How can it do that without any reference to the surface? That it must amount to a grant or an equivalent assurance is made plain by the later decisions. *Bell* v. *Love*, 10 Q. B. D. 547, decided in 1883, arose under an Inclosure Act, as did *Rowbotham* v. *Wilson*, and makes it plain that the nature of the right is unimportant, and also that a provision releasing the right of support must be a grant or the equivalent thereof. This case was decided long after that question was settled, and though it arose under an Inclosure Act, the same principles control as in other cases. In that case, Baggalay, L. J., used this language: "In every case, however, in which the owner of the minerals claims any rights in respect of getting them in excess of, or other than, the *prima facia* right of getting them without causing injury to the owner of the surface, the origin and the nature of such rights *must be clearly defined by some grant or equivalent assurance;* in the absence of which the presumption is in favour of the right of the owner of the surface to support." Lindley, L. J., delivering an opinion in the same case, after referring to *Rowbotham* v. *Wilson*, *Smith* v. *Darby*, *Duke of Buccleugh* v. *Wakefield*, *Aspden* v. *Seddon*, *Gill* v. *Dickinson*, *Smith* v. *Haines*, *Blackett* v. *Bradley*, and *Hext* v. *Gill*, said: "These cases appear to me to establish two propositions, viz., first, that an Inclosure Act is not to be construed so as to allow the lord of the manor to let down the surface of allotments by working mines under them unless the language of the Act is clearly and unmistakably to that effect; and, secondly, that the absence of all provision for compensation for injury sustained by letting down the surface tends strongly to indicate that the legislature did not intend by general words to reserve or to confer upon the lord of the manor the right to work his mines so as to let the surface down." These views have the high approval of Lord Coleridge, Chief Justice of England, for Bag-

galay, L. J., in concluding his opinion, says: "I have the authority of Lord Coleridge, C. J., who heard the argument, to say that he agrees in the conclusion at which I have arrived; *he agrees also with the substance of my judgment, and he thinks it unnecessary to write a judgment of his own.*" By judgment here, he means what we call an opinion. These authorities most effectually do away with the view that the right of support can be parted with otherwise than by a grant or an equivelant assurance, notwithstanding the conclusion that it is a natural right of property and not an easement. The question presented in this case has a double aspect, one of right, the other of remedy. They must not be confused. We must not lose sight of the question of estate by fixing our eyes on that of the remedy for redressing a wrong done to it. In *Dixon* v. *White*, 8 App. Cas. 833, decided in 1883, Lord Blackburn said: "Lord Mure is reported as saying in this case, 'that nothing but the most express terms,' would entitle the court to hold that the proprietors of the surface have accepted them under a contract to give up the right of support. I think that is going further than I should like to follow. But I think that the burden is on those who say there is such a contract, to show that there is an intention to that effect appearing on the face of the titles." In the same case, Lord Watson said. "If A. conveys minerals to B., reserving the property of the surface; or if A. conveys the surface to B., reserving the property of the minerals below it, A. in the one case retains, and B. in the other gets, a right to have the surface supported, unless the contrary shall be expressly provided, or shall appear by plain implication from the terms of the conveyance." Lord Fitz-Gerald said, in the same case: "If the owner of the minerals, on the other hand, alleges that he has not only the property in the whole minerals, but has also retained all proper means to make that property available, and amongst them a right to get and remove the whole, although in doing so he may destroy the surface by removing its necessary supports, then he must show by his title that he had such a right." The law as stated by Baggalay, L. J., in *Bell* v. *Love*, in 1883, was accepted as the settled law of England in 1889, in *Consett Water Works Co.* v. *Ritson*, 22 Q. B. D. 318. This was six years later than *Dixon* v. *White* and adopted the opinions

in *Bell* v. *Love* and *Treharne* v. *Davis* as true expositions of the law. See opinion at page 321. In *Greenwell* v. *Coal Co.*, 2 Q. B. (1897) 165, *Davis* v. *Treharne* was followed as correct law. In none of these late cases is *Eadon* v. *Jeffcock* referred to or considered. It seems to have dropped almost wholly out of view. All of them are to the effect that it is a question of title to be established by the mine owner or lessee to an interest in the surface and not a mere question of estoppel. Nor did any of them treat the change of opinion as to the nature of the right as having any bearing whatever upon the construction of the deed or lease. Its principal effect seems to have related to pleading and evidence. In *Dixon* v. *White*, Lord Blackburn said, speaking of the right of support and the right of mining: "Those rights are given (to use a phrase familiar to pleaders of the old school in England, but not to Scotch lawyers) 'of common right,' that is, when it is established that the upper and lower strata are in different hands, it is not necessary either in pleading to allege, or in evidence prove, any special origin for those rights, the burden both in pleading and in proof is on those who assert that the rights are different from those existing as of common right."

Since at no time does it appear that the nature and origin of the right of support was deemed to have any effect upon the question of construction, and the requirement that he who claims the right to deprive the surface of its support must show title in himself as his warrant for such action, such as a grant of the right to let down the surface, or a covenant imposed upon the surface, running with it, binding the land in the hands of subsequent alienees, and operating as a grant of title, it seems to me that all of the early doctrine of the English courts, asserted in *Harris* v. *Ryding* and *Humphreys* v. *Brogden*, that is material to, or has any bearing upon, the question presented by this record, is firmly adhered to at the present time by the English courts. If the case of *Eadon* v. *Jeffcock* may be deemed to have indicated a variance from the line of those early decisions, the loose doctrine propounded by that case has been clearly repudiated and overthrown by the later decisions and is no longer authority for any proposition, except that the fact that the mines are operated under a lease, and not under a deed, is an element to be

considered in construing the lease for ascertainment of the intent. On that question it may be still cited as authority and properly so. At the present time it can be safely said that there is no impairment of the early English doctrine upon this subject, either in England or any place else. It was at one time threatened in England, but the case which seemed to put it in danger was quickly and effectually condemned in *Davis* v. *Treharne*, and since that time, there has been no deviation in the same direction or along any other line variant from the principles of the early cases, as to any subject or proposition that enters into the disposition of this case.

The length of this opinion, the limit upon my time and the breadth of the great field of the law of estoppel, forbid any attempt at an extensive exposition of the principles of that law, in an effort to determine whether its application, as made in this case, is consistent with those principles. For my part, I am content with the knowledge that no other court has ever professedly rested its decision upon principles of that law in a case of this kind. I feel impelled, however, to say that the application of that principle here places the parties in an anomalous situation. It admits that the right of support belongs to the plaintiff in this case. He has not granted it. He is only precluded from recovering damages for a wrong done to his own property. This is a presumption raised by the Court in order to work out the conclusion to which it has come. It says the plaintiff must have intended this else he would not have consented. There is law for the position that the court cannot indulge in any presumption that a man has consented to an unlawful act. For this we need look no further than the great case of *Davis* v. *Treharne*, relied upon in the opinion of the majority, and later in date than *Eadon* v. *Jeffcock*. The lease provided that the seams and veins of coal should be worked "in the usual and and most approved way in which the same is performed in other works of the like kind in the county of Glamorgan." By the usual and most approved method of work in that county, the surface was let down. It was contended that the lease showed plain intent by reference to this custom to allow the surface to be let down. In the House of Lords, Lord Chancellor Selborne said in his opinion: "It is impossible

that those words 'the usual and most approved way of work-
ing in the county of Glamorgan' can have been intended to
absolve the lessee from a legal obligation, collateral to the
working of the mine.   For this purpose it cannot make any
difference, whether the question arises between a lessor who
is owner of the surface, and his lessee, or between the lessee
and a surface owner who is not lessor.   Those words are
equally apt, equally effectual, and have the same meaning, in
each of those cases.   They relate simply to the manner of
working the mine for mining purposes; they have no reference
to the right of other persons, which there could not possibly
be any local custom in such a district as a county to disre-
gard, and which must be respected in carrying on those
works; they cannot be understood to have been meant by
either of these parties to signify, that the working must be
carried on as if there were no such rights of other persons,
or of the lessor himself, which the lessee was bound to re-
spect." Other judges have said the same thing.   It was
decided in a Pennsylvania case.   I cannot take time to hunt
them up.   The application of this principle makes it neces-
sary to indulge in the further presumption that this immu-
nity from the consequences of an unlawful act is for a valua-
ble consideration.   As this case stands upon a demurrer to a
declaration, without any averment on the subject of consid-
eration, I am unable to see how the Court can accept as a
truth the payment of any consideration.   How can we look
beyond the declaration?   It may be that the deed itself im-
ports a consideration for whatever is granted by it.   But to
assume that there was a consideration of any certain amount,
or for the purpose of determining what the deed grants is an
unheard of proposition.   The recital of the consideration in
a deed is wholly unimportant as regards its amount.   In de-
termining what has been granted, we must look to the terms
of the deed.   It cannot pass titles and rights upon mere pre-
sumption.   They must pass by the terms of the instrument
and the intent disclosed thereby.   What the consideration
was does not appear from this declaration.   The usual and
only correct way of construing the granting part of a deed
is to look at its terms and the court never concerns itself
about the consideration.   There can be no presumption from
the fact of consideration or the amount of consideration, in

determining what the language of the granting part of the deed means. How can this Court say what the coal, without the right to let down the surface, was worth, or what the coal, with the right to let down the surface, was worth? We know nothing about that and are not permitted to indulge in any presumptions. When is it that the court may presume that the surface owner has been compensated for the right to destroy the support of his surface? Mr. Macswinney answers, from the authorities, by saying it is when the mine owner is, by the terms of the deed, relieved from liability for damage. Macswinney on Mines 340. He does not say we may look to the consideration expressed in the deed to determine whether the mine owner is relieved from liability. On the other hand, he says the exact reverse of this. When, from the terms of the deed, it appears that the mine owner is relieved from liability, then it may be assumed that the surface owner was paid for that immunity. The decision in this case reverses the rule and the Court makes an assumption of payment of a consideration in order to strengthen the force and effect of the language upon which the defendant relies as a grant of the right to destroy the subjacent support. In all other courts when the deed, by its terms, gives the right to let down the surface, it is deemed that there has been a grant of a property right to the mine owner, the imposition of a servitude upon the estate of the surface owner for the benefit of the mine owner, and that the effect is to make the action of the mine owner in letting down the surface a rightful, lawful, act, in consequence of which no right of action arises. This decision makes it a wrongful, unlawful act and then bars recovery for the damages by the principle of estoppel. Another thing inconsistent with the principles of law is found in this, that the mere consent or permission operating by way of estoppel is revocable, as has been shown hereinbefore, except under peculiar circumstances, making it inequitable to allow a revocation, as where, on the face of it, large expenditures have been made, or the party has, in some other way, altered his position on the faith of it. But it may be revoked at any time before it is acted upon. Now, we must determine what this deed was at the time it was made. Its character has not been changed by lapse of time. No doubt, considerable time intervened be-

tween the execution of the deed and the beginning of operations under it. If it was a mere consent, a mere permission, and did not pass any estate in the land, then it was revocable and the grantor had it in his power under this deed to defeat the professed object of this clause. It was nothing more than a mere license, even if it rested upon a consideration. Being such, it was revocable, and, if revoked before it was acted upon, not even a court of equity would lend its aid to prevent a revocation of it. Suppose Griffin had revoked this license before the mines were opened. What would then have been the consequence? A mere right in Camden to recover back what he paid for it, if anything. Would any coal owner in this State, or would this defendant be satisfied with such a determination as to the character of the right? It may be that if a man consent to the building of a slaughter house or a factory by his neighbor on a lot adjoining his residence, and thereby induce him to lay out large sums of money in such work, he cannot, after the work is completed, compel him to abate that work as a nuisance. But having consented to it, in writing or otherwise, if, before the act is done, before any money has been laid out on the faith of it, he revoke that promise, or refuse to allow that to be done which he agreed to allow, the only remedy against him, if any, would be a personal action for the consideration. No court would compel him to specifically perform. It would give no right to burden his estate or his property with a servitude. In order to do that, it must rise to the dignity of a grant of a right in the property and amount to more than a mere license, or a covenant not to sue a man for something which he does on his own property. No such agreement can have any such effect. No covenant runs with the land unless it relates to, or is connected with, an interest in the land or estate transferred by the deed. There must be a privity of estate. "A covenant which may run with the land can do so only when there is a subsisting privity of estate between the covenantor and the covenantee, that, when the land itself, or some estate or interest therein, even though less than the entire title, to which the covenant may attach as its vehicle of conveyance, is transferred; if there is no privity of estate between the contracting parties, the assignee will not be bound by, nor have the benefit of, any covenants between the

the contracting parties, although they may relate to the land he takes by assignment or purchase from one of the parties to the contract. In such a case the covenants are personal and collateral to the land." 11 Cyc. 1081. If this be a covenant, it is unconnected with any grant of any part of the surface, and would not, for that reason, run with the land. Such a covenant would not amount to a license to do anything upon the covenantor's land. It would have no relation whatever to his estate in any legal sense, but would be a mere personal covenant which he would be at liberty, at any time, to break and pay the consequent damages. These principles seem to me to be absolutely conclusive of the unsoundness of this theory of estoppel or personal covenant, whichever it may be. Its character is not very clearly defined in the opinion.

To show that the position above taken and the principles enunciated, concerning the nature and effect of a license or mere personal covenant, are correct, the following is quoted from Wood on Nuisances, a work by a celebrated and able author, whose analysis of the cases cited by him is no doubt perfectly accurate. I do this for want of time to set out and analyze all of them in my own language.

Section 360. "When assent has been given to one by another to do an act, the natural and probable consequences of which are to produce a certain result, and the person to whom the assent is given goes on and expends money on the strength of the assent and makes erections of a permanent character, while the consent does not give any interest in the land, and at law is revocable at any time, even though given for a consideration, yet a court of equity will enforce it as an agreement, to give the right, in a case of fraud or great hardship, or will generally enjoin a party from revoking it. But it must be made to appear in such a case, to entitle a party to such relief, that the license has not been exceeded, and that its exercise produces no more injury to the party than might have been reasonably foreseen or apprehended.

In *Veghte et al.* v. *The Raritan Water Power Co.*, (19 N. J. Eq. 142,) this question was discussed by the court upon an application for an injunction to restrain the defendants from raising and tightening their dam on the Raritan river, by which it was claimed that a larger portion of the water of

the river would be diverted than formerly. The defendants set up a consent from the plaintiffs, or a part of them, to the diversion of the water, in writing, and the erection of works and the diversion of water under it. The chancellor says: 'The consent in such case is only a license, at law or in equity. In general, a license at law will create no estate in the hands of the licenser, but will justify or excuse any acts done under it. It is revocable, even when given for a consideration. But in such cases, where the revocation would be a fraud, courts of equity give a remedy, either by restraining the revocation or by construing the license as an agreement to give the right, and compelling specific performance.'

Section 361. "As to the effect to be given to a license from one to do an act upon his land, at law, the court of New Jersey, in the case of *Hetfield* v. *The Central R. R. Co.*, (29 N. J. Law, 571) is in point. In that case the charter of the defendants authorized them to enter upon and take the lands required for their road, but directed that they should not enter without the consent of the owner. The defendant entered upon the plaintiff's lands by his consent, but did not take any conveyance from him in the manner required by law, in order to give them right or title. The court held that this consent did not dispense with the necessity of a deed or conveyance of the land or right in the form required by law. That it was not a consent that was intended to confer a title and was revocable."

"In *Wood* v. *Ledbitter*, (13 M. & W. 838,) the question as to the effect of a license arose in an action of assault and battery. The evidence disclosed that the plaintiff purchased a ticket for the sum of one guinea, which entitled him to admission to the grand stand. That the Earl of Ellington was one of the stewards of the races, and that the tickets were issued by the stewards, but were not signed by Lord Ellington. That under this ticket the plaintiff entered the ground on one of the race days, when the defendant, who was a policeman, under the directions of Lord Ellington, who first ordered him to leave, upon his refusing to do so committed the assault complained of, using no more force than was necessary for that purpose. Upon the trial the judge directed the jury that, assuming the ticket to have been sold to the plaintiff under the sanction of Lord Ellington, it still was

lawful for Lord Ellington, without returning the guinea, to order the plaintiff to quit the inclosure, and that after a reasonable time had elapsed, if he failed to leave, then the plaintiff was not on the ground by the leave and license of Lord Ellington, and the defendant would be justified in removing him under his orders, and this ruling was sustained in Exchequer."

"In *Miller* v. *The Auburn & Syracuse R. R. Co.*, (6 Hill (N. Y.) 61), which was a case somewhat similar to that of *Hetfield* v. *The Central R. R. Co.*, before referred to, the defendants erected their railroad with an embankment upon Garden street in Auburn, interrupting the plaintiff's access to his premises, in 1839, and maintained it until 1842, when this suit was brought. The defendants offered to prove that the embankment was raised under a parol license from the plaintiff, but the proof was excluded by the court and the case was heard in the Supreme Court upon the question of the admissibility of that evidence. Cowen, J., among other things, said: 'If what the defendants in this case proposed to show was true, viz., that the plaintiff verbally authorized the making of the railway, while the authority remained, their acts were not wrongful. License is defined to be a power or authority. So long as the license was not countermanded, the defendants were acting in the plaintiff's own right.'

"In this case the court uphold a license as a defense until it is revoked, and hold that it must be revoked before an action can be brought; but in *Veghte* v. *The Raritan Power Co.*, *ante*, the court held that the bringing of the action is a revocation of itself, and all that is necessary. But the former would seem to be the better rule, and the one generally adopted. The following authorities will be found applicable upon the question of the effect of a license."

Section 362. "The case of *Roberts* v. *Rose*, (L. R., 1 Exch. 82,) is a leading case both upon the effect of a license, the right to revoke it, and the rights to abate nuisances affecting their individual rights."

"In that case it appeared that the plaintiffs were the lessees of a colliery called the Bank colliery, and that in 1861 they obtained from the owner of the fee of the adjoining lands written permission to make a water course from their colliery to an old pit in what was called the Broadwater colliery. A

part of the surface of the Broadwater colliery was at that time in possession of a tenant, and the plaintiffs also procured a license from him to build and maintain the water course in question, and the tenant also used the water course for the prosecution of the business of brickmaking.   Shortly after the watercourse was built, the plaintiffs were required by the owners of the fee to extend the watercourse over the spoil banks of the old pit, so as to join another water course that had formerly been built to carry away the waters from the Broadwater colliery, and which was discharged into a neighboring canal.''

''The premises over which the water course extended were subject to mortgage, and early in 1861, but after the water course was built, the defendants leased the Broadwater colliery of the mortgagors.   The lease was of the coal in or under the land, and leave was given to the defendant to occupy such parts of the lands as might be necessary for the due carrying on of the coal mines, and also to make use of the water courses over the land.   The lessors reserved the right to make water courses for certain mines on the land, proper compensation being made to the lessees therefor.''

''The defendant, on entering into possession, assented to. the continuance of the plaintiff's water course, and certain changes were made therein at the defendant's request, and the extension thereof was also made as required by the owner of the fee.''

''In 1863 the defendant applied to the plaintiffs for a money payment in consideration of their use of the water course, but the plaintiffs refused to comply with their demand, insisting that, under their license from the owner of the fee, they were entitled to continue their water course as it was.''

''The defendants thereupon gave them notice that the water course must be discontinued, and the plaintiffs not having discontinued it, the defendant stopped up the water course on the lands of the tenant, from whom the plaintiffs had license, near the boundary of the premises occupied by the plaintiffs.   The result of this obstruction was to pen back and throw the water pumped from the plaintiff's mines back upon the plaintiff's premises, and by its accumulation there it percolated through the soil into their mines.''

''The court held that the license to the plaintiffs was revo-

cable, and, having been revoked, deprived them of the right to maintain the water course, but that the defendant was bound to adopt a reasonable mode of abating the nuisance, and so as to do no unnecessary or unreasonable damage, and if the mode adopted by him was unreasonable and unnecessary he would be liable. A verdict was found for the plaintiff, upon the ground that the obstruction of the water was unreasonable and unnecessary at the point where it was made, and upon hearing on exceptions in exchequer, the verdict was sustained."

The cases put by way of illustrating the application of this new doctrine are not apt. They are not parallel. They totally ignore the difference in subject matter of the contract. Nobody ever sells all the materials in one story of his house except in view of the wrecking of that house and its conversion into personal property. Coal, in place, is sold all over the world without any view of disturbance to the surface. Nobody ever sold a chair on which he was sitting with a right to remove it from under him before he got up. No particular chair, nor any particular position, is necessary to the personal support of an individual in his natural state. If he stands, lies down, or sits down, he is natural. The chair has no connection with his person. Besides, it would be an impossibility by any covenant or contract for one person to confer upon another any estate, right or title in his person. Of course, if one person allow another to tear down his house and move it away, he has no right to sue him. But by that act such other person acquires no interest in the estate. If he sell him the houses or any part of them, and authorize removal of them, he thereby severs them from the estate and converts them into personal property. If, when the purchaser comes to take them off, he refuse to allow him to do it, the only remedy would probably be an action for damages. But if he pass title to a part of the land, or give him an easement upon the land to be attached to his adjoining land, then he acquires a part of the estate. It is not a mere personal covenant. But the terms of the deed must be broad enough to take hold of part of the estate, take it out of the covenantor, and vest it in the covenantee. If this deed is to be operative, it must carve out of the surface owned by the plaintiff a part of it, a right in it, and attach it to the coal for the

benefit of the owner thereof, and make it a servitude or bur-
den on the superincumbent land.   Such sales as are supposed
in the illustrations shown in the majority opinions are not
sales of property in place.   A sale of coal by deed, passing
title, is a sale in place.   It confers title to real estate, immov-
able property, not mere personal property.   The rules of
law, governing the rights in and to the two classes of prop-
erty are wholly different.   Nor are illustrations of agreements
allowing a man to do something on his own real property of
any force here.   Such agreements pass no title.   They merely
bar the remedy for doing a thing which the actor had no
right to do.   This right of support is real estate, confessedly
and indisputably.   Title to it must pass by deed, not by mere
estoppel, and a deed does not pass it unless the terms thereof
extend to it with the same degree of certainty that is requir-
ed in other cases.

A comparison of these results of the law of estoppel or
mere license with the principles declared, and conclusions ex-
pressed, in the later English decisions shows conclusively that
those decisions do not rest at all upon that law.  *Bell* v. *Love*,
decided in 1883, after the true nature of the right of support
had been ascertained, says the right to disturb or destroy it
"must be clearly defined by some grant or equivalent assur-
ance."   In *Dixon* v. *White*, decided in 1883, Lord Blackburn
said: "It is established that the titles may shew that the sur-
face is held on the terms that the owner of the minerals is at
liberty to remove the whole of them without leaving any sup-
port to the surface," thereby distinctly asserting that it is a
question of title.   In the same case, Lord FitzGerald said
that if the mine owner claims the right "to get and remove
the whole, though in doing so he may destroy the surface by
removing its necessary support, *then he must shew by his ti-
tle that he had such right.*"   It is likewise so declared in the
syllabus of that case in these terms: "If the owner of a piece
of land sells the surface and reserves the minerals below it,
with power to get them, he must, if he intends to have the
power of destroying or letting down the surface by subsi-
dence in getting them, frame his power in such language that
the Court may be able to say from the titles that such was
clearly the intention of the parties."   In *Bell* v. *Earl of
Dudley*, L. R. 1 Ch. D. 182, decided in 1894, Chitty, J., said:

"This inference (of retention of right of support) is strong; in order to rebut it the burden lies on the owner of the minerals to shew affirmatively and by clear words that he has the right of letting down the surface;" and this language is incorporated in the head notes of the case. If *Harris* v. *Ryding* and *Humphries* v. *Brogden* may be regarded as having been trenched upon by *Taylor* v. *Shafto*, *Shafto* v. *Johnson* and *Eadon* v. *Jeffcock* or by any of these, the later decisions, as just shown, must be taken and treated as having fully restored, to their pristine vigor and force, all the principles of construction of those first two cases, applicable upon the inquiry for the intent as to whether the right of support has been parted with. The altered view as to the nature of that right does not, in any degree, affect this question. As to this, the early English decisions are not, in my opinion, at all discredited, either at home or elsewhere.

Since, to my mind, the certain import of the decisions everywhere is to the effect that the right to destroy the support rests upon a grant, by the owner of the surface to the owner of the coal, of an easement or right in the surface as an appurtenance of the coal and a consequent burden or servitude upon the surface, it becomes necessary, I think, to keep in view the requisites of a deed sufficient to pass such an interest, and to test this deed by the rules governing the subject.

These principles are important, in view of the fact that the clause in this deed, relied upon as connecting or attaching to the coal a servitude upon the surface, contains not a word relating to, or touching, the surface. It adds nothing to the coal. The owner of the coal has a right to remove it, that right is an incident of his estate in it. We must look at this deed and construe it as the conditions were at the time of its execution. Nobody knew exactly what the geological formations were under that land. Nobody knew how the coal laid, its quantity or the nature of the overlying strata. Nobody knew how much coal it would take to support the surface. We may say that it was probable that it would take some, as it does almost everywhere in this State. But for aught that anybody knew to the contrary, the conditions existing in that tract of land might have been such as to enable the owner of the coal to remove every particle of it without letting down the surface. Not a word in the clause purports to grant any

right to injure or use the surface for any purpose other than those specified. None of these extend to the letting down of the surface. As to the removal of the coal, that was a power to do something not to the surface, but to the coal—not to the plaintiff's property, but to the defendant's property. And the thing authorized was what he had the right and power to do, by reason of his ownership of that property. It is not pretended by anybody that the grant of this power is in and of itself an express grant of any right in the surface. Thus far, the contention for the defendant rests not upon any grant, either express or implied, but upon the principle of estoppel which, in my judgment, absolutely fails to reach the question of title, and is, therefore, inapplicable to this case.

The alleged intent here to grant an easement out of the surface to be used and enjoyed in connection with the coal, disclosed by the clause granting the right to mine, excavate and remove all the coal, is a mere conjecture. As it does not stand upon any language which, in any way, includes or touches any part of the surface, its foundation is a mere presumption. No matter what intention the grantor had, if he did not express it in the deed, it is not effective. A deed never carries any interest or estate in land except by words of express grant or words which amount, in legal effect, to a grant. That a deed, in order to carry an estate or interest, must contain operative words of grant, is a rule from which the courts can never depart. Even when aided by a statute, requiring deeds to be liberally construed, this essential element must still appear.

"Section 313. The courts will construe the words used by the parties so as to give effect to the deed, if possible. 'The judges have been *astuti* to carry the intent of the parties into execution, and to give the most liberal and benign construction to deeds, *ut res magis valeat.*' Upon this principle a feoffment, or a bargain and sale from a parent to a child, to take effect after the death of the parent, may be held to be a covenant to stand seised to the use of the parent for life, because a deed of bargain and sale would be void.

A release to one not in possession, if made for a valuable consideration, will be construed to be a bargain and sale, or a covenant to stand seised, by which the estate might pass. And so a deed of lease and release has been held to be a cove-

nant to stand seised to uses where the consideration was a good one. A deed which cannot take effect as a bargain and sale, for want of a pecuniary consideration, may be given effect as a covenant to stand seised if there is a consideration of blood. In Massachusetts, where a valuable consideration is sufficient to support a covenant to stand seised, a deed of bargain and sale may operate as a covenant to stand seised when it is necessary that it should have that effect in order to carry out the manifest intention of the parties.

"Section 314. A deed without words of conveyance passes no title. In some states it is provided by statute that any instrument in writing signed by the grantor is effectual to transfer the legal title, if such was the intention of the grantor, to be collected from the entire instrument. But, even under such statutes, some words of conveyance are necessary. The statute does not wholly dispense with the use of words operative to convey, but simply imposes upon the courts the duty of construing liberally the words employed as words of transfer. An assignment of a deed, indorsed thereon, does not convey any interest in the lands therein described. In equity it might entitle the assignee to a decree for a specific performance, but it cannot operate as a transfer of the legal title.

"Section 315. If an instrument has no words of conveyance, the courts have no right to put them in by interpretation. 'Courts cannot make contracts for parties. It is not their province to write in an instrument words which will make it operative as a deed, where none of that character have been written by the parties themselves. The rule that courts will so construe an instrument as to make it effective does not mean that courts shall inject into it new and distinct provisions.'

"Section 316. A deed does not bind a person signing it unless it contains words expressive of an intention to convey some estate, title or interest. 'It has been said that the signing of a deed manifests the intention of the signer to be bound by it, and that the courts should construe every instrument so as to give effect to the intention of the parties to it. But the intention of the parties to a written contract must be derived from the language of the contract itself; and, where there is nothing in the deed to show an undertaking on the

part of one of the signers to convey, we do not see very clearly that his signature manifests a purpose to make a conveyance.  Where the title is in one person, and the consent of another is essential, under the law, to convey such title, and such other signs the deed, his name not appearing thereon as a grantor, the signature, it would seem, would merely manifest his consent to the conveyance.' Merely signing, sealing, and acknowledging an instrument in which another person is grantor is not sufficient.·

"Section 317. If from the whole deed the grantor appears to be named as such, and his intention to convey is manifest, the deed is not void, though his name does not appear in its proper place in the granting clause. Thus, where a conveyance is in the form of an indenture between the person who signs it as grantor, of one part, and a person named as grantee, of the other part the omission of the grantor's name in· the granting clause, when it appears in the covenant of warranty as well as in the *in testimonium* clause, is not a fatal defect. · The receipt of the consideration by a person who signed a deed but did not join in it as a grantor does not operate to give effect to the deed as his conveyance.

"Section 318. A deed by a husband in his own name only, conveying his wife's land in fee, in which she does not join, though she affixes her signature and seal, is not a conveyance of her estate in fee. Her signature, 'in token of her relinquishment of all her right in the bargained premises,' or 'in token of her release of dower,' does not convey her title in fee, nor bar her from asserting her title. That it was her intention to convey her estate in fee is not sufficient unless this intention is expressed in the deed. Such intention will not enable a court of chancery to correct the mistake and decree the execution of a perfect deed. The signing of the deed by the wife at most merely signifies her consent to the conveyance; it does not convey any interest or estate she has in the granted land. Under statutes which provide that a conveyance by a married woman may be made with the written consent of her husband, it is held that this consent is sufficiently manifested by his signing a deed by which his wife conveys her separate property, though he is not named as a party to the deed. The husband has nothing to convey, and his assent to the conveyance by his wife is all that is requir-

ed. The case is very different when the legal interest or estate is in the wife, and she does not join in the deed, or use any words manifesting an intention to convey such interest or estate, but merely signs a deed which purports to be a conveyance by the husband alone.

"Section 319. A wife cannot bar her right of dower by signing and sealing her husband's deed without any words of conveyance or of release by her of dower. By usage, however, in New Hampshire a wife may bar her dower by signing her husband's deed without any words of conveyance or release. The words, 'in token of her free consent,' used at the conclusion of a deed, do not sufficiently express her intention to bar her right of dower, nor do the words, 'I agree in the above conveyance.' If a wife having an estate in fee executes a deed of it with her husband, both joining in the granting part of the deed, the fact that the wife also releases dower and homestead in the granted premises does not restrict her conveyance to these interests, but the deed passes the title of the wife in fee." Jones' Law of Real Prop. in Convey., sections 313–319.

A deed can never convey a thing to which it makes no reference and does not purport by any language to pass. This deed does not grant a right to let down the surface either in express terms or any other language, touching or relating to the surface. The right of support belongs to the surface, no matter how, whether by reservation or *ex jure naturae*. It cannot be parted with except by cutting it out of the surface. A deed which makes no reference to the surface cannot, by any possibility, take anything out of it. In the clause relied upon here, there is no word which either expressly or impliedly touches the surface. No matter what intention Griffin had with reference to this right of support, if he did not use language which touches it, relates to it, carries it away, the defendant did not obtain it. "Nothing passes by a deed except what is described in it, whatever the intention of the parties may have been. Though parol evidence is often admissible to ascertain what lands are embraced in the description, such evidence cannot make the deed operate upon land not embraced in the descriptive words. A deed described the land conveyed as beginning at a certain rock, and running thence one mile east, one mile north, one mile west, and one

mile south, to the place of beginning, and also stated that it was the land set off to a certain Indian under a treaty with the government. The Indian had previously selected his land as 'a tract one mile square, the exact boundaries of which may be defined when the surveys are made.' After the deed was given, the Indian's land was located and patented so as to include a section not in the form of a square, no part of which lay within the boundaries named in said deed. It was held that deed, being for a specific tract of land, could not be construed to convey the grantor's interest in the land actually patented to the Indian. That one parcel or some portion of the lands is not described with sufficient certainty does not invalidate the deed as to other parcels that are sufficiently described." Jones Law of Real Prop. Convey., section 325.

Not only must a deed by some language used in it include the thing, title to which is set up under it; but the language must be certain. It is not enough that a man has a piece of land or other property and makes a deed conveying land to another man. Because it appears that he intended to convey something, the courts cannot permit a resort to parol evidence to show what he intended to grant. What he intended to grant must be shown by the language of the instrument, and parol evidence can only be used for the purpose of identifying that which is described in the deed,—applying the description to its subject-matter. Jones' Law of Real. Prop. Convey., section 323; *Mathews* v. *Jarrett*, 20 W. Va. 415; *Westfall* v. *Cottrell*, 24 W. Va. 763; *Dickens* v. *Burns*, 79 N. C. 490; *Brown* v. *Coble*, 76 N. C. 39.

The suggestion that a deed, even where there are terms touching property or property rights, claimed under it, will pass title thereto by anything but a necessary implication, where there are no words of express grant, is inconsistent with a rule of law applicable to the construction of all muniments of title. The phrases, "plain implication," and "necessary implication," have exactly the same meaning when used in reference to the construction of such instruments. By these is not meant a physical necessity, but a logical necessity. Where a clause is enlarged in its effect beyond the import of the words used, on the theory of an intent established by implication, it must be necessary to so enlarge it in order to give effect to the plain and express

provisions of other clauses, or the probability of intent must
be so strong that the contrary thereof cannot be supposed.
In *Wilkinson* v. *Adam*, 1 Ves. & B. 422, 466, Lord Eldon
said: "With regard to that expression 'necessary implica-
cation,' I will repeat what I have before stated from a Note
of Lord Hardwicke's judgment in *Cariton* v. *Hellier;* that
in construing a Will Conjecture must not be taken for Implica-
tion; but necessary Implication means, not natural Necessity,
but so strong a probability of Intention that an Intention con-
trary to that, which is imputed to the Testator, cannot be sup-
posed." An intent by implication cannot be engrafted upon the
whole instrument because it is barely probable that the
grantor intended the words to have such broader meaning
and effect. It is well settled that a more liberal rule obtains
in the construction of wills than in the construction of
deeds. There is never any presumption that a man granted
a thing by deed. The presumption is that he did not, unless
the language of the deed includes it. Nothing will ever
be added to a deed upon the mere presumption that the tes-
tator intended to dispose of property; but in the law of wills,
there is a presumption that a man who has made a will in-
tended to dispose of his whole estate and not die intestate
as to any of it. Another rule is that, when a will contains
language relating to children, there is a presumption that
the testator did not intend to give his property to strangers
in preference to his children. But even in these cases, the
lax rule contended for here does not apply. Though a will
is aided by this presumption as to the intent of the testator,
his whole estate does not pass, nor are his children preferred
to strangers in the case of doubtful language, unless the
intent to that effect appears by necessary implication.
"There may be a legacy given by implication, but to raise
such implication it must be necessary to do so in order to
carry out a manifest and plain intent of the testator which
would fail unless such implication be allowed." *Bartlett* v.
*Patton*, 33 W. Va. 72. This rule was applied in the case
just mentioned, in the very face of the presumption that
the testator did not intend to die intestate as to any part
of his property. "Since the courts endeavor to ascertain
the intention of testator from his whole will, rather than
disjointed parts thereof, and enforce this intention, if lawful,

when thus ascertained, it follows that it is possible for testator to dispose of property, not by any formal disposition in his will, but by necessary implication from his will taken as a whole.   The presumption is very strong, however, against his having intended any devise or bequest which he has not set forth in his will.   There must, as has been quoted in recent cases, be a probability arising from the whole will that testator intended to make the bequest or devise, which he has not set forth expressly, so strong, that it cannot be supposed that any other intention existed in the mind of testator."   Page on Wills, section 468; *Michael* v. *Pye*, 75 Ga. 189; *Reinhardt's Estate*, 74 Cal. 365; *Eneberg* v. *Carter*, 98 Mo. 647; *Barnhard* v. *Barlow*, 50 N. J. Eq. 131; *De Silver's Estate*, 142 Pa. St. 74; *Sutherland* v. *Sydnor*, 84 Va. 880; *Bartlett* v. *Patton*, 33 W. Va. 71, 5 L.R.A.523; *Wilkinson* v. *Adam*, 1 Ves. & B. 445; *Boston Safe Deposit & Trust Co.* v. *Coffin*, 152 Mass. 95; 8 L. R. A. 740; *Masterson* v. *Townshend*, 123 N. Y. 458; 10 L. R. A. 816; *Goodright* v. *Hoskins*, 9 East. 306; *Jackson* v. *Billinger*, 18 Johns. 383; *In re Springfield* (1894), 3 Ch. 603; 64 L. J. Ch. (N. S.) 201; *Smith's Trusts*, L. R. 1 Eq, 79; *Blake's Trusts*, L. R. 3 Eq. 799.

Another proposition to be remembered is that even in the constructions of wills, liberal as are the rules, a court can never go outside of the language of the will and make it pass something or pass a thing to somebody, on the bare ground of a probability that the testator intended to do so. The intention must be gathered from the language of the will, and that language must either give the thing expressly or by necessary implication.   By the use of the term, "expressly," it is not meant that it shall be given any particular formula of words; but only that the intent must be shown by express language, which language must reach to, and include, the object of the donation, the person to whom the thing is given, and must also take in by some form of description the thing to be given.   Neither of these can be supplied   except by necessary implication, and that implication must arise from some intent plainly expressed somewhere in the will, · under the rule that in construing a will, all its parts must be considered.   When, being so considered, something must be supplied which is not ex-

pressed in any form, in order to effectuate the general intent, it is necessarily implied. That is the only way a thing not expressed in a will can be added to it, and that addition must be founded upon an express intent in the deed as to other matters in some way connected with the particular matter. Nothing can be added upon any theory of intent not derived from the language of the will, no matter how clear it may appear from something outside of the will that it was intended. "In the interpretation of a will, the true enquiry is, not what the testator meant to express, but what do the words used express. When the language of the testator is plain and his meaning clear, the courts can do nothing but carry out the will of the testator, if it be not inconsistent with some rule of law." *Couch* v. *Eastham*, 29 W. Va. 784.

Such is the strictness of the rule in testamentary alienation by implication. It must be more strict in alienations by deed, because they are unaided by the presumptions as to intent as already stated. If any such rules are at all applicable to deeds, they must be of very limited application. No author, so far as I can see, mentions them among the rules given for the construction of deeds. Every deed, of course, carries with it everything naturally or artificially attached to the property conveyed. This does not stand upon any rule of conveyance by implication. It is an express conveyance, because the things that go with the land are parts of the land. I know of no instance in which a piece of property, not mentioned in the deed in some way, has ever been held to have passed by it, nor in which any person not made a grantee in a deed by some sort of expression, has ever been permitted to take property under it. As the liberal rules above mentioned, as being applicable to wills, do not apply to deeds, nothing can be held under a deed, unless it be conveyed by express words of grant or by some language or provision which is, in legal effect, the equivalent of a grant. Such other language or clause must be equivalent in the sense that it shows express intent, not mere possible or probable intent, to part with the thing claimed under it. It is not enough that it grants the right to do some other thing. It must show intent to part with the very thing claimed. The grant of a right to a man to

remove his own coal is very different from the grant to him of a right to let down the surface, belonging to another person, and it does not necessarily mean that the surface shall be let down or may be let down.

Such is the result of proper application of the rules of law, if the words of the clause, "together with the right to enter upon and under said land and to mine, excavate and remove all of said coal," be given their full force and effect according to their ordinary and plain meaning. If we say the grantor thereby authorized the removal of every pound of coal under the land, it is not enough to carry the right to let down the surface, for the language falls short of granting any right to let it down. But, be this as it may, the very latest English authorities say no mere grant of any powers to work the mines, however broad and ample they may be, will be accepted by the courts as showing intent to part with the right of support. The present state of the law is expressed by Lord Chancellor Halsbury, in *New Sharlstan &c. Co.* v. *Earl of Westmorland*, decided by the House of Lords in 1900, reported in L. R. 2 Chy. D. (1904) page 443, as a note to *Bishop Auckland &c. Society* v. *Butterknowle &c. Co.*, as follows: "My Lords, the state of the law is, now, by the decisions which have been referred to, perfectly clear. The mere fact of giving a right to sink pits and to work or get coal does not of itself establish a right to get rid of the common law right of the surface owner to have his surface undisturbed. That is a plain proposition of law, and when one approaches the question from that point of view it is manifest that in each of the cases that have been referred to the learned judges were talking of the particular instruments they had then to construe, and their problem was to find out whether by the express language of the grant, or by that right which might be construed to be the general effect and intent of the whole instrument, there was a power to interfere with that common law right. I do not think that those principles were so firmly established some ten or twenty years ago as they are now; but that is the proposition of law, and it must be applied to the particular instrument which the Court has to construe in each case. In this instrument, my Lords, I confess I am wholly unable to find any such permission to let down the

surface. One observation which lies very plainly before one
is that there is no express permission to do it, and if the ar-
rangement between the parties was that it was contem-
plated, it is not, as was pointed out, I think, in *Love* v. *Bell*, 9
App. Cas. 286, an immaterial circumstance that it is not men-
tioned when they are dealing with such a subject, and deal-
ing with it in such a way, as would naturally suggest the
question whether that is to be the state of relations between
the parties—the lessor and lessee, or the vendor and vendee,
as the case may be. The absence of such an express per-
mission is not without its significance. Then we have
to deal with the question whether upon the whole in-
strument we can discover from its language that the par-
ties did contemplate giving the right to let down the surface.
My Lords, I can find no such right here; and it appears to
me that, applying the principle of *Davis* v. *Treharne*, 6
App. Cas. 460, and the long line of cases which may have
now settled the law, it would be reversal of what has been
so settled if your lordships were to assume, or from any-
thing that you can find in this deed to imply a right to
let down the surface. It appears to me that the law
upon the question must now be regarded as settled, and,
there being no express permission, the onus lies on the
person who says he has a right to do so, to show some-
thing in the instrument which gives him that right." In
*Bishop Auckland &c Society* v. *Butterknowle &c. Co.*, L.
R. Ch. D. (1904) p. 419, 424, Farwell J., said: "Words,
*however large*, applicable to the right of working and priv-
ileges connected with it and compensation for the exercise
of such right and privileges are not enough, at any rate, if
the words used are fairly applicable to the ordinary course
of working and nothing more." In the same case, pp. 435,
436 and 440, Vaughan Williams, L. J., said: "The key-
note of the law which controls the relations of surface
owners and mineral owners is as stated by Lord Halsbury in
*New Sharlston Colleries Co.* v. *Earl of Westmorland*—
namely, that 'the mere fact of giving a right to sink pits and
to work or get coal does not of itself establish a right to get
rid of the common law right of the surface owner to have
his surface undisturbed.' This law does not exclude the ob-
ligation of the Court to ascertain the meaning of the par-

ties to a contract, whether such contract is embodied in an Act of Parliament or not, but the 'letting down' of the surface by underground workings is so injurious to the user of the surface by the surface owner, that it is not reasonable to construe a contract as giving the mineral owner this right unless the words of the contract make this plain, either by express words or by implication.    The surface owner has by common law a right to have the surface supported by the subjacent lands.   It is not reasonable to suppose that the surface owner intends to give up a right so important for the 'user' of the surface without adequate consideration, and the Courts do not easily come to the conclusion that it is the intention of a contract to give up this right to support, and therefore, in construing a contract intended to determine the relative rights of the surface owner and the owner of the subjacent land, it is fitting to take into consideration, not only the words of the contract, but the nature of the right which it is sought to say the contract intends that the surface owner shall surrender.   In this case there are no express words giving a right to the mineral owner to let down the surface, so it becomes necessary to see if the words of the contract embodied in the Act of Parliament are such as to make it plain that it was the intention of the parties thereto that the surface owner should surrender the right of support.   *   *   *   *   *   The case is near the borderline; but I am not prepared to hold that the terms of the compensation clause are sufficiently plain and unequivocal to make it right that we should hold that there is by necessary implication power given to the mineral owner to let down the surface in a case in which there is no express power, and the general powers construed by themselves would not include such a power.   I think the decision of Farwell J. ought to be affirmed." In the same case, Romer, L. J., said: "General powers of working conferred by the act of the mine owner, however large, will not be held to take away the right of support if the general powers are not inconsistent with the right.   *   *   *   *   *   And all I need say is, after a careful consideration of the compensation clause in the present case, that the Legislature has not made it clear that it was contemplating compensation for damage arising from letting down the surface.   The words: 'search-

ing for, winning and working the mines and quarries within and under their respective allotments' are quite general, and I cannot gather from the use of the word 'working' (a very general word and of large import), even coupling it expressly with the word 'under' the allotments, that the Legislature must have contemplated damage arising from letting down the surface." It is to be observed that the case just quoted from follows *Bishop Auckland &c. Society* v. *Butterknowle &c. Co..* decided in 1900, which took for its key-note *Bell* v. *Love,* 9 App. Case. 286, decided by the House of Lords, in 1884. Lord Chancellor Selborne based his opinion in that case upon *Harris* v. *Ryding, Dugdale* v. *Robertson, Davis* v. *Treharne,* and *Duke of Buccleugh* v: *Wakefield,* passing over, in silence, *Eadon* v. *Jeffcock, Taylor* v. *Shafto* and *Shafto* v. *Johnson,* as did also Lords Watson and Bramwell. His interpretation of *Davis* v. *Treharne* was as follows: "In the same case, *Davis* v. *Treharne,* two pages later, Lord Blackburn deals with the question which there arose, and on this principle: that when the person on whom the burden of proof lies has to satisfy it, he will not be able to do so merely by showing that there are words, however large, applicable to the right of working, and privileges connected with it, and compensation to be paid for working and for the use of those privileges, which may receive full effect consistently with the right of support. I will not refer in detail to that passage: it is in accordance with what is to be found in other authorities." Lord Bramwell said: "If there had been nothing more in the Act, the Dean and Chapter would have had no right to touch the surface to get the minerals. And if all the right the Act gave them was to use such part of the surface as was necessary to get the minerals they would have no right in getting them to let down the surface. In other words, when the ownership of the soil generally and of the minerals is severed, the mineral owner has no rights as against the surface in getting the minerals except what the instrument of severance gives him, and if it gives the right to get the minerals without more, there is no right to let down the surface." All these late decisions emphasize the proposition that the intent to be ascertained is that the surface may be let down—not that the coal may be removed or that large powers may be exercised

under ground—and occasionally there is an intimation to the effect that even such intent is not enough, and that ample compensation for that, aside from the consideration recited in the deed, must appear to have been specially provided for. Thus, in *Bell* v. *Love*, 9 App. Cas., Lord Watson said: "The terms of the reservation to the Dean and Chapter of Durham present a marked contrast to the broad and comprehensive terms of the clause with which the House had to deal in *Duke of Buccleugh* v. *Wakefield*, a clause which, to use the words of Lord Hatherly conferred the 'largest imaginable power' upon the owner of the mines; yet in that case the decision of the House was given in his favor, not because the clause *per se* enabled him so to work so as to cause subsidence, but in respect that its powers were made subject to the condition that those who worked the mines, should make full compensation for all injury thereby occasioned to the owners of the surface. I concur in the opinion expressed by Mellish L. J. in *Hext* v. *Gill*, that 'no one can read the judgment without coming to the conclusion that, if the provision as to compensation had not been there, the House of Lords, notwithstanding the strength of the other words, would in all probability have come to another conclusion.'"

That the grant of a right *to remove all the coal* under the land does not authorize letting down the surface was expressly and unequivocally decided and held in *Aspden* v. *Seddon*, 10 Chy. App. 397, a case cited in the opinion of the majority of this Court. To show this no more is necessary than a quotation from that part of the opinion of Mellish, L. J. which decides the case, emphasizing the language that states this conclusion. It reads as follows: "Now, by the deed, all mines and seams of coal, ironstone, and other minerals are reserved to *Stott*, with full liberty, power, and authority for *Stott* and his lessees 'to search for, get, win, take, cart and carry away the same, and sell or convert to his or their own use the said excepted mines, veins and seams of coal, cannel and ironstone and other mines and minerals, or any of them, or any part or parts thereof, at pleasure, and to do all things necessary for effectuating all or any of the aforesaid purposes.' These words do certainly appear in *very plain terms to give power to the mineral owner to remove any part of the minerals at*

*his pleasure;* but, nevertheless, we think that we are bound by the authorities to hold that these words are not by themselves sufficient to take away the surface-owner's right to support. *If the sentence had stopped there, these words would be consistent with the construction that the mineral owner may take away every part of the minerals, provided he can do so without violating the surface-owner's right to support, but not otherwise, and some further words would be necessary to prove that the intention of the parties was that the mineral owner should be at liberty to take away the whole or any part of the minerals, notwithstanding he might thereby let down the surface or any buildings thereon.* Accordingly the respondents rely on the words which immediately follow in the deed as sufficient for this purpose. Those words are, 'but without entering upon the surface of the said premises, or any part thereof, so that compensation in money be made by him or them for all damage that shall be done to the erections on the said plot by the exercise of any of the said excepted liberties or in consequence thereof.' As by the express words of the reservation the mine-owner in working the mines *is not to enter upon the plot of land conveyed by the deed, the damage to the buildings for which compensation is to be given must be damage to the buildings caused by the removal of the minerals reserved, and therefore it follows that a right to remove all the minerals, notwithstanding the buildings above might be thereby damaged,* was one of the liberties reserved by the deed. In substance, the plain meaning of the whole reservation seems to us to be that the mine-owner is to be at liberty to remove the whole or any part of the minerals at his pleasure, paying compensation to the surface-owner for any damage which may be thereby occasioned to the buildings of the surface-owner, which is equivalent to saying that he may remove the whole of the minerals, notwithstanding the buildings may be thereby damaged, subject to a liability to pay compensation. We do not think there is any other clause in the deed which really affects the question." Test the language of the deed in this case by the opinion in *Aspden* v. *Seddon* and reach the conclusion declared by the decision of this Court in this case! It is an utter impossibility. *Aspden* v. *Seddon* reiterates in plain terms, the following declaration of Baron Park in *Harris* v.

*Ryding*, the first reported case: "I do not mean to say that all the coal does not belong to the defendants, but that they cannot get it without leaving sufficient support."

Strange as it may seem, *Aspden* v. *Seddon* is cited by Mr. MacSwinney, 339, for the proposition, quoted in the majority opinion, to the effect that the later English cases construe mining deeds and leases in a manner different from the "curious mode" adopted in the earlier ones.    The decision was an absolute necessity arising from the terms of the deed.    In no other possible way could they be made effective.  The compensation clause could not be referred to surface workings, for none were authorized.    Hence, damage to the surface from workings underneath was the only damage that' could result, or be compensated.    The rule of presumption against an intention to part with the right of support, asserted in the early cases, was allowed to stand in that case until overcome by the absolute necessity of making it yield in order to give effect to plain terms used in the deed, utterly irreconcilable with any other construction, so far as the court could then see.    And, moreover, whether *Aspden* v. *Seddon* is good law in England today may well be doubted, in view of the opinion of Lord Davey in *New Sharlston &c. Co.* v. *Earl of Westmorland*, decided in 1900, concurred in by Lords Brampton and Robertson, which, in part, reads as follows: "Speaking for myself, I cannot see why a covenant providing a particular measure or mode of obtaining compensation is in any way inconsistent with the existence of an obligation not to let down the surface, even though that covenant extends beyond the surface and is applicable also, or even exclusively, to underground operations.    The use of the words 'by reason of the exercise of the powers' does not seem to me to carry it any further, because it may apply to any incidental injury done—whether accidentally or wilfully makes no difference—whilst exercising the powers.    It does not seem to me to give a license to do the injury, if you say that a person shall pay compensation if he does it.    A covenant to pay compensation for doing a thing which you are prohibited from doing is in no way contrary to or inconsistent with the continuance of the obligation not to do it.    Indeed, one may go further and say that, if the thing nothwithstanding the prohibition is done, there is no other means by which you

can obtain a remedy for what is past (an injunction, of course, will not extend to the past) except by provision for payment of compensation.   Therefore, I do not accede to the argument that the existence of a covenant for payment of compensation for letting down the surface is, whether it applies wholly or partially to underground operations or not, in any way inconsistent with the continuance of the common law obligation." Lord Davey's views were approved in *Bishop Auckland &c. Society* v. *Butterknowle &c. Co.*, decided in 1904, and elaborated upon by Vaughan Williams, L. J., as follows: "Be this how it may, it seems to me that the finding of Lord Esher that the only damage which could be done by the underground working would be by causing a subsidence of the surface does not bind us today, because it is a finding of fact in a particular case arrived at by consideration of the words of a particular instrument which had to be construed in that case, and is not a judgment laying down a canon of construction.   I can conceive myself injuries which might be caused by underground working other than 'letting down the surface.'   It seems to me that underground working might affect the springs and streams and wells on the surface, and I am not sure that underground working might not affect the surface or the buildings on the surface by vibration, without actually letting the surface down."

MacSwinney on Mines was published in 1884, since which time some very important cases have been decided, and the tendency has been strongly in the direction of the rigidity of the presumption in favor of the retention of support.   MacSwinney's first and second rules, quoted by JUDGE COX, are mere general conclusions, for which no particular authority is cited by him.   The third undertakes to set out specific rules, founded upon authority, saying: "Where the mine owner is relieved from liability for damage, the surface owner may often be presumed to have been compensated by anticipation."   He deduced this rule from *Rowbotham* v. *Wilson*, cited, *Richards* v. *Harper*, L. R. 1 Exch. 199, *Williams* v. *Bagnall*, 15 W. R. 272, *Buchanan* v. *Andrew*, L. R. 2 Sc. & D. 286, and *Bensfield &c. Board* v. *Consett Co.*.   In the first, the clause of release exonerated from liability "to any action or actions for damage on account of working and getting the said mines, for or by reason that the *surface of*

*the lands aforesaid may be rendered uneven and less commo-dious to the occupiers thereof, by sinking in hollows* or being otherwise defaced and injured where such mines shall be worked." Moreover, the award, under which the plaintiff took his title, contained the following recital: "The said several proprietors, parties to these presents and interested in the disposal of lands and mines under the circumstances aforesaid, having agreed with each other and being willing and desirous to accept their respective allotments in their several situations hereinbefore declared, subject nevertheless to any inconvenience or incumbrance which may arise from the cause aforesaid." Injury to the surface resulted necessarily from giving effect to these provisions. In no other way could they have had any effect, as the court then believed. There was nothing else to which they could refer, and they extended to, and expressly mentioned, the surface and injury thereto. Nothing was left to presumption. The second case went off on an entirely different point, the deed relied upon never having been recorded and the surface owner having neither actual nor constructive notice of the right claimed by the mine owner. *Williams* v. *Bagnall* was like *Aspden* v. *Seddon*, except in one particular. There was in it a clause releasing from liability instead of one providing for compensation. The deed allowed nothing to be done on the surface. Hence, the injury contemplated by the release was necessarily injury from underground working—subsidence. It was a case of necessary implication,—of letting down the surface or rejecting part of the deed,—because it could not mean anything else. The nature of *Buchanan* v. *Andrew* and the grounds of the decision are best stated in the following language of Lord Chancellor Hatherly, taken from his opinion, delivered in the House of Lords: "Your Lordships will see that this express agreement to exclude claims for damage is not confined to some particular description of damage, but it extends to any damage, the words being 'and shall not be liable for any damage.' Secondly, the feu contract particularly takes notice of the buildings, and of the liability of those buildings to damage through the workings; and it says that the Superior shall not be liable for any damage which may happen to any buildings then upon the property, or afterwards to be there. The importance of that reference to build-

ings will be seen presently, when we come to the latter part
of the deed which relates to that particular subject. Thirdly,
the feu contract takes notice of the modes of working by
which such damage may happen, and puts foremost 'long
wall workings,'—a remarkable thing; because that was not
the mode of working actually in use, or which ever had been
in use there; and it was a mode of working which would
completely extract, if it were followed, the whole of the coal
without leaving any support whatever, except such limited
supports as might arise by rubbish left in the mine, and
which, according to the evidence relating to this mine, would
have been clearly insufficient to prevent damage by subsi-
dence.    I ought further to remark that the feu contract no-
tices two kinds of damage: the one direct damage by the
working of the seams remaining to be worked; and the other
what I may describe as indirect damage by the subsiding of
the wastes in the two seams already worked, in consequence
of those excavations.    The feu contract deals with the dam-
age arising from the loss of lateral support occasioned by
working in the neighborhood, as well as with the damage
arising from the loss of support occasioned by workings im-
mediately under the surface in question.    Can anything pos-
sibly be more clear, than that the intention of the parties on
both sides was that the Superior was to have the unrestrain-
ed right of taking out the whole and every part of the re-
served minerals, the whole risk of any consequent damage
being undertaken and to be sustained by the feuar?"    The
deed    provided    for    " Long-wall "    working.    By    that
method, all pillars were withdrawn and the surface let down.
It released the mine owner from all damage of every kind,
occasioned by the workings.    This is another clear case of
absolute necessity resulting from express terms relating di-
rectly to the surface and injury thereto by subsidence. *Bens-
field &c. Board* v. *Consett Co.* was a case of injury to a pub-
lic highway, established pursuant to a local Inclosure Act,
by which a commons was enclosed and partitioned, and the
mine owner released from liability for damages to the surface.
The court refused to apply to the public the rules governing
the rights of individuals, saying it could not have been in-
tended, that an Act, which appointed a public road, should,

at the same time, legalize a public nuisance by injuring the road. So the principle of that case has no application here.

It will be observed that MacSwinney does not say a release of liability will always, and of itself, sufficiently evidence intent to part with the right of support. He would not be justified, by the authorities he cites or any others, in intimating that it will ever do so. The cases just analyzed show that the liability for which the release is provided must affirmatively appear to be liability for damages resulting from letting down the surface. Not one of them stops short of the disclosure of such intent by express words or necessary implication. They are no authority for the proposition that a general release from liability for damages, and nothing more, will exonerate the mine owner from the consequence of subsidence, occasioned by him. Some later cases, illustrating the effect of such a clause, not only fail to carry it so far, but show that it stops short of that. In *Consett Waterworks Co.* v. *Ritson*, 22 Q. B. D. L. R. 31, decided in 1889, the Inclosure Act under which it arose provided that the lord of the manor should enjoy all mines and minerals as fully and freely as if the act had not passed, without paying damages or making satisfaction for so doing, &c.: and, further provided that the annual rental of 500 acres (out of about 20,000) should be set a part to provide for the compensation to which the allottees of the surface might thereafter be entitled, any deficiency to be made up by means of a rate levied upon the allottees. The Court of Queen's Bench held the lord answerable for letting down the surface, notwithstanding the provision for compensation; but the decision was reversed by the Court of Appeals. Commenting on the decision of the Court of Appeals in the *Consett Case*, Vaughan Williams, L. J. said, in 1904, in *Bishop Auckland &c. Society* v. *Butterknowle &c. Co.*: "It is argued that this Court is bound by reason of its own earlier decision, on the Consett Case to hold that the necessary effect of a compensation clause, coupled with the words 'without making or paying any satisfaction for so doing,' if it extends to working under the surface, is to give the mine owner a right to let down the surface. But it seems to me that all that the Court of Appeal were doing in the *Consett Case* was to construe those words in that case, and that we are not bound to put the same construction in this

case if we find matters in the present statutory contract which
were not present in the *Consett Case* going to negative the in-
tention to give the lord a right to let down the surface.  Be-
fore calling attention to these differences, I would like to call
attention to the fact that Lord Esher, at all events, gave his
judgment upon the basis that the presence of a compensation
clause takes away the fetter put upon the courts as to con-
struing 'large words,' according to their ordinary effect.    I
do not think that this view is in accordance with the decis-
ions in the House of Lords.    It may be that the presence of
a 'compensation clause,' especially where the compensation
is to come from others than those who do the  act for which
compensation is to be made, is a matter to which considera-
ble weight ought to be given on a question of construction,
but I cannot think that there is no fetter on construction left.
The presumption in favor of the common law right of sup-
port should still prevent the Court from construing 'large
words' as freely as if no such presumption existed.  Now the
words of the compensation clause in the present Act are as
follows: (His Lordship read the clause, and continued:—) It
appears, therefore, that any person who suffers damage in
his allotment by the 'searching for, winning, and working of
the mines and quarries therein,' or by the laying or repair-
ing of wagon-ways, and a number of other matters (the dam-
ages resulting from which last-mentioned causes would be ob-
viously small), is to complain to one or more justices, who
are to inquire into the compensation in a summary way and
to finally settle and determine the damages sustained by such
person, which damages are to be borne by the occupiers of
the several allotments ratably in proportions to be fixed by
the justices, with a liability to distress in default of payment.
It will be observed that the damages from whatever cause are
to be paid by the occupiers, not by the owners and  proprie-
tors of the allotments, who are mentioned a few lines later,
and that the summary inquiry before the justices to finally
settle the damages recoverable from the occupiers by distress
seem very unsuitable to the fixing of large damages, but suit-
able rather to the recovery of small damages.    Compare s.
48 of the Consett Act.    It is true you find the same colloca-
tion of damages from various causes, but these damages are
to be paid primarily, not by the occupants, but from a fund

resulting from the rents of lands allotted to justices as trustees for the very purpose of providing compensation to persons injured by the working of the mines.    It is true that there is in s. 49 a provision that if the fund formed by the clear rents and profits is deficient, the deficiency may be recovered from the owners or occupiers of all the several allotments ratably in proportion to value, and may be recovered by distress, but it is provided 'that every occupier or tenant who shall have paid such damages as aforesaid shall and may deduct and retain out of his or her rent or rents so much money as he or she shall so pay.' I am not saying that mere inadequacy of the statutory compensation would justify a limitation of the 'large words' of definition of damages, but I think that the consideration of the class of persons on whom the liability to pay the compensation is thrown may make it right to put a narrow meaning on the words defining the damages for which compensation is to be given.    With regard to the *Consett Case* itself, I am not sure that it is consistent with the observations of Lord Davey in *New Sharlston Collieries Co.* v. *Earl of Westmorland*, to which I have already called attention.    It clearly would not be consistent with those observations but for the differences in the sources from which the compensation is to be paid.    It may be, however, that Lord Davey's observations as to the payment of compensation, rather importing that the thing the doing of which is to be compensated for is wrong than that it is right, only apply where the compensation is paid by the person doing that act."    In the same case, Romer, L. J. commented on the *Consett Case* as follows:    "But then come the words: 'And that without making or paying any satisfaction for so doing.' And it is with reference to somewhat similar (though not identical) words in the Act considered in *Consett Waterworks Co.* v. *Ritson* that some of the passages in the judgments occur which have occasioned me difficulty in the present case. I am bound to say that I cannot fully follow or appreciate the force of some of the observations in the passages in question. . I cannot myself see why the words in question are not quite consistent with the surface owners having the right of support.    The expression without making or paying any satisfaction 'for so doing' means to my mind, after I find that 'so doing' means doing something not involving the right to

let down the surface, merely not making or paying any satisfaction for doing any of the acts authorized or enumerated, and is not dealing with or considering the act of letting down the surface.    At any rate, that is the conclusion I come to in the present case, notwithstanding what was said in the *Consett Waterworks Co.* v. *Ritson.*    That being so, all that remains for me to consider is the compensation clause.    Again there are, I admit, some passages in the judgments in the *Consett Waterworks Co.* v. *Ritson* with reference to the compensation clause there considered which have caused me considerable difficulty, for those judgments are of the Court of Appeal, and would or might bind me if the compensation clause there had been identical with that in the present case. But the two clauses are not identical.    I need not enumerate the differences.    Some of them have been already referred to by the Lord Justice in his judgment just delivered.    And all I need say is, after a careful consideration of the compensation clause in the present case, that the Legislature has not made it clear that it was contemplating compensation for damage arising from letting down the surface.    The words: 'searching for, winning, and working the mines and quarries within and under their respective allotments' are quite general, and I cannot gather from the use of the word 'working' (a very general word and of large import), even coupling it expressly with the word 'under' the allotments, that the Legislature must have contemplated damage arising from letting down the surface.    And this view is fortified by the provision that the persons who have to pay the compensation are only the 'occupiers' of the allotments, and moreover occupiers excluding the occupier of the allotment damaged.'' These two cases show conclusively that a mere general release is not enough to authorize the letting down of the surface, because it stops short of the expression of any intent to allow the surface to be affected in that way.    Another case, illustrating and accentuating this view is *Belt* v. *Earl of Dudley*, L. R. 1 Chy. D. 1, decided in 1894.    The Inclosure Act under which it arose released from liability and provided for compensation for ''great damage'' to which the lord of the manor was himself obliged to contribute.

I have quoted enough from the decisions to demonstrate that a compensation clause alone is not sufficient to show in-

tent to relinquish the support, *Davis* v. *Treharne*, even though it expressly relate to underground workings, *New Sharlston &c. Co.* v. *Butterknowle &c. Co.* Such a clause and a release from liability both failed in the *Bishop Auckland Case.*

From the foregoing review of the English decisions, the following conclusions are inevitable: First. Neither the principles of estoppel, nor those of mere license, govern in the construction of a lease, deed or statute to determine whether the right of subjacent support is thereby relinquished. A provision in an instrument, to have such effect, must be a grant of a right in the surface or an equivalent assurance. Second. Such provision must, in express terms, in some form, relate to, and permit injury of, the surface by subsidence, occasioned by underground workings. Third. The express grant of a right to remove all the coal, without an express release of liability for consequent damages, resulting from subsidence, or a provision for compensating for such damages, is not sufficient. *Aspden* v. *Seddon; Williams* v. *Bagnall; Davis* v. *Treharne; Harris* v. *Ryding.* Fourth. The consideration recited in a deed, conveying minerals, will never be presumed to include compensation for loss of the right of support, in the absence of an express release from liability for damages, resulting to the surface from subsidence, occasioned by the working of the mines. Fifth. The *right of support* passes, not by implication, but only by express grant or an equivalent assurance; but *intent to pass it* may be disclosed by necessary implication, arising from express language, relating to the surface or right of support. The clause in the deed under consideration here, relied upon as passing the right of support, wholly fails to comply with these conditions and requirements. I think I made it clear in my former opinion that that clause has another purpose and stated what its office is. No attempt to get rid of that exposition of its purpose has been made; and I, therefore, consider it unnecessary to say anything more on that branch of the subject, except that the cases herein reviewed overwhelmingly sustain the proposition that it must be subordinated to the general intent shown by the deed, whenever that can be done. I have plainly demonstrated how it can be done.

But it is said this doctrine leads to an absurdity, for condi-

tions may be such as to require the whole of the coal to be
left for the support of the surface. In one or two cases I
have examined, the court has ventured to say that, if the deed
conferred no right to disturb the surface, and none of the
coal could be taken out without letting down the surface,
then it must all be left; but it is a mere dictum. The cases
in which the statement has been made presented no such
question for decision. This hypothesis puts an extreme case,
such as is not likely ever to be found in this State, and occurs
rarely, if ever, elsewhere. General rules and laws are
neither founded upon, nor controlled by, such exceptional
conditions. The law assumes that contracting parties will
be governed by reason, common-sense and their knowledge of
conditions. If the coal lies under a thin stratum of earth,
such as must come down on removal of any of the coal, this
condition is apparent, and it is not to be assumed that a man
would do the idiotic act of buying the coal without taking, in
his deed, an express grant of the right to let down the sur-
face in taking it out. He is presumed to know the conditions,
when apparent, as well as the law. He is bound to
know both, and if he puts himself in a helpless condition by
his own contract, with knowledge both of the facts and the
law, it is beyond the power of any court to extricate him.
Hence, the effort to break down the well established law, by
the process *reductio ad absurdum*, runs counter to the law
itself, and so fails. There is one case, however, which, as
applied to china clay, expressly holds that the owner, not
having the right to disturb the surface in obtaining the min-
erals, was bound to leave every bit of it, for the reason that
none of it could be removed without tearing up, and disturb-
ing, the surface. That case is *Hext* v. *Gill*, L. R. 7 Chy.
App. 699. The Duke of Cornwall had granted the surface,
reserving to himself "all mines and minerals within and un-
der the premises with full and free liberty of ingress, egress
and regress, to dig and search for, and take, use, and work
said excepted mines and minerals." It was admitted in the
case that china clay could not be gotten without totally de-
stroying the surface. A bill, by the owner of the surface to
restrain the owner of the minerals from taking china clay,
having been dismissed by the Vice-Chancellor on the ground
that the reservation included china clay with the power to get

it, the court of appeals held "that the china clay was included in the reservations, but that the surface-owner was entitled to an injunction to restrain the owner of the minerals from getting it in such a way as to destroy or seriously injure the surface." This prevented the mining of any china clay at all *Hext* v. *Gill* has been cited with approval as a leading case from the date of the decision, 1872, down to the present time. Moreover, it post dates the decision of *Rowbotham* v. *Wilson* in which the new view as to the nature of the right of support was settled. That case is cited in the opinion. Another case somewhat similar is *Bell* v. *Wilson*, L. R. 1 Chy. App. 303, in which it was held that a deed conveying all mines and minerals, but giving no right to let down or destroy the surface, included freestone, but did not authorize the working of an open quarry on the surface, and that whatever freestone should be taken must be obtained by means of underground quarries without disturbing the surface. Viewed in the light of the nature of their respective subjects-matter and the conditions and circumstances, these two decisions show that the application of this law, in its alleged absurd aspect, operated justly, according to each party what the deed, upon a fair and reasonable construction, gave him and nothing more. In either case, to have allowed the mine owner to do what he had undertaken, would have deprived the other party of practically everything that the deed purported to vest in him. It would have left him with the legal title to a worthless thing, a surface which could not be beneficially used, and that on a bald and obviously false presumption that he had been compensated for conveying away in substance, but not technically, what, by the tenor and effect of the deed, he appeared to hold. Such is the operation of the deed now under consideration under the construction which this Court gives it. Griffin is deprived of the surface as well as the coal, notwithstanding the fact that he took the strongest possible measure for retaining it, by not referring to it in his deed in any way, except by giving certain specific and clearly defined rights and privileges in and upon it. As owner of the whole tract, he undoubtedly had title to the surface. By not, in any way, granting the surface, he felt that he must have retained it. I think he did. This decision admits that he did, but it nevertheless destroys that surface in his hands

and entertains and enforces the intolerable presumption that he has been paid for allowing this to be done. Search will be made in vain for any other decision in which such a presumption was allowed, under a deed, lease or legislative act, (and as to all of them the same principles and rules of construction now apply, *Bishop Auckland &c. Society* v. *Butterknowle Co.* 1904), which did not contain an express release from liability for damages, and, moreover, for damages for letting down the surface. The Court had to be able to see plainly that the damages contemplated by the release were that kind of damages. Where the instrument did not contain such clause of release, a provision for compensation had to affirmatively appear in the deed. In cases involving leases, the royalties stipulated for were sometimes treated as such provisions.

The decision in this case says the deed grants the right to remove all the coal, and that this grant incidentally carries with it the right to do all things which may be incidental to the exercise of that power, and therefore includes a grant of a right in the surface. I think I have effectually shown that the law does not warrant any such construction. For this purpose, I have adverted to general legal principles. But, on this very point, I have a decision which distinctly and emphatically sustains my position, and decides that the title to land, or an easement in land, does not pass, as an incident to the grant of a right merely to do an act. An Act of George II authorized certain persons to convert an existing brook into a navigable stream, and to maintain such navigation and to make such new cuts and canals as might be required for the purpose, paying compensation by annual rent or a payment in gross to any land owner for user of or damage to his land in carrying on or maintaining the said navigation, and to charge tolls for the user by the public of the said brook, cuts and canals. There was no express power given to purchase lands, and there was no reference to mines or minerals, nor any express provision for their purchase. The brook was converted into a canal. Many years afterwards the owners of the coal under the canal worked so as to cause a subsidence, and the canal owners sought an injunction to prevent them from injuring or destroying the canal by mining the coal. The court held "that the Act of George II was to be

read *as equivalent to a grant by the owners of land* over·
which the canal passed of a mere right to make and maintain
the canal as a waterway, *and not to a grant of the surface
land; and that a grant of such a right did not carry with
it, as a necessary incident, a right of support so as to prevent
the landowners from working their adjacent mines.*" It was
merely the grant of the use of a stream, a right to do certain
acts, stopping short of the use of any express words, giving,·
or purporting to give, any interest in the land.

. Having thus satisfied myself of the correctness of the po-
sition I have taken in this case, I wish slightly to qualify one
proposition asserted in my former opinion. It is there said
or intimated that a covenant not to sue, running with the
land, might be the equivalent of a grant of a right to disturb
the surface. That depends upon its terms. A covenant not
to sue for removing the coal or all the coal would not run
with the land. A covenant not to sue for damages to the
surface by subsidence, resulting from removing coal or work-
ing the mine, might be sufficient. Whatever the form, there
must be express words in the instrument from which the in-
tent to allow the surface to be let down can be ascertained.
It cannot be put in as a mere presumption, nor can any pre-
sumption against the right of support be indulged. Every
reasonable presumption and intendment in its favor must be
recognized, if the law is to be applied in accordance with the
latest and most authoritative expositions thereof.

In order to show the relevancy of some portions of the
foregoing opinion and of my original dissenting opinion, it
becomes necessary for me to call attention here to changes
that have been made, on the rehearing, in the opinion origi-
nally filed by the majority of the Court on the decision of
the case.

After the question, "Why should a different rule prevail
when a contract is for the sale of mineral below the surface?"
found in that part of Judge Mason's opinion · which was
adopted in the opinion of JUDGE McWHORTER, the following
language was, on the petition for rehearing, stricken out of
the part originally quoted and adopted:

"None are suggested by counsel, except that the courts of
England have established a differed rule, and many of the
American courts have followed these decisions. While these

decisions do not have the force of law in this State, yet they are of such character as to deserve the careful consideration of the courts. They are persuasive but are not conclusive arguments, especially should it be found that one simply leans on the other.''

After the citation of *Noonan* v. *Pardee*, 200 Pa. St., all of the following was eliminated from the part of Judge Mason's opinion which originally appeared in the opinion of JUDGE McWHORTER :

''The learned Judge in delivering the opinion of the court in this case said, 'Of course the defendant has a right to all the coal under his lot, but he had no right to take any of it if thereby necessarily the surface caved in. The measure of his enjoyment of his right must be determined by the measure of his absolute duty to the owner of the surface.' This is the English rule broadly and frankly stated, and the one which a large number of American courts have rigidly followed without question.

''So far as I have been able to ascertain the first American case announcing this rule was decided by the Supreme Court of Pennsylvania in 1871. Without giving any substantial reasons for the opinion the learned judge says, 'The English cases referred to and others which might be referred to emanate from great ability, and from a country in which mining, its consequences and effects are more practical, and the experience greater than in any other country of which we possess any knowledge. We think it safe, therefore, to follow its lead in this matter.' *Jones* v. *Wagner*, 66 Pa. State 429; 5 American Rep. 385. There are a number of other cases in Pennsylvania decided the same way.

''The same rule has been adopted in Alabama. See *Williams* v. *Gibson*, 84 Ala. 228; 5 Am. State Rep. 368, decided in 1887.

''In the case of *Marvin* v. *Brewster Iron Mining Company*, decided in 1874, and reported in 55 N. Y. 538 and 14 Am. Rep. 322, the supreme court of that state recognized this rule. See also *Ryckman* v. *Gillis*, 57 N. Y. 68 and 15 Am. Rep. 464.

''The Supreme Court of Indiana has adopted this rule in the case of *Yanders* v. *Wright*, 66 Ind. 319, also 32 Am. Rep. 109, decided in 1879.

"The same rule is adopted by the Supreme Court of Illinois. See case of *Wilms* v. *Jess*, 94 Ill. 464, and 34 Am. Rep. 242, decided in 1880.

"The supreme court of Iowa has not only approved this rule but has gone a step further and held that when one conveys land to another reserving the right to remove the underlying coal if necessary to support the surface of the soil he must leave the pillars or ribs of coal, although the reservation exempted him from any liability for injury to the surface of the land by reason of the mining operations. See *Livingston* v. *Moingona Coal Company*, 49 Iowa 369; also 31 Am. Rep. 150, decided in 1873.

"It must be conceded that plaintiff's contention is supported by many of the best American and English courts. But it will be found upon careful examination of the decisions of the American courts that they have been contented with following the dicta of the English courts. The Pennsylvania courts first adopted the English rule for the reason that the cases 'emanate from great ability, and from a country in which mining, its consequences and effects are more practical and the experience greater than in any other country of which we possess any knowledge.' And hence the court declared 'we think it safe to follow its lead.' This was the first decision of this question in this country and it is still the leading case, referred to and followed by all the other American courts, and yet no better or other reason is given for it than the court thought it safe to follow the English cases. I refer to *Jones* v. *Wagner*, 66 Pa. State 429. So that while we find many American courts following the English decisions we gain nothing from the American cases, and must look to the English cases alone for the principles upon which the decisions rest."

On the petition for rehearing, the two paragraphs near the conclusion of JUDGE McWHORTER's opinion as it now stands, commencing, respectively, "We agree with the conclusion," and "We in no sense question," were inserted as additional matter. They did not appear in the opinion, as it was originally delivered.